1  LATHAM & WATKINS LLP
   James K. Lynch (CA Bar No. 178600)
2     jim.lynch@lw.com
3  505 Montgomery Street, Suite 2000
   San Francisco, California  94111-6538
4  Telephone:  +1.415.391.0600
   Facsimile:  +1.415.395.8095
5
   LATHAM & WATKINS LLP
6     Richard P. Bress (*Pro Hac Vice* Pending)
      rick.bress@lw.com
7     Michael E. Bern (*Pro Hac Vice* Pending)
      michael.bern@lw.com
8     John S. Cooper (*Pro Hac Vice* Pending)
      john.cooper@lw.com
9  555 Eleventh Street, NW, Suite 1000
   Washington, DC  20004-1304
10 Telephone:  +1.202.637.2200
   Facsimile:  +1.202.637.2201
11

12 *Attorneys for Plaintiff*
   The American Beverage Association
13
   *Additional Counsel on Signature Page*
14

15                    UNITED STATES DISTRICT COURT

16                    NORTHERN DISTRICT OF CALIFORNIA

17

18 THE AMERICAN BEVERAGE
   ASSOCIATION, CALIFORNIA RETAILERS
19 ASSOCIATION, CALIFORNIA STATE
   OUTDOOR ADVERTISING ASSOCIATION
20

21                    Plaintiffs,

22            v.                                 Civil Action No.

23 THE CITY AND COUNTY OF SAN              **COMPLAINT FOR DECLARATORY**
   FRANCISCO,                              **AND INJUNCTIVE RELIEF**
24

25                    Defendant.

26

27

28

**INTRODUCTION**

1.      At its very core, the First Amendment forbids the government from suppressing private speech that it disagrees with, and equally forbids the government from compelling private speakers to express the government's views.

2.      This action addresses two ordinances recently enacted by the City and County of San Francisco ("the City") that violate these core principles.  The City has banned certain advertising and required on other advertising a warning label that is misleading—and, at a minimum, disputed and controversial.  The ordinances reflect the City's opinion that sugar-sweetened beverages have little or no value, and its value judgment that there is no place for them in a healthy diet and lifestyle.  No matter how zealously the City holds its views, the First Amendment forbids the City from conscripting private speakers to convey them while suppressing conflicting viewpoints on this controversial topic.

3.      The City has tried such a scheme before.  In 2010, the City required retailers to warn consumers about cell phone radiation, despite those retailers' belief that cell phone usage is not hazardous to health.  This Court preliminarily enjoined the enforcement of that ordinance on First Amendment grounds, and the Ninth Circuit affirmed that decision, and indeed expanded the scope of the preliminary injunction.  *See CTIA—The Wireless Ass'n v. City & Cnty. of San Francisco*, 827 F. Supp. 2d 1054, 1060-61 (N.D. Cal. 2011), *aff'd in part and vacated in part on other grounds*, 494 F. App'x 752 (9th Cir. 2012).  The City then agreed to a permanent injunction.

4.      The two ordinances at issue in this case demonstrate even less respect for free speech.  The ordinances not only require sugar-sweetened beverage advertisers to voice the City's controversial opinion that beverages with added sugar are uniquely harmful to health, but also ban from City property advertising promoting sugar-sweetened beverages and prohibit producers of sugar-sweetened beverages even from using their names on City property—even when promoting events or products having nothing to do with sugar-sweetened beverages.

5.      The City is free to try to persuade consumers to share its opinions about sugar-sweetened beverages.   It may, for instance, sponsor its own advertising campaign promoting

1  those opinions.  Alternatively, it could subsidize programs that promote what the City considers

2  to be a healthy diet.  Instead, the City is trying to ensure that there is no free marketplace of

3  ideas, but instead only a government-imposed, one-sided public "dialogue" on the topic—in

4  violation of the First Amendment.

5  **The Speech Ban**

6  **6.**     The first ordinance (the "Speech Ban") has two components, which suppress

7  private speech and penalize private speakers for their views on sugar-sweetened beverages.  San

8  Francisco Ordinance No. 98-15, amending S.F. Admin. Code § 4.20 (June 25, 2015),

9  https://sfgov.legistar.com/View.ashx?M=F&ID=3844152&GUID=9AEE5498-CEF5-4D66-

10  B326-48C8FD8002C4 [hereinafter "S.F. Admin. Code § 4.20" or "Ordinance 98-15" or

11  "Speech Ban"].

12  **7.**     The Speech Ban's first component prohibits advertising of sugar-sweetened

13  beverages on City property, including its buses, trains, parks, and bus stops, and other locations

14  where the City historically has allowed private parties to advertise a variety of viewpoints,

15  products, services, and events.  It exempts City properties where the City allows and benefits

16  from the production or sale of sugar-sweetened beverages.  And it explicitly permits

17  advertisements that criticize sugar-sweetened beverages or encourage people to stop drinking

18  them.  The First Amendment flatly forbids such government-imposed viewpoint discrimination.

19  **8.**     The second component of the Speech Ban goes further.  It prohibits all producers

20  of sugar-sweetened beverages—beverage manufacturers, restaurants, hotels, and department

21  stores that create beverages with added sugars (including local icons like Ghirardelli Chocolate,

22  Peet's Coffee, Jamba Juice, and Swensen's)—from using their *names* on any City property to

23  promote *any* product or *any non-charitable event*, no matter whether commercial, athletic,

24  musical, or even political in nature.

25  **9.**     This provision discriminates against certain private speakers explicitly based on

26  their identities, and prohibits them from engaging in core protected speech.  It would, for

27  instance, forbid a sugar-sweetened beverage producer from using its name in a traditional public

28  forum like Civic Center Plaza to rally political opposition to laws or politicians attacking sugar-

sweetened beverages. It would equally prevent a sugar-sweetened beverage producer from

sponsoring or otherwise promoting an event completely unrelated to sugar-sweetened

beverages—such as a parade on city streets or a conference on an unrelated topic like water

sustainability or fair labor practices. Under hornbook First Amendment law, this speech restraint

is unlawful and irreparably overbroad.

10. The Effective Date of the Speech Ban is July 25, 2015—thirty days after its

enactment on June 25, 2015.

**The Warning Mandate**

11. The second ordinance ("the Warning Mandate") also violates core First

Amendment principles, by compelling sugar-sweetened beverage advertisers to broadcast the

City's controversial, negative opinions about their products. The Warning Mandate violates

private speakers' constitutional right to decide for themselves what to say, and what not to say.

San Francisco Ordinance No. 100-15, adding art. 42, div. I, §§ 4200-4206 to San Francisco

Health Code (June 25, 2015), *available at*

https://sfgov.legistar.com/View.ashx?M=F&ID=3844184&GUID=59549F25-8D8A-4E07-

BE7D-D1683A53BEAE [hereinafter "S.F. Health Code §§ 4200-4206" or "Ordinance 100-15"

or "Warning Mandate"].

12. The Warning Mandate requires anyone who produces, distributes, or advertises

sugar-sweetened beverages to display prominently on many advertisements a massive message

stating: "WARNING: Drinking beverages with added sugar(s) contributes to obesity, diabetes,

and tooth decay. This is a message from the City and County of San Francisco." S.F. Health

Code § 4203(a). This warning must cover at least 20% of the advertisement and be enclosed in a

rectangular border the same color as the warning. *Id.* § 4203(b).

13. The Warning Mandate requires private speakers to convey, regardless of their

own views, the City's controversial and misleading opinion that certain beverages with added

sugar are inherently hazardous, more harmful to consumers' health than beverages with natural

sugar or foods with added sugar, and uniquely responsible for increasing rates of obesity

and diabetes.

**14.** This message conflicts with the findings of United States Department of Agriculture researchers and other experts, who have concluded that added sugar and natural sugar are metabolized in identical ways.

**15.** It also conflicts with the conclusions of respected health organizations such as the Academy of Nutrition & Dietetics (formerly the American Dietetic Association), which have issued dietary recommendations concluding that sugar-sweetened beverages—like countless other foods and beverages, including pizza, cookies, apple juice, hamburgers, ice cream, and burritos—may be consumed as part of a healthy diet and lifestyle.

**16.** The City's mandated warning nonetheless singles out sugar-sweetened beverages among all foods and beverages, and conveys the misleading and controversial view that they are hazardous in any quantity and more hazardous to health than any other food or beverage about which the City requires no warning.

**17.** The City's mandated warning ignores the fact that, while Americans consume many more calories today than in the past and rates of obesity and diabetes are on the rise, sugar-sweetened beverage consumption has decreased substantially over the last 15 years.

**18.** The Warning Mandate exempts all newspaper, television, magazine, radio, internet, circular, or other electronic media advertisements. Its narrow scope ensures that the Warning Mandate will accomplish little other than harming outdoor advertisers and other covered media by incentivizing those who promote sugar-sweetened beverages to switch to exempt alternatives.

**19.** The Warning Mandate grants the Director of Public Health unlimited discretion, following a publicly noticed hearing: (1) to modify the text of the Warning, (2) to set, and later modify the size of the text of the Warning, (3) to modify the minimum area that the Warning must cover, and (4) to issue implementing guidelines.

**20.** The Warning Mandate becomes operative on July 25, 2016.

**21.** Together, the Speech Ban and Warning Mandate seek to replace the free marketplace of ideas with a single government-imposed viewpoint. Private speakers who disagree with this viewpoint must stop speaking, parrot the government's opinions, or pay a fine.

22. The City apparently mistrusts the people's competence to hear competing views about sugar-sweetened beverages and decide for themselves whether or how to consume them. But the First Amendment, not the City, sets the bounds for public debate on controversial subjects. "The choice 'between the dangers of suppressing information, and the dangers of its misuse if it is freely available' is one that 'the First Amendment makes for us.'" *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2671 (2011) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976)).

23. The Speech Ban and Warning Mandate violate the First Amendment and Due Process Clause and should be struck down.

24. Plaintiffs, by their undersigned attorneys, further state as follows:

### NATURE OF THE ACTION

25. This is a civil action under 42 U.S.C. § 1983. Plaintiffs seek, under 28 U.S.C. §§ 2201-02, a declaration that the two ordinances ("the Ordinances") violate the First Amendment and/or the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs also seek injunctive relief, restraining the City and its officers, employees, and agents from enforcing or threatening to enforce any part of the Ordinances against Plaintiffs and any of Plaintiffs' members.

### JURISDICTION AND VENUE

26. This Court has jurisdiction over this action under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States.

27. The City is subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure § 410.10, because the City is located in the State of California and/or caused harm by acts that occurred in the State of California.

28. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2), because the City is located within this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

**INTRADISTRICT ASSIGNMENT**

29. Pursuant to Civil Local Rule 3-2(c), this action should be assigned to the San Francisco Division of this Court because a substantial part of the events giving rise to Plaintiffs' claims for relief occurred in the City.

**PARTIES**

30. The American Beverage Association ("ABA") is a national trade organization representing the non-alcoholic beverage industry, including beverage producers, distributors, franchise companies, and support industries. ABA members bring to market beverages including carbonated soft drinks, bottled water (including still water, mineral water, and artesian water), sports drinks, energy drinks, 100% juices, juice drinks, and ready-to-drink teas. These products are sold in various sizes with labels that provide nutritional information (including calories and total sugar) enabling consumers to make informed beverage choices. Numerous ABA members—including The Coca-Cola Company, PepsiCo, and Dr Pepper—advertise in the City and use their brand names to promote events in the City, including on property owned or controlled by the City. For example, ABA members maintain advertisements on numerous transit shelters throughout the City, and have sponsored the Chinese New Year Festival and Parade and the San Francisco Recreation & Parks Department Mobile Recreation Program. This action is germane to the purpose of ABA and neither the claims asserted nor the relief requested require the participation of its members.

31. The California Retailers Association ("CRA") is a statewide trade association representing all segments of the retail industry including general merchandise, department stores, mass merchandisers, fast food restaurants, convenience stores, supermarkets and grocery stores, chain drug, and specialty retail, such as auto, vision, jewelry, hardware and home stores. CRA members advertise in the City, and use their names to promote events in the City, including on property owned or controlled by the City. This action is germane to the purpose of CRA and neither the claims asserted nor the relief requested require the participation of its members.

32. The California State Outdoor Advertising Association ("CSOAA") is a statewide trade association representing the interests of outdoor advertisers in the California Legislature

1   and in local governments across the state. CSOAA's membership comprises 14 outdoor

2   advertising companies—including OutFront Media—and more than 20 affiliate members.

3   CSOAA members make advertising space available and exercise editorial content over

4   advertisements, including in the City and on City property. This action is germane to the

5   purpose of CSOAA and neither the claims asserted nor the relief requested require the

6   participation of its members.

7       **33.**    The City is a municipal corporation located in the State of California. It exercises

8   local government powers under state law.

9                           **LEGAL BACKGROUND**

10      **34.**    The First Amendment and Due Process principles outlined in this section frame

11  the constitutional issues central to this dispute.

12      **35.**    *First,* the government cannot prohibit speech, even in a forum of its own creation,

13  on the basis of viewpoint or where unreasonable in light of the purposes of the forum. *Seattle*

14  *Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 496-99 (9th Cir. 2015) [hereinafter

15  *SeaMAC*]; *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("Content-based

16  laws—those that target speech based on its communicative content—are presumptively

17  unconstitutional and may be justified only if the government proves that they are narrowly

18  tailored to serve compelling state interests.").

19      **36.**    *Second*, laws compelling speech ordinarily receive strict scrutiny. *See Wooley v.*

20  *Maynard*, 430 U.S. 705, 715-16 (1977). With the exception of required disclosures of purely

21  factual and noncontroversial information necessary to redress what would otherwise be

22  fraudulent or deceptive advertisements, *see Zauderer v. Office of Disciplinary Counsel*, 471 U.S.

23  626, 651 (1985), laws compelling commercial speech receive at least heightened scrutiny, *i.e.*,

24  they are prohibited if they do not directly and materially advance the government's interest, or

25  are more extensive than necessary. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447

26  U.S. 557, 566 (1980); *CTIA—The Wireless Ass'n*, 827 F. Supp. 2d at 1060-61; *see also Entm't*

27  *Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) ("The sticker ultimately

28

1  communicates a subjective and highly controversial message . . . .  [Thus], we must apply strict

2  scrutiny . . . .”).

3       **37.**    *Third*, a law that “fails to provide a person of ordinary intelligence fair notice of

4  what is prohibited, or is so standard-less that it authorizes or encourages seriously discriminatory

5  enforcement,” is unconstitutionally vague.  *United States v. Williams*, 553 U.S. 285, 304 (2008).

6  Vagueness in a law that restricts speech is particularly disfavored.  “When speech is involved,” a

7  more “rigorous adherence to [the requirement that a law provides fair notice of what is

8  prohibited] is necessary to ensure that ambiguity does not chill protected speech.”  *FCC v. Fox*

9  *Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).

10                                      **FACTUAL BACKGROUND**

11      **38.**    Over the past several decades, nutrition scientists have markedly shifted their

12  views regarding what is and is not part of a healthy diet.

13      **39.**    Researchers’ continually evolving views regarding optimal diets are debated and

14  frequently revised.  The dietary villains of one era frequently are revealed as the dietary saviors

15  of the next.  Likewise, foods and beverages Americans were once encouraged to consume

16  become disfavored—and sometimes later favored once again.

17      **40.**    In the 1980s, for example, Americans were urged to make grains—particularly

18  pasta, rice, bread, and cereal—the centerpiece of their diets, until government nutrition scientists

19  later reversed course.  *See, e.g.*, Cheryl Achterberg, *Government Food Cops Are Out to Lunch*,

20  Wall St. J., Feb. 26, 2015, http://www.wsj.com/articles/cheryl-achterberg-government-food-

21  cops-are-out-to-lunch-1424997724 (noting that “people were encouraged to make bread, cereal,

22  rice, and pasta the foundation of their diets—until told not to”).

23      **41.**    For several decades, dietary guidelines urged Americans to significantly reduce

24  fat consumption; but nutrition scientists have since substantially retreated from that view.  *See,*

25  *e.g.,* Allison Aubrey, *Don’t Fear The Fat: Experts Question Saturated Fat Guidelines*, NPR

26  (Mar. 17, 2014), http://www.npr.org/sections/thesalt/2014/03/17/290846811/dont-fear-the-fat-

27  experts-question-saturated-fat-guidelines (“[A]uthors of a new meta-analysis published in the

28

1   *Annals of Internal Medicine* conclude that there's insufficient evidence to support the long-

2   standing recommendation to consume saturated fat in very low amounts.").

3          42.      Nutrition scientists also told Americans for years to avoid foods high in

4   cholesterol, like eggs and butter.  But by the mid-2000s, research "showed there was no

5   association between cholesterol-containing foods and blood cholesterol content, and specifically

6   ruled out eggs as a problem."  Maryn McKenna, *No Yolk: USDA May Put Eggs Back on the*

7   *Menu*, Nat'l Geographic: The Plate (Feb. 19, 2015),

8   http://theplate.nationalgeographic.com/2015/02/19/ok-cholesterol/.  In 2015, the government

9   "abandon[ed] its almost 40-year war against cholesterol in food."  *Id.*

10         43.      The government long "has advised Americans that they are eating too much salt,

11  and that this excess contributes yearly to the deaths of tens of thousands of people."  Peter

12  Whoriskey, *More scientists doubt salt is as bad for you as the government says*, Wash. Post:

13  Wonkblog (Apr. 6, 2015),

14  http://www.washingtonpost.com/blogs/wonkblog/wp/2015/04/06/more-scientists-doubt-salt-is-

15  as-bad-for-you-as-the-government-says/.  But "according to studies published in recent years by

16  pillars of the medical community, the low levels of salt recommended by the government might

17  actually be dangerous."  *Id.*; *see id.* (noting that government's recommendation "has come under

18  assault by scientists who say that typical American salt consumption is without risk").

19         44.      As nutrition science evolves, "[o]netime good guys, like margarine and pasta,

20  have been recast as villains."  Other "[n]utritional bad guys that have fallen from grace in the

21  national consciousness—white potatoes, eggs, nuts, iceberg lettuce—have been redeemed years

22  later."  Heather Tirado Gilligan, *Nutritional Science Isn't Very Scientific*, Slate.com (Apr.

23  12, 2015),

24  http://www.slate.com/articles/life/food/2015/04/nutritional_clinical_trials_vs_observational_stud

25  ies_for_dietary_recommendations.single.html; *see also* Kelsey Gee, *Butter Makes Comeback as*

26  *Margarine Loses Favor*, Wall St. J., June 25, 2014, http://www.wsj.com/articles/butter-makes-

27  comeback-as-margarine-loses-favor-1403745263 ("In the 60s and 70s, before trans fats were

28  really thought to be bad, we looked at margarine and said it was healthier because it didn't have

1   as much saturated fat.  The opposite is the case today." (citation and internal quotation

2   marks omitted)).

3         **45.**    In short, "accepted" nutritional science is continually evolving; it is complicated,

4   often controversial, and subject to contentious debate.  And once-firm conclusions are frequently

5   rethought and revised or discarded years later as scientists learn more about the complicated

6   interaction of discrete dietary choices on our overall health and well-being.

7         **The City's Current Opinions Regarding Sugar-Sweetened Beverages Are Controversial,**

8                            **Incomplete, And Misleading**

9         **46.**    The impact of added sugar on the consumer diet—like the impact of fat,

10   cholesterol, salt, carbohydrates, coffee, and countless other foods—is the subject of

11   scientific dispute.

12         **47.**    For instance, the medical journal *Diabetes Care* recently commissioned a point-

13   counterpoint "debate" on the "controversy in regards to sugar-sweetened drinks."  William T.

14   Cefalu, American Diabetes Association, *A 'Spoonful of Sugar' and the Realities of Diabetes*

15   *Prevention*, 37 Diabetes Care 906, 908 (2014), *available at*

16   http://care.diabetesjournals.org/content/37/4/906.full.pdf+html.  Critics of sugar offered their

17   opinion, while other prominent scientists argued that "there is no direct evidence that sugar itself,

18   in liquid or solid form, causes an increase in appetite, decreases satiety, or causes diabetes. . . .

19   [I]f there are any adverse effects of sugar, they are due entirely to the calories it provides, and it

20   is therefore indistinguishable from any other caloric food."  *Id*.  According to the journal's

21   editor-in-chief, "both author groups clearly defend their positions, and in this regard, it is

22   obvious we have more work to do to fully understand this area of research."  *Id*.

23         **48.**    Similarly, the Obesity Society's annual meeting recently featured a keynote

24   "debate" between well-known scientists over "the role of sugar-sweetened beverages in the

25   development of obesity" and related conditions.  D.A. York, Sugar-Sweetened Beverages, 14

26   Obesity Reviews 605, 605 (2013).  The debate was re-published in the scientific literature so that

27   "each reader [could] evaluate the evidence and come to their own conclusions."  *Id*.

28

49.     A recent review of the scientific literature by scientists from the U.S. Department of Agriculture and several research universities concluded that the "debates rage on, even though it is clear that public policy in such an important area should not be made in the absence of higher levels of proof than are currently available." D.M. Klurfeld et al*., Lack of Evidence for High Fructose Corn Syrup as the Cause of the Obesity Epidemic*, 37 Int'l J. of Obesity 771, 772 (2013), *available at* http://www.nature.com/ijo/journal/v37/n6/pdf/ijo2012157a.pdf.

50.     Sustained overconsumption of calories from any source—whether sugar-sweetened beverages, ice cream, pizza, hot dogs, or pasta—without offsetting physical activity can contribute to weight gain and its associated negative health consequences. But the City's opinion about a unique connection between sugar-sweetened beverages and obesity, diabetes, and tooth decay is controversial.

51.     During hearings before the City's Board of Supervisors, the co-sponsors of the Ordinances solicited comments from various presenters in support of the bill. Among other things, these presenters stated that (1) "sugary drinks are categorically different than foods with some sugar," (2) "sugary drinks … spike blood sugar heavily and overwhelm the liver and pancreas, leading to diabetes," and (3) the scientific view that "calories in equals calorie out" is "absurd." Video of San Francisco Board of Supervisors Meeting: Health Code – Sugar-Sweetened Beverage Warning for Advertisements at 21:10 (June 9, 2015), *available at* http://sanfrancisco.granicus.com/MediaPlayer.php?view_id=10&clip_id=23003.

52.     However, researchers at the University of North Carolina Department of Medicine and McMaster University Faculty of Health Sciences recently summarized the literature and found "that there is no clear or convincing evidence that any dietary or added sugar has a unique or detrimental impact relative to any other source of calories on the development of obesity or diabetes." Richard Kahn & John L. Sievenpiper, *Dietary Sugar & Body Weight: Have We Reached a Crisis in the Epidemic of Obesity and Diabetes? We Have, But the Pox on Sugar is Overwrought and Overworked*, 37 Diabetes Care 957, 961 (2014), *available at* http://care.diabetesjournals.org/content/37/4/957.full.pdf+html. Instead, they concluded that

1  "[e]xcess total energy consumption seems far more likely to be the cause of obesity and

2  diabetes." *Id*.

3      **53.**     During the hearings, one presenter stated that "liquid sugar, as we know it, the

4  consensus would be clear, is toxic to us."

5      **54.**     However, a recent review by a leading United States Department of Agriculture

6  scientist concluded that "there is no credible evidence that added sugar or any single saccharide

7  is toxic." David Klurfeld, *What Do Government Agencies Consider in the Debate Over Added*

8  *Sugars*, 4 Advances in Nutrition 257, 259 (2013), *available at*

9  http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3649106/pdf/257.pdf; *see also* Cefalu, 37

10  Diabetes Care at 908 (noting prominent scientists who argued that "there is no direct evidence

11  that sugar itself, in liquid or solid form, causes an increase in appetite, decreases satiety, or

12  causes diabetes").

13      **55.**     The City's *opinion* is that added sugars contribute more to obesity, diabetes, and

14  tooth decay than sugars inherently in or naturally present in food (e.g., as in 100% fruit juice).

15      **56.**     However, the Academy of Nutrition & Dietetics (formerly the American Dietetic

16  Association) has concluded that the "[h]uman metabolism does not distinguish between sugars

17  found in a food and those added to the food. . . . Fructose is absorbed, digested, and metabolized

18  in an identical manner no matter what the source." Valerie B. Duffy, Position of the American

19  Dietetic Association: Use of Nutritive and Nonnutritive Sweeteners, 104 J. Am. Dietetic Ass'n.

20  255, 259 (2004), *available at* http://www.andjrnl.org/article/S0002-8223(03)01658-4/pdf.

21      **57.**     In addition, a review sponsored by the World Health Organization concluded that

22  "the link [of added sugars to] obesity is tenuous," the evidence has a "high" risk of bias, studies

23  showing media-worthy effects may be more likely to be published than those showing no such

24  effects, and the quality of much of the data is "low." Lisa Te Morenga et al., *Dietary sugars and*

25  *bodyweight: Systematic Review and Meta-Analyses of Randomised Controlled Trials and Cohort*

26  *Studies*, Brit. Med. J. 4-8 (2013); World Health Organization, Draft Guidelines on Free Sugars

27  Released for Public Consultation, Annex 1, 2014, *available at*

28  http://www.bmj.com/content/346/bmj.e7492.full.pdf+html; World Health Organization,

1   *Guideline: Sugars intake for adults and children,* Annex 1: GRADE evidence profiles at 21

2   (2015), *available at* http://apps.who.int/iris/bitstream/10665/149782/1/9789241549028_eng.pdf.

3          **58.**     The City's *opinion* is that any consumption of sugar-sweetened beverages

4   contributes to obesity, diabetes, and tooth decay.  The City's proposed warning label tells

5   consumers, without limitation, that "[d]rinking beverages with added sugar(s) contributes to

6   obesity, diabetes, and tooth decay."  S.F. Health Code § 4203(a).

7          **59.**     The United States Dietary Guidelines do not support that view.  The guidelines

8   recommend only that Americans consume less than 70 teaspoons of added sugar per week.  The

9   guidelines also state that in a diet where "total calorie intake [is held] constant, there is little

10  evidence that any individual food groups or beverages have a unique impact on body weight."

11  Food and Nutrition Service, USDA, *Dietary Guidelines for Americans 2010* at 15 (2010),

12  *available at* http://www.health.gov/dietaryguidelines/dga2010/dietaryguidelines2010.pdf.  As the

13  City has acknowledged, a single 12-ounce can of full-calorie soda contains eight to ten teaspoons

14  of sugars.

15         **60.**     Many experts believe, therefore, that sugar-sweetened beverages may be

16  consumed as part of a healthy diet and exercise regime, without contributing to negative

17  health outcomes.

18         **61.**     The City's *opinion* is that sugar-sweetened beverage consumption per se is a

19  unique factor in rising rates of diabetes and obesity in America.

20         **62.**     In 1970, Americans consumed an estimated 2,109 calories from all sources per

21  person per day.  By 2010, they consumed an estimated 2,568 calories daily—over 20% more

22  calories each day.  U.S. Department of Agriculture, Economic Research Service, *Food*

23  *Availability and Consumption: Close to half of Americans' calories come from grain products*

24  *and fats/oils*, http://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-

25  essentials/food-availability-and-consumption.aspx (last updated May 19, 2014).  As the amount

26  of total calories consumed by Americans each day has increased, the prevalence of obesity and

27  Type II diabetes among Americans has increased.

28

63.     Over the last fifteen years, however, consumption of sugar from sugar-sweetened beverages has significantly decreased on a per capita basis in the United States.

64.     According to federal nutrition data published in the American Journal of Clinical Nutrition, between 1999 and 2008 alone, sugar intake from sugar-sweetened beverages decreased by 37% among people aged two and older.  Jean A. Welsh et al., *Consumption of added sugars is decreasing in the United States*, 94 Am. J. Clinical Nutrition 726, 728 (2011), *available at* acjn.nutrition.org/content/94/3/726.full.pdf.

65.     The same study also found that "the consumption of added sugars in the United States decreased between 1999-2000 and 2007-2008, primarily because of a reduction in soda consumption." *Id.* at 726.

66.     During that same time period, in which sugar-sweetened beverage consumption was decreasing significantly, Type II diabetes and obesity rates increased.  For example, federal data show that obesity rates continued to rise through 2012, the most recent year for which figures are available.  Lin Yang & Graham A. Colditz, Letter, *Prevalence of Overweight & Obesity in the United States, 2007-2012*, JAMA Internal Medicine (2015).

67.     Sugar-sweetened beverage consumption is also decreasing among children.

68.     From 2003-2004 to 2009-2010, the percentage of calories in children's diets from sugar-sweetened beverages decreased by nearly one-third.  Meghan M. Slining et al., *Trends in Food and Beverage Sources among US Children and Adolescents: 1989-2010*, 13 J. Acad. Nutrition & Dietetics 1683-94 (2013).

69.     The percentage of calories in children's diets from sugar-sweetened beverages was lower in 2009-2010 than it was in 1989-1991.  *See id.*

70.     During that same time period, the percentage of calories in children's diets from desserts, snacks, and candy has increased by one-third.  *See id.*

71.     In 2009-2010, children consumed almost three times as many calories from desserts, snacks, and candy as they did from sugar-sweetened beverages.  *See id.*

72.     Although sugar-sweetened beverage consumption is declining, while overall consumption of calories and other sources of sugar is increasing, the City's Ordinances target only sugar-sweetened beverages and those who produce, sell, or advertise them.

### The Ordinances Suppress Speech Promoting Sugar-Sweetened Beverages While Compelling Private Speakers To Voice The City's Negative Opinions About Sugar-Sweetened Beverages

73.     The Speech Ban, Ordinance No. 98-15, amends Section 4.20 of the City's Administrative Code "to prohibit advertising of sugar-sweetened beverages on City property."  It also prohibits any company that produces sugar-sweetened beverages from using its name, or the name of any sugar-sweetened beverage, to promote any product or non-charitable event—whether commercial, athletic, cultural, or even political—"on property owned by or under the control of the City and County of San Francisco."  S.F. Admin. Code § 4.20(b).  The Speech Ban has no statement of purpose.

74.     The Warning Mandate, Ordinance 100-15, amends the City Health Code "to require advertisements for sugar-sweetened beverages to include a warning about the harmful health effects of consuming such beverages."

75.     Specifically, the Warning Mandate requires anyone who produces, distributes, or advertises sugar-sweetened beverages to include the following warning on many advertisements in the City: "WARNING: Drinking beverages with added sugar(s) contributes to obesity, diabetes, and tooth decay.  This is a message from the City and County of San Francisco."  S.F. Health Code § 4203(a).  This warning must cover at least 20% of the advertisement and be enclosed in a rectangular border the same color as the warning.

76.     Both Ordinances define "sugar-sweetened beverage" as any "Nonalcoholic Beverage sold for human consumption that has one or more added Caloric Sweeteners and contains more than 25 calories per 12 ounces of beverage, or any powder or syrup with added Caloric Sweetener that is used for mixing, compounding or making Sugar-Sweetened Beverages."  S.F. Admin. Code § 4.20(e); S.F. Health Code § 4202(f).  The City's

1    definition of a sugar-sweetened beverage thus would label even beverages defined as "low-

2    calorie" by FDA regulations as contributing to obesity.  *See* 21 C.F.R § 101.60(i)(A).

3         77.    This definition excludes milk—which the Ordinance defines to include "flavored

4    milk containing no more than 40 grams of total sugar (naturally occurring and from added

5    Caloric Sweetener) per 12 ounces"; "[m]ilk alternatives"; "[a]ny beverage that contains solely

6    100 percent Natural Fruit Juice, Natural Vegetable Juice, or a combined Natural Fruit Juice and

7    Natural Vegetable Juice"; "product[s] sold for consumption by infants"; "[m]edical [f]ood";

8    "[a]ny product designed as supplemental, meal replacement, or sole-source nutrition"; "[a]ny

9    product sold in liquid form designed for use as an oral nutritional therapy"; and "[a]ny product

10   sold in liquid form designed for use for weight reduction."  S.F. Admin. Code § 4.20(e); S.F.

11   Health Code § 4202(e).

12   **The Speech Ban Suppresses Speech And Speakers That Contradict The City's Views And**

13   **Favors Speech That Agrees With The City's Views**

14        78.    The Speech Ban prohibits most "advertising" of sugar-sweetened beverages on

15   property owned by or under the control of the City ("City property").  But it specifically exempts

16   any advertising designed to "communicate the health hazards of . . . Sugar-Sweetened

17   Beverages" or "encourage people . . . to stop drinking . . . Sugar-Sweetened Beverages."  S.F.

18   Admin. Code. § 4.20(b).  It also exempts advertising promoting sugar-sweetened beverages on

19   City properties where the City operates or licenses restaurants, concerts, sports venues, or other

20   facilities or events where sugar-sweetened beverages are sold or produced.  In effect, it prohibits

21   all favorable advertising for sugar-sweetened beverages on City property except where the City

22   allows and benefits from the sale or production of sugar-sweetened beverages.

23        79.    The Speech Ban further prohibits "the placement of . . . the name of a company

24   producing Sugar-Sweetened Beverages, or the name of any . . . Sugar-Sweetened Beverages, in

25   any promotion of any event or promotion of any product or beverage on property owned by or

26   under the control of" the City, excepting solely "the inclusion of the name of a company

27   producing Sugar-Sweetened Beverages, or a charitable foundation containing any such

28   company's name, on signage listing sponsors of a charitable event occurring on City property."

1     *Id.* The wide variety of companies that produce (or may produce) sugar-sweetened beverages,

2     *see infra* ¶¶ 97, 110, thus cannot advertise any product—even low-calorie or calorie-free

3     products—on City property if the company's name appears on the advertisement. They equally

4     cannot promote any non-charitable political, cultural, educational, athletic, or commercial events

5     on City property if the company's name appears in the promotion.

6     *The City Properties Affected By The Speech Ban—Properties Used For Private Advertising—Are*

7     *Limited Public Forums*

8     **80.** The City properties on which Plaintiffs' speech will be banned are all either

9     traditional public forums, in which speech is permitted virtually free of government restriction,

10     or at least "limited public forums."

11     **81.** When the government leases its property for private advertising, it creates at least

12     a limited public forum. *SeaMAC,* 781 F.3d at 496-97. For example, the City allows private

13     advertising on and in certain City properties, including its buses, light rail vehicles, trolleys,

14     stations, garages, public benches, and cable cars, utility poles, the San Francisco International

15     Airport ("SFO"), and the Moscone Convention Center.

16     **82.** Even in a limited public forum, any subject-matter or speaker limitations must be

17     viewpoint neutral and reasonable. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of*

18     *Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content

19     discrimination. The government must abstain from regulating speech when the specific

20     motivating ideology or the opinion or perspective of the speaker is the rationale for the

21     restriction. These principles provide the framework forbidding the State from exercising

22     viewpoint discrimination, even when the limited public forum is one of its own creation."

23     (citation omitted)); *SeaMAC,* 781 F.3d at 496 (noting reasonableness inquiry "focuses on

24     whether the exclusion is consistent with 'limiting [the] forum to activities compatible with the

25     intended purpose of the property'" (alteration in original) (citation omitted)).

26     *The Speech Ban's Advertising Prohibition Is Not Viewpoint Neutral*

27     **83.** The Speech Ban discriminates facially between competing viewpoints, in

28     violation of the First Amendment, by expressly prohibiting advertising on City property designed

1   to promote or encourage people to drink sugar-sweetened beverages, while expressly allowing

2   advertising designed to criticize or discourage people from drinking sugar-sweetened beverages.

3        **84.**     Among other things, it prohibits advertising designed to communicate that sugar-

4   sweetened beverages may be consumed as part of a healthy diet, oral hygiene, and lifestyle,

5   while permitting advertising communicating that sugar-sweetened beverages are inherently

6   hazardous to health.

7   *The Speech Ban's Advertising Prohibition Is Not Reasonable In Light Of The Intended Purposes*

8   *Of The Covered Property*

9        **85.**     The Speech Ban prohibits advertising promoting sugar-sweetened beverages in

10   properties where the City otherwise permits private advertising.

11        **86.**     The City permits the consumption of sugar-sweetened beverages at most of

12   these properties.

13        **87.**     The City allows and benefits from the sale of sugar-sweetened beverages in

14   certain of its properties, and the Speech Ban contains an express exemption allowing advertising

15   promoting sugar-sweetened beverages in those properties.

16        **88.**     Advertising for sugar-sweetened beverages is compatible with the intended

17   purposes of the City's properties in which it otherwise permits private advertising.

18        **89.**     Advertising sugar-sweetened beverages does not harm, disrupt, or interfere with

19   the purposes of the properties on which the City otherwise permits private advertising.

20   *The Speech Ban Impermissibly Discriminates Based On The Identity and Viewpoint Of The*

21   *Speaker*

22        **90.**     The Speech Ban discriminates against speech based on the identity of the

23   speaker, in violation of the First Amendment, by expressly prohibiting speech that includes the

24   name of any sugar-sweetened beverage producer.

25        **91.**     This name ban also violates the First Amendment by discriminating against

26   certain views—the promotion of sugar-sweetened beverages and the belief that sugar-sweetened

27   beverages may be consumed consistent with a healthy diet and lifestyle.

28

92. As the Supreme Court has recognized, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Reed*, 135 S.Ct. at 2230 (alteration in original) (citation omitted). The Court generally has insisted that "laws favoring some speakers over others demand strict scrutiny when the [government's] speaker preference reflects a content preference." *Id.* (citation omitted). The Speech Ban's prohibition on sugar-sweetened beverage producers' use of their own names facially discriminates against their speech based on their identities, in violation of the First Amendment, by expressly prohibiting speech that includes the name of any sugar-sweetened beverage producer.

*The Speech Ban's Prohibition On Sugar-Sweetened Beverage Producers' Use Of Their Own Names Is Not Reasonable In Light Of The Covered Properties' Purposes*

93. Use of sugar-sweetened beverage producers' names in promotions of events on City property is not incompatible with the intended purposes of the covered properties on which the City otherwise permits private advertising.

94. The City permits the consumption of sugar-sweetened beverages on City properties where the Speech Ban applies.

95. Use of sugar-sweetened beverage producers' names in promotions of events on City property does not harm, disrupt, or interfere with the purposes of the properties on which the City otherwise permits private advertising or promotions.

*The Speech Ban's Prohibition On Sugar-Sweetened Beverage Producers' Use Of Their Own Names Imposes An Unconstitutional Prior Restraint*

96. The Speech Ban prohibits the placement of the name of any company producing sugar-sweetened beverages "in *any* promotion of any event" on City property—exempting only "the inclusion of the name of a company producing Sugar-Sweetened Beverages, or the name of a charitable foundation containing any such company's name, on signage listing sponsors of a charitable event occurring on City property." S.F. Admin. Code § 4.20(b) (emphasis added).

97. The Speech Ban thus prohibits companies such as The Coca-Cola Company, PepsiCo, Dr Pepper, Starbucks, Peet's Coffee and Tea, Seven-Eleven, Jamba Juice, or

1    Ghirardelli Chocolate from using their names to sponsor events in the City's parks, streets, and

2    public plazas.

3          **98.**    The Speech Ban prohibits these companies from using their names in those

4    forums to promote a wide variety of events, including events featuring core political speech, such

5    as a rally in opposition to laws targeting sugar-sweetened beverages or a political event for

6    candidates opposed to laws targeting sugar-sweetened beverages.  It would even prevent sugar-

7    sweetened beverage producers from using their names to sponsor or otherwise promote events

8    completely unrelated to sugar-sweetened beverages—including parades on city streets and

9    conferences on unrelated topics like water sustainability or fair labor practices.

10         **99.**    The Speech Ban also prohibits named sponsorship of countless other non-

11   commercial events—prohibiting companies that produce sugar-sweetened beverages from using

12   their names to promote athletic events in City parks, cultural, professional or political events in

13   City-owned buildings, and more, unless the City determines—in the exercise of its discretion—

14   to permit the sale or production of sugar-sweetened beverages at those events.

15         **100.**   The Speech Ban also prohibits other core non-commercial speech.  For instance, it

16   prohibits anyone from advocating in an advertisement on City property the viewpoint that

17   consumption of sugar-sweetened beverages is compatible with a healthy lifestyle.  Such speech

18   is entitled to heightened First Amendment protection.  *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind*

19   *of N.C., Inc.*, 487 U.S. 781, 796 (1988) (applying "test for fully protected expression" where

20   commercial speech is "inextricably intertwined with otherwise fully protected speech").

21         **101.**   By preventing Plaintiffs from using their names to sponsor products and events,

22   and preventing them from promoting their views about the compatibility of sugar-sweetened

23   beverages with a healthy lifestyle, the Speech Ban imposes an unlawful prior restraint that will

24   significantly infringe on Plaintiffs' non-commercial speech rights.

25

26

27

28

*The  Speech Ban's Prohibition On Sugar-Sweetened Beverage Producers' Use Of Their Own*

*Names Impermissibly Restricts Commercial Speech In Traditional Public Forums*

**102.**     The Speech Ban unreasonably prohibits companies producing sugar-sweetened beverages from engaging in commercial speech at events (like product giveaways and contests) in traditional public forums throughout the City, such as its public plazas and parks.

**103.**     The Speech Ban is not limited to commercial speech relating to sugar-sweetened beverages.  Rather, it prohibits companies producing sugar-sweetened beverages from using their names to promote events relating to products with no added sugars, such as bottled water, 100% juice and diet soda.

**104.**     The Speech Ban will significantly infringe on Plaintiffs' commercial speech rights.

*The Speech Ban Also Fails Intermediate Scrutiny Under* Central Hudson

**105.**     Even under *Central Hudson*, the Speech Ban would violate the First Amendment.

a.     The City lacks a substantial interest in suppressing on certain City properties speech promoting sugar-sweetened beverages that it permits on other City properties where it allows and benefits from the production or sale of such beverages.

b.     By exempting advertisements for numerous other foods and beverages containing the same or more sugar from the scope of the Speech Ban, and excluding significant amounts of City property from the operation of the Speech Ban, the law does not directly and materially advance the government's interest.

c.     The Speech Ban is also more extensive than is necessary to serve the government's interest.  Rather than effectively communicating its own opinions about sugar-sweetened beverages, the City has imposed through the Speech Ban an excessive restraint on private speech protected by the First Amendment.

*The Speech Ban Is Overbroad*

**106.**     Even if the Speech Ban's restrictions were constitutional as applied to some of Plaintiffs' speech, it would nonetheless be invalid in total because its unlawful applications are substantial in relation to any legitimate sweep, and that overbreadth deters and chills

1  constitutionally protected speech. *See Comite de Jornaleros de Redondo Beach v. City of*

2  *Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011).

3  <u>*The Speech Ban Is Void For Vagueness*</u>

4  **107.**   The Speech Ban is impermissibly vague in violation of the Due Process Clause of

5  the Fourteenth Amendment.

6  **108.**   Several of the Speech Ban's principal terms are not defined or are

7  otherwise vague.

8  **109.**   For example, although the Speech Ban prohibits the placement of the "name of a

9  company producing Sugar-Sweetened Beverages" in "any promotion of any event or promotion

10 of any product" on City property except for, *inter alia*, a "charitable event," or on "City property

11 used for operation of a restaurant, concert or sports venue, or other facility or event where the

12 sale or production of Sugar-Sweetened Beverages is permitted," the Speech Ban leaves uncertain

13 (1) what constitutes "producing sugar-sweetened beverages" (2) what constitutes a  "charitable

14 event" exempt from the Ban; and (3) how the exemption for "City property used for operation of

15 a restaurant, concert or sports venue, or other facility or event where the sale or production of

16 Sugar-Sweetened Beverages is permitted" operates.  S.F. Admin. Code § 4.20(b), (d).

17 **110.**   *First*, the Speech Ban does not define what is meant by "producing sugar-

18 sweetened beverages."

19       a.   Numerous restaurants produce products that would appear to constitute

20 sugar-sweetened beverages within the meaning of the Speech Ban.  For instance, McDonalds and

21 Burger King sell milkshakes and smoothies.  Wendy's sells Frosties.  Sonic sells Slushes.  7-

22 Eleven sells Slurpees.  Similarly, Super Duper Burger sells organic shakes, fountain drinks,

23 organic iced tea, and fresh lemonade.  Roam Artisan Burgers sells house-made sodas. Likewise,

24 In-And-Out Burger makes ice-cream based shakes.  Those drinks appear to constitute sugar-

25 sweetened beverages within the meaning of the Speech Ban.

26       b.   Many other companies own restaurants or coffee bars that produce sugar-

27 sweetened beverages arguably within the meaning of the Speech Ban.  Nordstrom's Espresso

28 Bar, for instance, sells smoothies and "Ice Storms."  Many hotel restaurants and companies with

their own cafeterias also sell frozen coffee, smoothie, or ice-cream based drinks with added sugar that might qualify as sugar-sweetened beverages within the meaning of the Speech Ban.

c.     Oxford Dictionary defines "producer" as "[a] person, company, or country that makes, grows, or supplies goods or commodities for sale." *Producer Definition*, Oxford Dictionaries (2015),

http://www.oxforddictionaries.com/us/definition/american_english/producer.  Black's Law Dictionary defines "produce" as "[t]o bring into existence; to create." *Black's Law Dictionary* (10th online ed. 2014).  Under some dictionary definitions of "produce," therefore, any company that possesses a soda fountain, and therefore, "bring[s]" a sugar-sweetened beverage "into existence," produces sugar-sweetened beverages.  Under other definitions, any company that "supplies" a sugar-sweetened beverage "for sale"—whether or not it manufactured the drink— would produce sugar-sweetened beverages.

d.     The Speech Ban leaves uncertain whether such companies will be viewed as producing sugar-sweetened beverages and thus be prohibited from using their names in any promotion of any event on property owned by the City or under the City's control.

**111.**     *Second*, although the Speech Ban exempts "signage listing sponsors of a charitable event occurring on City property," the Speech Ban does not define what constitutes a charitable event.

**112.**     *Third*, although the Speech Ban exempts "City property used for operation of a restaurant, concert or sports venue, or other facility or event where the sale or production of Sugar-Sweetened Beverages is permitted," it leaves unclear how that exemption operates.  For instance, the Speech Ban leaves unclear whether, if a cafe in the Moscone Center or a restaurant at SFO makes sugar-sweetened beverages available for sale, advertising everywhere within the greater facility is permitted.

**113.**     For all of these reasons, the Speech Ban fails to provide a person of ordinary intelligence fair notice of what is prohibited by the Speech Ban, and is so standardless that it authorizes or encourages seriously discriminatory enforcement of the Speech Ban.

114. Because the Speech Ban is vague, it will chill protected speech and violates due process.

**The Warning Mandate Unlawfully Compels Non-Factual And Controversial Speech**

115. As noted above, *supra* ¶¶ 11-20, 74-75, the Warning Mandate requires any advertiser who posts a sugar-sweetened beverage advertisement in the City after its Operative Date to place a large warning on the advertisement.

116. The Warning Mandate applies, however, only to a relatively narrow subset of advertisements.

117. The Warning Mandate exempts any advertisement in any national or local newspaper, magazine, periodical, advertisement circular or other publication, or on national or local television or radio, the internet, or other electronic media.

118. The Warning Mandate also exempts all advertising on containers or packages for sugar-sweetened beverages.

119. The Warning Mandate also exempts any menus or handwritten listings or representations of foods and/or beverages that may be served or ordered for consumption in a retailer's establishment.

120. The Warning Mandate also exempts any display or representation of, or other information about, a sugar-sweetened beverage, including, without limitation, any logo on a vehicle, if the vehicle is being used by any Person who is in the business of manufacturing, distributing or selling the sugar-sweetened beverage in the performance of such business.

121. The Warning Mandate also exempts any logo that occupies an area that is less than 36 square inches and is unaccompanied by any display, representation, or other information identifying, promoting, or marketing a sugar-sweetened beverage.

122. The Warning Mandate also exempts any shelf tag or shelf label that states the retail price, order code, description, or size of a product for sale.

123. The Warning Mandate also exempts all existing advertisements of any kind other than "general advertising signs" permitted by the City before the Operative Date. The Warning Mandate therefore exempts all point-of-sale advertisements permitted before July 25, 2016.

1      **124.**    The Warning Mandate also exempts any general advertising sign that has not been

2   substantially altered for 50 years.

3              <u>*The Warning Mandate Is Subject To And Fails First Amendment Scrutiny*</u>

4      **125.**    The Warning Mandate is subject to at least heightened scrutiny because it

5   constitutes, on its face, a content-based regulation—requiring City-mandated speech on certain

6   advertisements based on the content of the advertisement and the identity of the speaker. *See,*

7   *e.g., Reed*, 135 S. Ct. at 2227, 2231. Government regulations that discriminate in this way on the

8   basis of viewpoint or identity are rightly subject to strict scrutiny. *See, e.g.*, *Rosenberger*, 515

9   U.S. at 829; *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

10      **126.**    Even though courts generally apply *Central Hudson*'s intermediate scrutiny to

11   commercial speech regulations, numerous Supreme Court Justices have indicated disagreement

12   or discomfort with that precedent. *See, e.g.*, *Sorrell*, 131 S. Ct. at 2672 (suggesting limits on

13   government's ability to regulate based on content with respect to commercial speech); *44*

14   *Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and

15   in the judgment) ("I do not see a philosophical or historical basis for asserting that 'commercial'

16   speech is of 'lower value' than 'noncommercial' speech."). The Ninth Circuit has reserved

17   decision on whether strict scrutiny would apply to a compelled disclosure of non-factual or

18   controversial information about a commercial product. *See Video Software Dealers Ass'n v.*

19   *Schwarzenegger*, 556 F.3d 950, 966 n.20 (9th Cir. 2009) (noting application of strict scrutiny on

20   similar facts in *Entertainment Software Association v. Blagojevich*, 469 F.3d 641, 651-52 (7th

21   Cir. 2006), *aff'd sub nom. Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011)).

22      **127.**    Regardless, the Warning Mandate cannot even survive intermediate scrutiny.

23      **128.**    The Warning Mandate burdens protected speech that concerns lawful activity and

24   is not misleading.

25      **129.**    The Warning Mandate does not directly and materially advance the government's

26   interest in reducing obesity, diabetes, and tooth decay.

27      **130.**    A law compelling speech will not directly and materially advance the

28   government's interest—when the law either (a) contains numerous exceptions that undercut the

1   government's purpose; or (b) makes distinctions among different kinds of speech that are

2   unrelated to the government's stated interest.  *See Metro Lights, LLC v. City of Los Angeles*, 551

3   F.3d 898, 905 (9th Cir. 2009).

4        **131.**     The Warning Mandate regulates one source of purported harm while specifically

5   exempting the vast majority of others.  For example:

6             a.       The Warning Mandate exempts "any advertisement that is in any

7   newspaper, magazine, periodical, advertisement circular or other publication, or on television,

8   the internet, or other electronic media."  S.F. Health Code § 4202(a).

9             b.       The Warning Mandate thus will not require a warning with respect to the

10  vast majority of advertising that reaches the City's consumers with respect to sugar-sweetened

11  beverages.  Far from achieving the City's goal, the Warning Mandate will largely redirect

12  advertising from media covered by the warning requirement, like billboards, to media exempted

13  from the warning, like newspapers, magazines, circulars, or television.

14            c.       The Warning Mandate also exempts every existing advertisement that is

15  not a "general advertising sign," or a sign that draws attention to a commodity or product apart

16  from the on-site business.  All existing advertisements promoting the consumption of drinks with

17  added sugar at an on-site business will be exempt from the law.  S.F. Health Code § 4203(d).

18            d.       The Warning Mandate thus singles out specific forms of advertising that

19  represent a small fraction of speech related to sugar-sweetened beverages.  It particularly and

20  disproportionately injures members of CSOAA, whose speech is disfavored relative to

21  other media.

22            e.       The Ordinance will reduce the ability of CSOAA members to exercise

23  editorial control over their speech and make it more difficult for them to compete with other

24  forms of advertising that are exempted from the Warning Mandate.

25            f.       The Warning Mandate also excludes advertising for myriad other products

26  that could contribute over the long term to obesity, diabetes, or tooth decay if consumed to

27  excess, as part of an unbalanced diet and lifestyle.

28

132.    In addition, Warning Mandate exemptions impose distinctions among media in a manner that are unrelated to the interest that the City purportedly is attempting to advance.

a.    For example, the Warning Mandate's exclusion of television, newspaper, electronic media, and certain other categories of media is unrelated to the health interest that the City purportedly is attempting to advance.

b.    During hearings regarding the Warning Mandate, the author of the Warning Mandate admitted that the exemptions for certain forms of media were unrelated to the City's asserted interests.

133.    Moreover, efforts to discourage individuals from drinking sugar-sweetened beverages may have unintended consequences at odds with the City's purported purpose. *See, e.g.*, Brian Wansink et al., *From Coke to Coors: A Field Study of a Fat Tax and its Unintended Consequences*, J. Nut. Education & Behavior (2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2079840.

134.    The Warning Mandate also fails intermediate First Amendment scrutiny under *Central Hudson* because, for the reasons detailed *supra* ¶¶ 128-33, it is more extensive and more burdensome than necessary to achieve the City's purported purpose.

a.    The City need does not need to compel private parties to speak against their will on its behalf to achieve this end.  Nothing prevents the City from delivering this message itself, through its own advertisements or messaging—especially on property that the City owns or controls.  Indeed, given the Warning Mandate's haphazard reach, the City could reach more consumers with its own advertising or messaging than through the Warning Mandate. Compelling sugar-sweetened beverage producers, distributors, sellers, or advertisers to carry a message with which they disagree is unnecessary and unduly burdensome.

b.    In any event, sugar-sweetened beverage packages already disclose the total amount of sugar in each serving.

135.    For all the reasons that the ordinance fails intermediate scrutiny under *Central Hudson*, it necessarily fails strict scrutiny as well.

*The Warning Mandate Is Not Subject To The Lesser Scrutiny Of Zauderer*

136.    The Warning Mandate is not subject to the lesser scrutiny of *Zauderer* because the required warning is not aimed at curing and does not cure or mitigate any consumer deception.  There is no misleading speech for the City to remedy.  The City made no suggestion and adduced no evidence of consumer deception at the hearings on the Ordinances, and the City does not assert any interest in remedying consumer deception in the Warning Mandate's findings and purpose.

137.    The Warning Mandate also is not subject to the lesser scrutiny of *Zauderer* because the required warning is not purely factual and uncontroversial.

138.    *First*, the Warning Mandate is non-factual and controversial because it is intended to and does communicate that consuming beverages with added sugar is unsafe and hazardous to health.

a.    Supervisor Scott Wiener, who authored the bill, explained that "[r]equiring health warnings on soda ads also *makes clear* that these drinks aren't harmless — indeed, quite the opposite."  Scott Wiener, Democrat for State Senate, Press Release, San Francisco Board of Supervisors Unanimously Passes First in the Nation Legislation to Combat Soda Advertising (June 9, 2015) (emphasis added), *available at* http://www.scottwiener.com/san_francisco_board_of_supervisors_unanimously_passes_first_in_the_nation_legislation_to_combat_soda_advertising_and_prohibit_city_spending_on_sugar_sweetened_beverages.  In the view of the Warning Mandate's author, "[t]hese drinks are making people sick, and we need to make that clear to the public."  *Id.*

b.    The message that the warning communicates to consumers on this topic is misleading, incomplete and controversial.  It reflects the City's opinion, not scientific consensus.

c.    Many experts believe that—like pizza, steak, burritos, Ghirardelli chocolate, ice cream, Caesar salads, doughnuts, milkshakes, and sourdough bread—beverages with added sugar, including soft drinks, sports drinks, juice drinks, and coffee drinks, can be consumed as part of a healthy diet and active lifestyle and without "making people sick."  *See supra* ¶¶ 46-49, 52, 54, 56-57.

139.  *Second*, the Warning Mandate is non-factual and controversial because it is intended to and does communicate that any and all consumption of beverages with added sugar contributes to obesity, diabetes, and tooth decay.

a.  The City's message is misleading, incomplete, and controversial. Consumption of beverages with added sugar does not in and of itself contribute to obesity, diabetes, or tooth decay.  Reputable scientists have concluded that, when consumed as part of a balanced diet and active lifestyle, beverages with added sugar do not contribute to obesity or diabetes.  *See, e.g.*, Jeane H. Freeland-Graves & Susan Nitzke, *Position of the academy of nutrition and dietetics: total diet approach to healthy eating*, 113 J. Acad. Nutrition & Dietetics 307, 307 (2013), *available at* http://www.ncbi.nlm.nih.gov/pubmed/23351634 ("It is the position of the Academy of Nutrition and Dietetics that the total diet or overall pattern of food eaten is the most important focus of healthy eating.  All foods can fit within this pattern if consumed in moderation with appropriate portion size and combined with physical activity.").

b.  Likewise, dental experts have found that drinking sugar-sweetened beverages in moderation, while brushing and flossing daily, minimizes the risk of tooth decay. For instance, while recommending that patients avoid "[h]eavy soda consumption," the Wisconsin Dental Association explains that "[t]his doesn't mean a person should never drink soda.  In fact, drinking it in moderation may represent no harm at all."  Wisconsin Dental Association, *Sip All Day, Get Decay*, http://www.wda.org/your-oral-health/sip-all-day (last visited July 24, 2015).

c.  Consumers will take away the misleading, incomplete, and controversial message that any and all consumption of beverages with added sugar contributes to obesity, diabetes, and tooth decay.

140.  *Third*, the required warning is non-factual and controversial because it is intended to and does communicate that consumption of beverages with *added* sugar contributes more to obesity, diabetes, and tooth decay than does consumption of beverages with *natural* sugar.

a.  The required warning applies only to advertisements for beverages with added sugar, and excludes advertisements for beverages with natural sugar, like 100% fruit juice.

b. The City's stated purpose in requiring warnings for sugar-sweetened beverages is "to inform the public of the presence of added sugars" and to "help ensure that San Franciscans make a more informed choice about the consumption of drinks that are a primary source of added dietary sugar." S.F. Health Code Art. § 4201.

c. The message that consumption of beverages with added sugar contributes more to obesity, diabetes, and tooth decay than consumption of beverages with natural sugar is inaccurate, or at minimum, controversial. *See* Duffy, 104 J. Am. Dietetic Ass'n at 259 ("Human metabolism does not distinguish between sugars found in a food and those added to the food. . . . Fructose is absorbed, digested, and metabolized in an identical manner no matter what the source."); Klurfeld, 4 Advances in Nutrition at 258 (noting that products with added sugar "are not metabolically different from those containing intrinsic sugar").

d. A 12-oz serving of a full-calorie soft drink and a 12-oz serving of many 100% fruit juice products have roughly the same amount of sugar—some 100% apple juice products have more sugar than a 12-oz full-calorie soft drink. Yet the Warning Mandate applies only to the soft drinks.

e. Advertisements for "mid-cal" sodas such as Coke Life (90 calories, 24 grams of sugar) and Pepsi True (60 calories, 16 grams of sugar) are also required to contain the City's warning even though these beverages have far less sugar than most exempt 100% fruit juices.

f. Consumers will take away the misleading, incomplete, and controversial message that consuming beverages with added sugar contributes more to obesity, diabetes, and tooth decay than does consumption of beverages with natural sugar.

141. *Fourth*, the required warning is non-factual and controversial because it is intended to and does communicate that beverages with added sugar contribute more to obesity, diabetes, and tooth decay than do foods with added sugar.

a. The required warning applies only to advertisements of beverages with added sugar, and excludes advertisements promoting foods with added sugar, like cookies, doughnuts, cereals, flavored yogurts, ketchup, spaghetti sauce, and ice cream.

1          b.     The implicit message that consumption of *beverages* with added sugar

2   contributes more to obesity, diabetes, and tooth decay than consumption of *foods* with added

3   sugar is inaccurate, or at minimum, controversial.  *See* Kahn, 37 Diabetes Care at 960 ("[T]here

4   is no evidence that fructose or HFCS per se causes obesity or even weight gain."); Duffy, 104 J.

5   Am. Dietetic Ass'n at 259 ("Human metabolism does not distinguish between sugars found in a

6   food and those added to the food. . . . Fructose is absorbed, digested, and metabolized in an

7   identical manner no matter what the source."); Irwin D. Mandel, American Dental Association,

8   *Caries Prevention: Current Strategies, New Directions*, 127 J. of the Am. Dental Ass'n 1477,

9   1484-87 (noting considerable evidence that consuming carbohydrate-rich, sticky food carries

10   greater risk of tooth decay than sugar-sweetened beverages).

11          c.     Consumers will receive the City's misleading, incomplete, and

12   controversial message that consuming beverages with added sugar would contribute more to

13   obesity, diabetes, and tooth decay than would consumption of foods with natural sugar.

14                 *The Warning Mandate Fails Even Under Zauderer*

15   **142.**     The Warning Mandate cannot survive any level of scrutiny, because it is unduly

16   burdensome.  *See Zauderer*, 471 U.S. at 651.

17          a.     The Warning Mandate demands that at least 20% of each regulated

18   advertisement convey the City's message.

19          b.     The large warning required by the Warning Mandate will effectively

20   eliminate advertisers' willingness to utilize the forms of media that are subject to the Mandate,

21   effectively silencing covered speech in those media altogether, particularly and

22   disproportionately injuring CSOAA.

23                 *The Warning Mandate Is Void For Vagueness*

24   **143.**     The Warning Mandate also is impermissibly vague in violation of the Due

25   Process Clause of the Fourteenth Amendment.  Among other things, the Warning Mandate fails

26   to adequately define key terminology, leaving uncertain what speech and which speakers are

27   regulated.

28

144.   *First*, although the Warning Mandate applies only to "advertisers," and defines that term, the ordinance leaves uncertain who qualifies as an advertiser.

    a.    The Warning Mandate defines an advertiser to include anyone who (a) is "in the business of manufacturing, distributing, or selling sugar-sweetened beverages, including without limitation, a Retailer; (b) is in the business of placing or installing advertisements, or who provides space for the display of advertisements; or (c) is an agent or contractor of a Person described in (a) or (b), assisting such Person with the manufacture, distribution or sale of sugar-sweetened beverage, the placement or installation of advertisements, or the provision of space for advertisements." S.F. Health Code § 4202.

    b.    The Warning Mandate leaves substantially uncertain what it means to be "in the business of manufacturing, distributing, or selling sugar-sweetened beverages."

    c.    For instance, the Warning Mandate leaves unclear whether every business that makes available to their employees vending machines that distribute sugar-sweetened beverages is an advertiser under the law.

    d.    The Warning Mandate leaves unclear whether every gym, university, or sports camp that makes available Gatorade or Powerade to those engaged in exercise are "advertisers" under the law.

    e.    The Warning Mandate exempts "menus" from the definition of an "–sugar-sweetened beverage] ad," but fails to define "menus," leaving unclear whether signs promoting special prices for depicted meals including sugar-sweetened beverages at specified restaurants are subject to the law.

145.   *Second*, although the Warning Mandate applies only to an "advertisement that identifies, promotes, or markets a Sugar-Sweetened Beverage for sale or use," the ordinance leaves substantially uncertain what conduct qualifies.

    a.    For instance, the ordinance leaves uncertain whether every use in an advertisement of an advertiser's name or corporate logo, if greater than 36 square inches, will render the advertisement one that must carry the required warning.

1          b.      The ordinance also leaves uncertain whether an advertisement promoting

2 the corporate brand of a sugar-sweetened beverage manufacturer or distributor qualifies as an

3 advertisement that identifies, promotes, or markets a sugar-sweetened beverage for sale or use.

4          c.      The ordinance also leaves uncertain whether an advertisement promoting

5 an alternative to sugar-sweetened beverages, like water or diet soft drinks, qualifies as an

6 advertisement that identifies, promotes, or markets a sugar-sweetened beverage for sale or use if

7 it also features prominently the corporate name or logo of a sugar-sweetened beverage

8 manufacturer or distributor.

9     **146.**    For all of these reasons, the Warning Mandate fails to provide a person of

10 ordinary intelligence fair notice of what is prohibited by the Warning Mandate, and is so

11 standardless that it authorizes or encourages seriously discriminatory enforcement of the

12 Warning Mandate

13     **147.**    Moreover, by vesting in the Director of Public Health discretion to modify the

14 text and presentation of the Warning Mandate, as well as to issue guidelines implementing a

15 vague and standardless Mandate, the City impermissibly empowers the Director to suppress

16 disfavored speech at his discretion. *Cf., e.g.*, *Reed*, 135 S. Ct. at 2229.

17     **148.**    Because the Warning Mandate is vague, it will chill protected speech.

18     **149.**    Plaintiff challenge the lawfulness of the Ordinances under 42 U.S.C. § 1983,

19 as follows:

**COUNT I**

**(VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES**

**CONSTITUTION)**

23     **150.**    The foregoing Paragraphs are incorporated by reference as if set forth in

24 full herein.

25     **151.**    The Free Speech Clause of the First Amendment of the United States Constitution

26 provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const.

27 amend. I.

28

1      **152.**    The Fourteenth Amendment of the United States Constitution made this

2 proscription applicable to the States and their political subdivisions. *See* U.S. Const. amend.

3 XIV § 1.

4      **153.**    The Speech Ban prohibits advertising within traditional public forums as well as

5 designated or limited public forums created by the City, in which the City has chosen to open its

6 property for advertising by non-governmental speakers.

7      **154.**    The Speech Ban constitutes impermissible viewpoint discrimination in violation

8 of Plaintiffs' and their members' First Amendment rights.

9      **155.**    The Speech Ban is not reasonable in light of the purpose of the public forums to

10 which it applies.

11      **156.**    The Speech Ban also constitutes a prior restraint on Plaintiffs' and their members'

12 non-commercial speech.

13      **157.**    The Speech Ban constitutes impermissible discrimination based on the identity of

14 certain speakers.

15      **158.**    The Speech Ban is unconstitutionally overbroad.

16      **159.**    The Speech Ban violates Plaintiffs' and their members' First Amendment rights.

17 <u>**COUNT II**</u>

18 <u>**(VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH**</u>

19 <u>**AMENDMENT TO THE UNITED STATES CONSTITUTION)**</u>

20      **160.**    The foregoing Paragraphs are incorporated by reference as if set forth in

21 full herein.

22      **161.**    The  Speech Ban also violates the Due Process Clause of the Fourteenth

23 Amendment to the United States Constitution.

24      **162.**    The Speech Ban leaves impermissibly vague core terms of the ordinance.

25      **163.**    The Speech Ban fails to provide a person of ordinary intelligence fair notice of

26 what is prohibited.

27      **164.**    The Speech Ban is so standardless that it authorizes or encourages seriously

28 discriminatory enforcement of the Ban.

165.     Because the Speech Ban is vague, it will chill Plaintiffs' and their members' protected speech and violates their due process rights.

**COUNT III**

**(VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION)**

166.     The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

167.     The Warning Mandate violates the Free Speech rights guaranteed to Plaintiffs and their members by the First Amendment to the United States Constitution.

168.     The Free Speech Clause guarantees the right to speak freely, as well as the right not to speak, and the right to choose the content of one's own speech.

169.     The Warning Mandate violates the Free Speech Clause because it compels Plaintiffs and their members to speak on a topic selected by the City, express a viewpoint dictated by the City, and do so in a manner prescribed by the City.

170.     The Warning Mandate is not narrowly tailored to further a compelling government interest.

171.     The Warning Mandate does not directly and materially advance the City's purported interest in the required warning.

172.     The Warning Mandate is more extensive than necessary to achieve the City's stated aims, and thus imposes undue burdens on Plaintiffs' speech.

173.     The Warning Mandate does not cure or mitigate consumer deception.

174.     The Warning Mandate compels Plaintiffs and their members to disseminate messages and information that are not purely factual and uncontroversial, but are instead inaccurate, misleading, controversial and unduly burdensome.

175.     The Warning Mandate violates Plaintiffs' and their members' First Amendment rights.

**COUNT IV**

**(VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH**
**AMENDMENT TO THE UNITED STATES CONSTITUTION)**

176.  The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

177.  The Warning Mandate violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

178.  The Warning Mandate leaves impermissibly vague core terms of the ordinance.

179.  The Warning Mandate fails to provide a person of ordinary intelligence fair notice of what is prohibited by the ordinance.

180.  The Warning Mandate is so standardless that it authorizes or encourages seriously discriminatory enforcement of the ordinance.

181.  Because the Warning Mandate is vague, it will impermissibly chill Plaintiffs' and their members' protected speech and violates their due process rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendant The City and County of San Francisco as follows:

(1)  A declaration, pursuant to 28 U.S.C. § 2201 that the Ordinances and any of their implementing regulations violate the First Amendment to the United States Constitution.

(2)  A declaration, pursuant to 28 U.S.C. § 2201 that the Ordinances and any of their implementing regulations violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

(3)  An injunction prohibiting the City or any of its officers, employees, or agents from enforcing or threatening to enforce the Ordinances and any of their implementing regulations

(4)  All costs, attorneys' fees, and expenses that Plaintiffs reasonably incur, *see* 42 U.S.C. § 1988; and

(5)  Such other and further relief as this Court deems just and proper.

Dated:  July 24, 2015                              Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ James K. Lynch
    James K. Lynch[1]
    LATHAM & WATKINS LLP
    505 Montgomery Street
    Suite 2000
    San Francisco, CA 94111-6538
    T +1.415.391.0600
    F +1.415.395.8095
    jim.lynch@lw.com

    Richard P. Bress
    Michael E. Bern
    John S. Cooper
    LATHAM & WATKINS LLP
    555 Eleventh Street, NW
    Suite 1000
    Washington, D.C. 20004-1304
    T +1.202.637.2200
    F +1.202.637.2201
    rick.bress@lw.com
    michael.bern@lw.com
    john.cooper@lw.com

    *Attorneys for Plaintiff*
    The American Beverage Association

---

[1] I hereby attest that concurrence in the filing of this document has been obtained from each of the other Signatories.

Theodore B. Olson (Bar No. 38137)
Andrew S. Tulumello (Bar No. 196484)
Helgi C. Walker (*Pro Hac Vice* Pending)
Jacob T. Spencer (*Pro Hac Vice* Pending)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
T +1.202.955.8668
F +1.202.530.9575
TOlson@gibsondunn.com
atulumello@gibsondunn.com
hwalker@gibsondunn.com
jspencer@gibsondunn.com

Charles J. Stevens (Bar No. 106981)
Joshua D. Dick (Bar No. 268853)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA  94105-0921
T +1.415.393.8233
F +1.415.374.8469
CStevens@gibsondunn.com
jdick@gibsondunn.com

*Attorneys for Plaintiff*
California State Outdoor Advertising
Association

Thomas S. Knox (Bar No. 73384)
KNOX, LEMMON & ANAPOLSKY, LLP
300 Capitol Mall, Suite 1125
Sacramento, CA  95814
T +1.916.498.9911
F +1.916.498.9991
TKnox@klalawfirm.com

*Attorneys for Plaintiff*
California Retailers Association