1  LATHAM & WATKINS LLP
       James K. Lynch (CA Bar No. 178600)
2        Jim.Lynch@lw.com
       Marcy C. Priedeman (CA Bar No. 258505)
3        marcy.priedeman@lw.com
   505 Montgomery Street, Suite 2000
4  San Francisco, CA 94111-6538
   Telephone: +1.415.391.0600
5  Facsimile: +1.415.395.8095

6  LATHAM & WATKINS LLP
       Richard P. Bress (Admitted *Pro Hac Vice*)
7        rick.bress@lw.com
       Michael E. Bern (Admitted *Pro Hac Vice*)
8        michael.bern@lw.com
       John S. Cooper (Admitted *Pro Hac Vice*)
9        john.cooper@lw.com
   555 Eleventh Street, NW, Suite 1000
10 Washington, DC 20004-1304
   Telephone: +1.202.637-2200
11 Facsimile: +1.202.637.2201

12 *Attorneys for Plaintiff*
   The American Beverage Association
13
   *Additional Counsel on Signature Page*
14

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17                      SAN FRANCISCO DIVISION

18 |                                          | Civil Action No. 3:15-cv-03415-EMC
   | THE AMERICAN BEVERAGE                    |
19 | ASSOCIATION, CALIFORNIA RETAILERS       | **NOTICE OF MOTION AND MOTION**
   | ASSOCIATION, CALIFORNIA STATE           | **FOR A PRELIMINARY INJUNCTION**
20 | OUTDOOR ADVERTISING ASSOCIATION,        |
   |                                          |
21 |                    Plaintiffs,           | Date:  April 7, 2016
   |                                          | Time:  1:30 p.m.
22 |                    v.                    | Judge:  Edward M. Chen
   |                                          | Courtroom:  5
23 | THE CITY AND COUNTY OF SAN              |
   | FRANCISCO,                               |
24 |                                          |
   |                    Defendant.            |
25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... iii

NOTICE OF MOTION .................................................................................................................. 1

RELIEF SOUGHT ......................................................................................................................... 1

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 4

STANDARD OF REVIEW ............................................................................................................ 6

ARGUMENT .................................................................................................................................. 7

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................... 7

    A.    The Warning Mandate Is Unconstitutional As Applied To Noncommercial Speech ................................................................................................................... 7

    B.    The Warning Mandate Is Unconstitutional As Applied To Commercial Speech ................................................................................................................... 9

        1.    The Warning Mandate Does Not Meet The Requirements of *Zauderer* ................................................................................................... 10

            a.    The City's Warning Is Not "Purely Factual And Uncontroversial" ................................................................................. 11

            b.    The Warning Mandate Is Unduly Burdensome And Chills Protected Commercial Speech ..................................................... 15

        2.    Compelled Speech Identified As The Government's Does Not Receive Lesser Scrutiny ................................................................... 18

        3.    The Warning Mandate Fails Heightened Scrutiny .................................. 19

            a.    The Ordinance Does Not Directly And Materially Advance The City's Interest .......................................................................... 20

            b.    The Warning Mandate Burdens Far More Protected Speech Than Necessary To Advance The City's Interest ......................... 22

II.    ENFORCING THE ORDINANCE DURING THE PENDENCY OF THIS LAWSUIT WOULD IRREPARABLY HARM PLAINTIFFS ......................................... 22

III.     THE REMAINING FACTORS SUPPORT AN INJUNCTION.......................................24

CONCLUSION.................................................................................................................................25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Meat Institute v. United States Department of Agriculture,*
760 F.3d 18 (D.C. Cir. 2014) ...............................................................................10, 11, 15, 18

*Brown v. Entertainment Merchants Ass'n,*
131 S. Ct. 2729 (2011) .................................................................................................................21

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993).................................................................................................................21, 22

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994)..........................................................................................................................23

*CTIA – The Wireless Ass'n v. City & County of San Francisco,*
494 F. App'x 752 (9th Cir. 2012) ..............................................................................................11

*CTIA – The Wireless Ass'n v. City & County of San Francisco,*
827 F. Supp. 2d 1054 (N.D. Cal. 2011), *aff'd,* 494 F. App'x 752 (9th Cir.
2012) ...............................................................................................................................................17

*CTIA - The Wireless Ass'n v. City of Berkeley,*
No. C-15-2529-EMC, 2015 U.S. Dist. LEXIS 126071 (N.D. Cal. Sept. 21,
2015) ......................................................................................................................................... *passim*

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014) .....................................................................................................25

*Evergreen Ass'n v. City of New York,*
740 F.3d 233 (2d Cir. 2014)......................................................................................................22

*Frudden v. Pilling,*
742 F.3d 1199 (9th Cir. 2014) ..................................................................................................19

*Glickman v. Wileman Brothers & Elliott, Inc.,*
521 U.S. 457 (1997).....................................................................................................................10

*Greater New Orleans Broadcasting Ass'n v. United States,*
527 U.S. 173 (1999)................................................................................................................20, 21

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group,*
515 U.S. 557 (1995)........................................................................................................................9

*International Franchise Ass'n v. City of Seattle,*
803 F.3d 389 (9th Cir. 2015) .....................................................................................................24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

MOTION FOR A PRELIMINARY INJUNCTION
CASE NO. 3:15-cv-03415-EMC

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ...........................................................................25

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
  601 F. App'x 469 (9th Cir. 2015) .........................................................................23

*Linmark Associates, Inc. v. Willingboro*,
  431 U.S. 85 (1977)...............................................................................................22

*Metro Lights, L.L.C. v. City of Los Angeles*,
  551 F.3d 898 (9th Cir. 2009) ...........................................................................7, 20

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010).......................................................................................10, 15

*National Electrical Manufacturers Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001)..................................................................................15

*Pacific Gas & Electric Co. v. Public Utilities Commission*,
  475 U.S. 1 (1986)......................................................................2, 7, 17, 18, 19

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ................................................................................7

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)................................................................................................2

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015)............................................................................................9

*Reno v. ACLU*,
  521 U.S. 844 (1997)..............................................................................................23

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ................................................................................23

*Retail Digital Network, LLC v. Appelsmith*,
  No. 13-56069, 2016 U.S. App. LEXIS 140 (9th Cir. Jan. 7, 2016)....................3, 9, 10, 15, 20

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
  487 U.S. 781 (1988)................................................................................................8

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995)..............................................................................................21

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) ................................................................................7

*Sorrell v. IMS Health Inc.*,
  131 S. Ct. 2653 (2011)........................................................................................2, 9

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ..............................................................................24

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001)..............................................................................9, 10, 18

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013) ..........................................................................22, 23

*Video Software Dealers Ass'n v. Schwarzenegger*,
   556 F.3d 950 (9th Cir. 2009) ..............................................................................11

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943)..............................................................................................9

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................................6

*Wooley v. Maynard*,
   430 U.S. 705 (1977)..............................................................................................2

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
   471 U.S. 626 (1985)..............................................................3, 7, 10, 15, 17

## CONSTITUTIONAL PROVISIONS, STATUTES AND REGULATIONS

U.S. Const amend. I ............................................................................................1

U.S. Const amend. XIV ......................................................................................1

21 C.F.R. § 101.60(b)(2)(i)(A) ........................................................................14

21 C.F.R. § 184.1866(c) ....................................................................................12

S.F. Health Code § 4201 ..........................................................................5, 14, 21

S.F. Health Code § 4202 ..............................................................................5, 8

S.F. Health Code § 4203 ....................................................................................5

S.F. Health Code § 4203(a)................................................................................5

S.F. Health Code § 4204 ....................................................................................5

San Francisco Ordinance No. 100-15 ................................................................1

1

# OTHER AUTHORITIES

2

American Dental Association, Comments on the Scientific Report of the 2015
     Dietary Guidelines Advisory Committee (May 8, 2015),
     http://www.ada.org/~/media/ADA/Advocacy/Files/ltr_150508_hhs_dgac2015
     _nosig.ashx.................................................................................................14

79 Fed. Reg. 11,880 (Mar. 3, 2014).................................................................6, 12, 14

80 Fed. Reg. 44,303 (July 27, 2015)..........................................................................14

Nutrition Education and Obesity Prevention Branch, California Department of
     Public Health, *Obesity in California: The Weight of the State, 2000-2012*
     (2014), https://www.cdph.ca.gov/programs/cpns/
     Documents/ObesityinCaliforniaReport.pdf ..........................................................13

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION**

2  PLEASE TAKE NOTICE that pursuant to the Court's scheduling order, on April 7, 2016,

3  at 1:30 PM, Plaintiffs The American Beverage Association ("ABA"), California Retailers

4  Association ("CRA"), and California State Outdoor Advertising Association ("CSOAA") will

5  bring for hearing this motion for a preliminary injunction.

6

**RELIEF SOUGHT**

7  To prevent imminent and irreparable harm to Plaintiffs,[1] as well as harm to the public,

8  Plaintiffs respectfully request a preliminary injunction to prohibit Defendant the City and County

9  of San Francisco ("San Francisco" or the "City") from enforcing or causing to be enforced any

10  provision of San Francisco Ordinance No. 100-15 (the "Warning Mandate" or "Ordinance"), or

11  any regulations implementing this Ordinance.  The Ordinance violates the First and Fourteenth

12  Amendments of the United States Constitution.  Preliminary relief is needed to afford this Court

13  time to decide in an orderly fashion the important constitutional issues raised by this lawsuit.

14

**INTRODUCTION**

15  The government cannot lawfully compel a private party to broadcast its hostile and

16  controversial viewpoint alongside the speaker's own message as the price for speaking.  But San

17  Francisco's Warning Mandate does just that.  Enacted as part of the San Francisco Board of

18  Supervisors' self-proclaimed "war" to "take down big soda," the Warning Mandate compels

19  manufacturers, retailers, and advertisers of sodas, sports drinks, vitamin waters, and sweetened

20  juices to overlay 20% of their billboards, posters, and displays with the City's opinions that

21  drinking these products is dangerous at any level; necessarily and inevitably contributes to

22  obesity, diabetes, and tooth decay; and contributes uniquely to these adverse health consequences

23  compared to other sources of sugar and calories.

24  The City's opinions conflict with the views of many respected scientists, including the

25  longtime Chief Scientific and Medical Officer of the American Diabetes Association,

26  _____

27  [1] The Warning Mandate's constitutional problems impact both Plaintiffs and their members.  For
ease of terminology, we use "Plaintiffs" to refer to the named Plaintiffs and/or their members.

28

Dr. Richard Kahn.  It does not matter for purposes of this case whether the City or those who disagree with it have the better of the argument.  What matters is that, at minimum, the City's opinions are the subject of vigorous and ongoing scientific debate, and the City nonetheless is requiring Plaintiffs to convey, associate with, and subsidize those opinions or stop engaging in commercial *and even noncommercial* speech on covered media.  That is anathema to the First Amendment.

The government is a welcome participant in the marketplace of ideas.  But the First Amendment prevents the government from burdening or silencing the messages of speakers with whom it disagrees on controversial matters "in order to tilt public debate in a preferred direction."  *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2671 (2011).  Forcing private speakers to use their own "facilities to spread [a hostile] message" as a prerequisite for speaking "penalizes the expression of particular points of view" and "deter[s] [speakers] from speaking out in the first instance"; instead of adding to the marketplace of ideas, it diminishes speech and "*inescapably* 'dampens the vigor and limits the variety of public debate.'"  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 10 (1986) (hereafter *PG&E*) (citation omitted).  So too here.  Because many Plaintiffs will not carry the City's hostile message as the price for speaking, the Warning Mandate will silence them on covered media within City limits.

Because the Warning Mandate applies to any speech associated with logos identifying sugar-sweetened beverages or representations of such products, it will burden not only Plaintiffs' commercial speech, but also their speech about social, political, and cultural issues that unquestionably is entitled to maximum First Amendment protection.  As applied to Plaintiffs' noncommercial speech—including their billboards and posters celebrating the Supreme Court's marriage equality ruling, or encouraging public service and socially-responsible investing—the City's content-based regulation is subject to strict scrutiny, "presumptively invalid," and practically indefensible.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (government may not require private speakers to "use their private property as a 'mobile billboard' for the State's ideological message").  As applied to Plaintiffs' commercial speech, it is subject at least to the "heightened judicial scrutiny" recently

1    recognized in *Retail Digital Network, LLC v. Appelsmith*, No. 13-56069, 2016 U.S. App. LEXIS

2    140, at \*3 (9th Cir. Jan. 7, 2016) (hereafter *RDN*), and likewise invalid:  the Warning Mandate is

3    riddled with so many exemptions and its warning is so uninformative and misleading that it will

4    not directly and materially advance the City's interests, and it will burden far too much speech

5    compared to the obvious alternative—the City using its own megaphone and purse to broadcast

6    its views.  The Warning Mandate cannot satisfy *Central Hudson*,  let alone heightened scrutiny.

7         The City will no doubt insist the Warning Mandate is subject to the special standard of

8    review that applies to certain compelled commercial disclosures.  *See generally Zauderer v.*

9    *Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985).  But

10   *Zauderer*'s lesser scrutiny is applicable only to government-compelled speech involving (1)

11   "purely factual and uncontroversial" disclosures that (2) will not unduly burden protected

12   commercial speech.  *Id.* at 651.  The Warning Mandate meets neither requirement.  The City's

13   message is inaccurate, misleading, and at minimum, controversial on matters of ongoing

14   scientific debate, and compelling private parties to proclaim the City's message will distort,

15   overwhelm, and suppress the protected commercial speech that the Warning Mandate targets.

16        The City likely will also lean heavily on this Court's recent decision in *CTIA -*

17   *The Wireless Ass'n v. City of Berkeley*, No. C-15-2529-EMC, 2015 U.S. Dist. LEXIS 126071

18   (N.D. Cal. Sept. 21, 2015) (hereafter *CTIA*).  But the Court should reject any effort to equate the

19   two cases, because this case presents vastly different issues.  In *CTIA*, Berkeley "require[d] cell

20   phone retailers to a provide a certain notice … to any customer who buys or leases a cell phone,"

21   *id.* at \*2, and this Court held that the notice, "for the most part, simply refers consumers to the

22   fact that there are FCC standards on [radiofrequency] energy exposure … and advises consumers

23   to refer to their [user] manuals," *id.* at \*26.  This Court thus concluded that Berkeley's notice

24   "contains accurate and uncontroversial information."  *Id.* at \*62.  The Court further concluded

25   that there was no suggestion that the challenged regulation "chilled … speech" and "no showing"

26   that it "would be a significant burden on retailers" to respond to the required notice through

27   additional speech.  *Id.* at \*50; *see also id.* at \*66.

28

San Francisco's Warning Mandate is different.  It is triggered not by completion of a transaction, but by the utterance of *speech* that the City disfavors.  It interferes with both commercial *and* noncommercial speech.  It forces Plaintiffs to broadcast inaccurate, misleading, and, at minimum, controversial *opinions* with which respected experts disagree.  And it is extraordinarily burdensome:  the warning's application (only to certain beverages with added sugars), as well as its content, size, and format, will so severely undermine Plaintiffs' own intended messages that it will necessarily chill their speech.  These conclusions are supported by a powerful evidentiary record, including factual declarations and expert testimony (even though the City bears the burden of establishing the constitutionality of its regulation).  Finally, the Warning Mandate is riddled with pages of exemptions that will prevent it from materially and directly advancing its stated purpose.

Heightened scrutiny should apply to this Ordinance, but it cannot survive any meaningful First Amendment scrutiny.  Because Plaintiffs are likely to prevail on the merits and suffer irreparable harm if the Ordinance takes effect, and the balance of harms and public interest tilt strongly in Plaintiffs' favor, this Court should enjoin the Warning Mandate's enforcement for the duration of this case.

## BACKGROUND

Nutrition science is constantly evolving and often hotly disputed.  Yesterday's dietary truths are routinely reevaluated and discarded.  The impact of beverages with added sugar on the consumer diet—like the impact of fat, cholesterol, salt, wine, coffee, and countless other foods and beverages—is the subject of vigorous and ongoing scientific debate.  *See* Expert Report of Dr. Richard A. Kahn ¶ 11 (attached to the Declaration of James Lynch as Exhibit A); Compl. ¶¶ 38-72, ECF No. 1.  Instead of simply participating in this debate, the City is attempting to end it by compelling sugar-sweetened beverage manufacturers, retailers, and advertisers either to burden their speech with the City's hostile viewpoint or to remain silent.

On June 25, 2015, the City amended its Health Code to "require advertisements for sugar-sweetened beverages to include a warning about the harmful health effects of consuming such beverages."  Regulating expressly on the basis of content and speaker, the Warning

Mandate compels anyone who produces, distributes, or advertises sugar-sweetened beverages to print on "any advertisement, including, without limitation, any logo, that identifies, promotes, or markets a Sugar-Sweetened Beverage for sale or use" a substantial warning, occupying 20% of the ad, *see* Expert Report of Peter N. Golder, Ph.D. at D-2 (mockups) (attached to Lynch Decl. as Exhibit B), stating as follows:

> WARNING: Drinking beverages with added sugar(s) contributes to obesity, diabetes, and tooth decay.  This is a message from the City and County of San Francisco.

*See* S.F. Health Code §§ 4202, 4203(a).[2]  Absent an injunction, the Warning Mandate takes effect on July 25, 2016.

Although it broadly applies to many forms of advertisements identifying, promoting, or marketing most sugar-sweetened beverages, the Warning Mandate is shot-through with exceptions and exemptions, as illustrated by the table below.  S.F. Health Code §§ 4201-02.

| What The Warning Mandate Applies To | What The Warning Mandate Exempts |
|---|---|
| Advertisements on paper, posters, billboards, or most vehicles or other surfaces, or in a stadium, arena, transit shelter or other structure | Advertisements in newspapers, magazines, periodicals, circulars, publications, television, the internet or electronic media |
| | All promotional copy on containers and menus |
| | Any representations of beverages that may be served or ordered for consumption in a retailer's establishment |
| | Stand-alone logos under 36 square inches |
| Beverages with *added sugar* containing 25 or more calories per 12 ounces (including sweetened grapefruit juice, cranberry juice, and vitamin waters) | Beverages with only *naturally occurring sugar* (such as 100% fruit juice or 100% fruit smoothies), regardless of sugar or calories |
| | Milk alternatives "regardless of sugar content" |
| | Beverages with added sugar that are flavored milk, containing up to 40 grams of sugar per 12 ounce beverage |
| | All foods |

---

[2] The Ordinance defines "Advertiser" broadly to include any person "in the business of placing or installing advertisements, or who provides space for the display of advertisements."  S.F. Health Code § 4202.  Accordingly, outdoor advertisers are independently required to ensure that all sugar-sweetened beverage ads posted on their property include the required warning, and are independently liable for failing to display the City's message. *Id.* §§ 4203-04.

1    By its application only to sugar-sweetened beverages, as well as its text, size, and
2  "WARNING" preface, the warning conveys the City's opinions that (i) consuming beverages
3  with added sugar is dangerous regardless of one's diet or lifestyle; (ii) consuming beverages with
4  added sugar necessarily and inevitably contributes to obesity, diabetes, and tooth decay at any
5  level of consumption; and (iii) consuming beverages with added sugar uniquely contributes to
6  those conditions relative to beverages with naturally occurring sugar or other caloric sources.
7  *See* Golder Rep. ¶¶ 41, 46-53; Kahn Rep. ¶¶ 72-81.

8    Plaintiffs disagree with these views, which are, at minimum, subject to "vigorous and
9  ongoing scientific debate."   Kahn Rep. ¶ 11; *see also* Compl. ¶¶ 46-49, 52, 54, 139.   Many
10  respected scientists believe drinking beverages with added sugar as part of a diet that balances
11  caloric intake, exercise, and oral hygiene is safe and does not contribute to obesity, diabetes, or
12  tooth decay.  *See, e.g.*, Kahn Rep. ¶ 14.  The FDA itself has expressly disagreed with the City's
13  opinion that beverages with added sugar contribute to obesity and related conditions uniquely
14  compared to beverages or foods with naturally occurring sugars or other caloric sources.  *See* 79
15  Fed. Reg. 11,880, 11,904 (Mar. 3, 2014) ("[A]dded sugars do not contribute to weight gain more
16  than any other source of calories."); *see also* Kahn Rep. ¶¶ 12-13; Compl. ¶¶ 52, 57, 59, 138-41.

17    Displaying on Plaintiffs' advertisements the City's warning that consumers should avoid
18  Plaintiffs' products would distort and utterly defeat the purpose of those ads.  Moreover, the
19  warning's  size  and  format  make  counterspeech  impractical.    *See infra* at I.B(1)(b).
20  Consequently, many (perhaps most) will conclude that it is better not to speak at all on covered
21  media rather than parrot the City's misleading message.  *See* Golder Rep. ¶¶ 67-68.  The three
22  major sugar-sweetened beverage manufacturers—Coca Cola, Pepsi, and Dr Pepper—all expect
23  to cease engaging in speech covered by the Warning Mandate if it takes effect.  *See* Declaration
24  of Steve Kelly ¶ 28; Declaration of Matt Johnson ¶ 28; Declaration of James Fox ¶ 27.

25                                    **STANDARD OF REVIEW**

26    A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed
27  on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance
28  of equities tips in its favor, and (4) an injunction would be in the public interest.  *Winter v.*

1    *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Under the 'sliding scale' approach …

2    observed in this circuit … 'a stronger showing of one element may offset a weaker showing of

3    another.'"  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citation omitted).  Thus, if

4    Plaintiffs establish irreparable harm and the "balance of hardships tips *sharply* in [their] favor,"

5    they need "only show that there are 'serious questions going to the merits.'"  *Shell Offshore, Inc.*

6    *v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (citation omitted).

7                                                          **ARGUMENT**

8    **I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

9                Plaintiffs  should  succeed  on  the  merits  of  their  First  Amendment  challenge.    The

10   Warning  Mandate  imposes  content-based  burdens  on  both  noncommercial  and  commercial

11   speech.    As  applied  to  Plaintiffs'  noncommercial  speech,  it  is  subject  to  strict  scrutiny  and

12   presumptively invalid.    As applied to Plaintiffs' commercial speech, it is subject to at least

13   heightened  scrutiny  and  fares  no  better,  because  its  many  exemptions  render  it

14   "unconstitutionally underinclusive," *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898,

15   905 (9th Cir. 2009), and because it is far more invasive than the obvious alternative of having the

16   City broadcast its own views itself.  While the City will argue otherwise, the Warning Mandate's

17   application  to  commercial  speech  cannot  be  sustained  under  *Zauderer*  because  the  City's

18   required message is not "purely factual and uncontroversial" and because the Warning Mandate

19   will "chill[] protected commercial speech" and is too "unduly burdensome" to survive.  471 U.S.

20   at 651.  Laws that force commercial speakers to express controversial and inaccurate messages

21   as the price for speaking do not pass any level of First Amendment scrutiny.

22   
23         **A.    The Warning Mandate Is Unconstitutional As Applied To**
               **Noncommercial Speech**

24                Plaintiffs frequently engage in discussions of "'matters of public concern' that the First

25   Amendment both fully protects and implicitly encourages."  *PG&E*, 475 U.S. at 8-9.  They

26   routinely use billboards and other outdoor advertisements, marked with their identifying logos or

27   representations of their products, to speak out on cultural, social, and health issues relevant to

28   San Franciscans, or to broadcast their participation in or sponsorship of events or programs

within the City.  Because the Ordinance applies broadly to "*any advertisement*, including without limitation, *any logo*, that identifies, promotes, or markets a Sugar-Sweetened Beverage for sale or use," S.F. Health Code § 4202 (emphasis added), the Ordinance would sweep much of this noncommercial speech within its scope, including the following real-world examples: [3]

- Coca-Cola advertisements proclaiming "Love Wins" in response to the Supreme Court's marriage equality ruling, celebrating the Chinese New Year, and promoting scholarship programs (*see* Kelly Decl. ¶ 14 & Exs. A-C);

- Pepsi advertisements exhorting consumers to "Do Some Good" and share ideas for how Pepsi could invest money as part of the Pepsi Refresh Project (*see* Johnson Decl. ¶ 15 & Ex. B);

- Dr Pepper advertisements concerning the Dr Pepper Tuition Giveaway, through which the company has given millions of dollars to help students reach their unique educational goals (*see* Fox Decl. ¶14 & Ex. A);

- Advertisements prominently featuring the logos of the American Beverage Association and its members that promote consumer awareness about balanced diets and the availability of low- and no-calorie alternatives to full-calorie sodas (*see* Declaration of Kevin W. Keane ¶¶ 12-13 & Exs. A-B);

- Plaintiffs' participation in events and programs such as the Pride Parade, Chinese New Year's Festival, and the San Francisco Recreation and Parks Department Mobile Recreation Program, *see, e.g.,* Answer ¶ 30, ECF No. 37, which Plaintiffs often publicize on signs including depictions of their products and logos.

Such educational, political, and social messages fall well beyond the boundaries of core commercial speech.  *See CTIA*, 2015 U.S. Dist. LEXIS 126071, at *32 ("[C]ommercial speech is 'defined as speech that does *no more* than propose a commercial transaction ….'" (emphasis added) (citation omitted).  Even if Plaintiffs' use of identifying logos or product representations rendered such speech *partly* commercial, those features are so inextricably intertwined with the non-commercial messages that the City's regulation of the whole is subject to strict scrutiny.  *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-96 (1988).[4]

---

[3] The Ordinance exempts logos that (1) "occup[y] an area that is less than 36 square inches" *and* (2) are "unaccompanied by any display, representation, or other information identifying, promoting, or marketing a sugar-sweetened beverage."  S.F. Health Code § 4202.  Few of Plaintiffs' signs will be exempt because few meet *both* requirements.  *See, e.g.,* Kelly Decl. ¶ 13; Johnson Decl. ¶ 12; Fox Decl. ¶ 13; Keane Decl. ¶ 14.

[4] In *CTIA*, by contrast, Berkeley's warning was triggered simply by the purchase or lease of a phone.  2015 U.S. Dist. LEXIS 126071, at *4.  Regulation of noncommercial speech thus was not an issue in that case.

1    The Warning Mandate cannot survive strict scrutiny.  As this Court recently recognized,

2    the government cannot "require that a speaker carry a hostile or inconsistent message of a third

3    party, at least in the context of noncommercial speech."  *CTIA*, 2015 U.S. Dist. LEXIS 126071,

4    at *48.  This applies to "business corporations" just as it applies to individuals, and it prohibits

5    not only compelled "expressions of value, opinion, or endorsement, but [also] statements of fact

6    the speaker would rather avoid."  *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515

7    U.S. 557, 573-74 (1995).  Whatever the City claims as its interest, and regardless of whether that

8    interest is deemed compelling, the City cannot establish that the Warning Mandate is narrowly

9    tailored to achieve it:  The compelled warning is misleading; the Warning Mandate contains far

10   too many exemptions and exclusions; and there is a glaringly obvious and less burdensome

11   alternative—the City can use its own megaphone and purse to broadcast its views.  *See infra* at

12   I.B(3).  Because the City cannot lawfully conscript Plaintiffs to carry its message as the price for

13   engaging in noncommercial speech on covered media, the Warning Mandate is invalid.

14       **B.     The Warning Mandate Is Unconstitutional As Applied To**
15       **Commercial Speech**

16   The Warning Mandate also violates the First Amendment as applied to Plaintiffs' purely

17   commercial speech.  The Ninth Circuit recently affirmed that "'the Government's content-based

18   burdens [on commercial speech] must satisfy the same rigorous scrutiny as its content-based

19   bans.'"  *RDN*, 2016 U.S. App. LEXIS 140, at *25 (quoting *Sorrell*, 131 S. Ct. at 2664).  At

20   minimum, therefore, "heightened judicial scrutiny" should apply.[5]  Regardless, the Warning

21   Mandate is so disruptive of speech that it flunks any level of First Amendment review.

---

22   [5] Several Justices have suggested that regulations of commercial speech may warrant strict

23   scrutiny.  *See, e.g.*, *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).  And the
     Court's recent holding that that all content-based regulation of speech is subject to strict scrutiny,

24   regardless of whether it reflects viewpoint discrimination, further undermines any justification
     for applying lesser scrutiny to commercial speech regulations.  *See, e.g.*, *Reed v. Town of Gilbert*,

25   135 S. Ct. 2218, 2232 (2015).  Commercial speech should receive the same protection as non-
     commercial speech, particularly where, as here, the government seeks to compel a controversial

26   message.  *See, e.g.*, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943) (recognizing
     that ordinarily, "involuntary affirmation [may] be commanded only on even more immediate and

27   urgent grounds than silence").  We therefore reserve the right to challenge at an appropriate time
     whether even heightened scrutiny is sufficiently protective of commercial speech.  Because the

28   Ordinance fails heightened scrutiny, however, the question should be academic here.

### 1.      The Warning Mandate Does Not Meet The Requirements of *Zauderer*

To avoid the heightened scrutiny that applies to content-based regulations of commercial speech, *RDN*, 2016 U.S. App. LEXIS 140, at *3, the City undoubtedly will argue that *Zauderer*'s lesser scrutiny should apply here.  It should not.  "To justify a compelled commercial disclosure, assuming the Government articulates a substantial governmental interest, the Government must show that the disclosure is purely factual, uncontroversial, not unduly burdensome, and reasonably related to the Government's interest."  *Am. Meat Inst. v. United States Dep't of Agric.*, 760 F.3d 18, 34 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment); *see also id.* (noting agreement with majority on that point); *RDN*, 2016 U.S. App. LEXIS 140, at *29 (placing burden on government).  The City cannot satisfy these requirements.[6]

In contrast to this Court's conclusion that the notice in *CTIA* "refer[red] consumers to the fact that there are FCC standards on [cell phone radiation] exposure … and advise[d] consumers to refer to their manuals regarding [that information]," 2015 U.S. Dist. LEXIS 126071, at *26, the Warning Mandate compels Plaintiffs to broadcast City *opinions* that conflict with the views of numerous respected scientists, and are contradicted by federal government statements.  Furthermore, requiring businesses to paste the City's controversial and hostile views about their

---

[6]   *Zauderer*'s more lenient scrutiny is also inapplicable here for an additional reason: the Ordinance is not "reasonably related to the State's interest in preventing deception of consumers," 471 U.S. at 651.  Plaintiffs appreciate that this Court recently held that *Zauderer* is not limited to regulations preventing consumer deception.  *See CTIA*, 2015 U.S. Dist. LEXIS 126071, at *46.  We respectfully urge this Court to revisit that conclusion.  Every Supreme Court Justice to specifically address the question has emphasized that "*Zauderer* carries no authority for a mandate unrelated to the interest in avoiding misleading or incomplete commercial messages."  *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 491 (1997) (Souter, Rehnquist, Scalia, Thomas, JJ., dissenting on other grounds); *see also Zauderer*, 471 U.S. at 658 (Brennan & Marshall, JJ., concurring in relevant part) ("[D]isclosure requirements are permissible only to the extent they 'are necessary to prevent [the advertisement from] being deceptive'"(alteration in original) (citation omitted)); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 257 (2010) (Thomas, J., concurring in part and concurring in the judgment) (same).  And in the one case where the issue most directly arose, the Supreme Court expressly found *Zauderer* inapplicable to a government mandate compelling the plaintiffs to "subsidize [commercial] speech with which they disagree[d]" because there was "no suggestion" that the government's mandate was "necessary to make voluntary advertisements nonmisleading for consumers."  *United Foods*, 533 U.S. at 410-11, 416.

products directly alongside any speech promoting those products on covered media will distort, undermine, and suppress the predicate speech that the City is targeting. And the prominence, text and "WARNING" preface of the required warning will compound this chilling effect. Rather than save the Warning Mandate, *Zauderer* underscores why it is invalid.

### a.   The City's Warning Is Not "Purely Factual And Uncontroversial"[7]

As the Ninth Circuit recognizes, *Zauderer* permits only government-compelled disclosures that convey "purely factual and uncontroversial information." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 953, 966 (9th Cir. 2009) (citation omitted). It does not allow the government to force private parties to disseminate mere opinions or assertions, the accuracy of which are subject to genuine dispute. *See id.* at 953. The Warning Mandate fails on that score. Because it compels Plaintiffs to proclaim City opinions that are inaccurate or misleading, or, at minimum, controversial, the Warning Mandate is not eligible for *Zauderer*'s lesser scrutiny and instead is invalid as a matter of law.

Courts examining whether compelled text is purely factual rightly consider what message the text conveys in context. *See, e.g.*, *CTIA – The Wireless Ass'n v. City & Cty. of San Francisco*, 494 F. App'x 752, 753 (9th Cir. 2012) (recognizing that City's recommendations about how to avoid excess radiation "could prove to be interpreted by consumers as expressing San Francisco's opinion that using cell phones is dangerous"); *Am. Meat Inst.*, 760 F.3d at 27 (recognizing the "possibility that some required factual disclosures could be so one-sided or incomplete that they would not qualify as 'factual and uncontroversial'"). Here, considering its application only to certain sugar-sweetened beverages, along with its sheer size and "WARNING" preface, the City's warning conveys several messages:

- Consuming beverages with added sugar is dangerous and harmful to health;

---

[7]  Doctrinally, a finding that an ordinance compels speech that is not purely factual and uncontroversial merely triggers heightened scrutiny. But no court of appeals has ever upheld such an ordinance, nor suggested that the government can ever compel private parties to disseminate controversial government opinions. The Ninth Circuit has recognized this explicitly, holding in *Video Software Dealers Ass'n*, that an ordinance compelling a non-factual or controversial warning violates the First Amendment as a matter of law. 556 F.3d at 966-67.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

- Consuming beverages with added sugar necessarily and inevitably contributes to obesity, diabetes, and tooth decay; and

- Consuming beverages with added sugar contributes to obesity, diabetes, and tooth decay in a unique manner and to a greater extent than consuming either beverages with naturally occurring sugar, or foods or exempt beverages containing an equivalent amount of added sugar or calories. *See also* Compl. ¶¶ 51–59, 61–66, 138-41.

Though presented as facts, these messages conveyed by the warning are merely the City's controversial (and inaccurate) opinions on matters of vigorous and ongoing scientific debate.

*First*, the City's warning conveys a message that sugar-sweetened beverages are inherently dangerous and should be avoided. *See, e.g.*, Golder Rep. ¶¶ 9, 46-47. The Warning Mandate's sponsor acknowledged that the warning "*makes clear* that these drinks aren't harmless—indeed, quite the opposite." Compl. ¶ 138(a) (citation omitted). But that unqualified assertion is inaccurate. Added sugar is "generally recognized as safe" by the FDA, such that it may be used in food "with no limitation other than current good manufacturing practice." 21 C.F.R. § 184.1866(c) (capitalization altered). And numerous respected scientists or scientific organizations believe that added sugar may be consumed as part of a healthy diet that balances caloric intake, energy output, and proper dental hygiene. *See, e.g.*, Compl. ¶ 139(a) (citing position of the world's largest organization of nutrition professionals that "[a]ll foods can fit" within a "pattern … of healthy eating" so long as "consumed in moderation with appropriate portion size and combined with physical activity"); Kahn Rep. ¶ 14 ("[W]hen consumed as part of a diet that balances caloric intake with energy output, consuming beverages with added sugar does not contribute to obesity or diabetes.").

*Second*, and more specifically, the warning conveys that drinking beverages with added sugar, in and of itself, contributes to obesity, diabetes, or tooth decay. *See* Golder Rep. ¶ 56. That too conflicts with the view of the FDA and many respected nutrition scientists. The FDA has found that "inadequate evidence exists to support the direct contribution of added sugars to obesity" and concluded that "under isocaloric [calorically equivalent] controlled conditions, added sugars, *including sugar-sweetened beverages*, are no more likely to cause weight gain in adults than any other source of energy." 79 Fed. Reg. 11,880, 11,904 (Mar. 3, 2014) (emphasis

1   added).   In other words, substituting sugar-sweetened beverages for an identical number of

2   calories from any other caloric source does not contribute to weight gain or loss.  Indeed, as Dr.

3   Kahn explains, the majority of "studies show that sugar-sweetened beverage consumption does

4   not lead to weight gain in the context of a diet in which energy intake is equal to energy

5   expenditure."  Kahn Rep. ¶ 45; *see also id.* ¶¶ 46-55.  Rather, "it is the consumption of *excess*

6   calories relative to one's caloric output that leads to increases in weight, not whether those

7   calories are composed of sugar-sweetened beverages or any other source of calories."  *Id.* ¶ 45.

8   The same is true of diabetes.  *See id.* ¶ 65 ("[T]here is no direct evidence that sugar itself, in

9   liquid or solid form, causes an increase in appetite, decreases satiety, or causes diabetes.  If there

10  are any adverse effects of added sugar, they are due entirely to the calories it provides, and it is

11  therefore *indistinguishable from any other caloric food*." (emphasis added) (citation omitted)).

12  Similarly, experts have noted that "drinking [soda] in moderation may represent no harm at all"

13  to your teeth.  Compl. ¶ 139(b) (citing report of the Wisconsin Dental Association).

14       Although many San Franciscans drink beverages containing added sugar, the California

15  Department of Health recently found that approximately *90 percent* of San Francisco adults are

16  not obese—illustrating that many San Franciscans consume sugar-sweetened beverages while

17  balancing their calorie consumption and physical activity.  Nutrition Education and Obesity

18  Prevention Branch, California Department of Public Health, *Obesity in California: The Weight of*

19  *the   State,   2000-2012* at   20-21   (2014),   https://www.cdph.ca.gov/programs/cpns/

20  Documents/ObesityinCaliforniaReport.pdf.   For many San Franciscans, therefore, drinking

21  sugar-sweetened beverages does not contribute to obesity (or secondarily to diabetes).   At

22  minimum, the warning's contrary inference is misleading.

23       *Finally*, the City's warning conveys that covered beverages with added sugar contribute

24  uniquely to these adverse health conditions compared with beverages with naturally occurring

25  sugar or foods or exempted beverages with added sugar.  *See* Golder Rep. ¶ 56.  This too

26  conflicts with many scientists' views and is at minimum quite controversial.  *See, e.g.*, Kahn

27  Rep. ¶ 43 ("I do not believe that sugar-sweetened beverages uniquely contribute to obesity or

28  diabetes."); *id.* ¶ 15 ("The human body does not distinguish between sugars found in a food and

those added to a food …."); 79 Fed. Reg. at 11,903 (concluding that "added sugars are not chemically different from naturally occurring sugars"); *id.* (noting "there is a lack of scientific agreement on the effects of added sugars on health outcomes independent of the effects of total sugar"); American Dental Association, Comments on the Scientific Report of the 2015 Dietary Guidelines Advisory Committee at 6 (May 8, 2015), http://www.ada.org/~/media/ADA/Advocacy/Files/ltr_150508_hhs_dgac2015_nosig.ashx (concluding, despite the "growing popularity of singling-out sugar-sweetened beverages as a key driver of dental caries [tooth decay]," that "the evidence is not yet sufficient to single out any one food or beverage product as a key driver").  Even the City appears to concede that whether added sugar contributes uniquely to obesity, diabetes, and tooth decay relative to other caloric sources is a matter of scientific debate.  Answer ¶¶ 46-49, 52; City's Responses to ABA's First Requests For Admission ¶¶ 37-38 (Jan. 7, 2016) (acknowledging "some scientists question whether the ingredients in [sugar-sweetened beverages] have intrinsic chemical properties that make them uniquely likely to contribute to obesity" or "to diabetes").

The City's warning is particularly misleading because it targets beverages equally without regard to how many calories or grams of added sugar particular beverages actually contain.  Thus, the warning applies to sports drinks and mid-calorie sodas that contain as few as 30 calories, while exempting 100% juices and milk substitutes containing far more calories and total sugar.[8]  Indeed, most beverages targeted by the Warning Mandate—including even full-calorie sodas—contain less added sugar than the FDA's proposed daily reference value for added sugar.  *See* 80 Fed. Reg. 44,303, 44,304 (July 27, 2015).  And most San Franciscans consume sugar-sweetened beverages less frequently than once a day.  *See* S.F. Health Code § 4201.[9]

---

[8] The Warning Mandate thus compels warnings even on advertisements for beverages defined by the FDA as containing "low calories," or less than 40 calories per 8 fluid ounces.  21 C.F.R. § 101.60(b)(2)(i)(A).

[9] At minimum, the Warning Mandate will mislead consumers by requiring warnings on advertisements for low- or *no*-calorie alternatives to sugar-sweetened beverages that also "identif[y] a Sugar-Sweetened Beverage for sale or use."  *See, e.g.*, Kelly Decl. ¶ 19 & Ex. F.

Because it conveys government *opinions* that are—at minimum—the subject of substantial scientific debate, the City's compelled warning is categorically different from what courts have found to be disclosures of *uncontroversial facts* that may be upheld under *Zauderer*. *See Zauderer*, 471 U.S. at 650 (requiring disclosure of contingent-fee clients' liability for costs); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 233-34 (2010) (requiring disclosure that certain services were "with respect to bankruptcy relief"); *Am. Meat Inst.*, 760 F.3d at 27 (requiring disclosure of product's country-of-origin); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107 (2d Cir. 2001) (requiring disclosure that mercury was present in product); *cf. CTIA*, 2015 U.S. Dist. LEXIS 126071, at *62 (construing Berkeley's notice to require disclosure of "accurate and uncontroversial information—*i.e.*, that the FCC has put limits on RF energy emission with respect to cell phones and that wearing a cell phone against the body (without any spacer) may lead the wearer to exceed the limits").

Ultimately, this Court does not need to decide whether the City's views are wrong.  It is enough that their accuracy is subject to genuine dispute.  The City cannot prove otherwise.  Because the messages conveyed by the warning are hotly debated, the City cannot compel private parties to broadcast those messages, under *Zauderer* or any other established level of First Amendment scrutiny.

### b.    The Warning Mandate Is Unduly Burdensome And Chills Protected Commercial Speech

Even if its warning was factual and uncontroversial, the Warning Mandate would still fail, because even under *Zauderer*, disclosure requirements that are so "unduly burdensome" as to "chill[] protected commercial speech" violate the First Amendment.  471 U.S. at 651; *accord Am. Meat Institute*, 760 F.3d at 27 (finding it "obvious … that Zauderer cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech").  The City cannot meet its burden to disprove that chilling effect here.  *See RDN*, 2016 U.S. App. LEXIS 140, at *16-17 (government bears burden to satisfy factors applied for scrutinizing commercial speech).

1    The evidentiary record in this case establishes that the Warning Mandate imposes such an

2   overwhelming burden on regulated speech that it not only will distort and undermine the speech

3   that it targets but will effectively drive many regulated speakers entirely out of covered media in

4   San Francisco.  Unlike most labeling and disclosure requirements, this compelled warning is

5   triggered by and directly burdens *speech* itself—attaching adverse consequences to a party's

6   decision to speak.  In this way, as well, the Warning Mandate differs from the regulation at issue

7   in *CTIA*.  The Berkeley ordinance requires retailers to provide a notice "to any customer who

8   buys or leases a cell phone."  *CTIA*, 2015 U.S. Dist. LEXIS 126071, at *2.  That disclosure is not

9   triggered by the retailer's affirmative speech.  But San Francisco's Ordinance is aimed *directly* at

10   private parties' speech.  It prohibits regulated parties from promoting their products on any

11   covered media within city limits unless they are willing to devote a large swath of their

12   billboards, posters, and displays to the City's hostile message that denounces those products,

13   hijacking and undermining the purpose and content of the advertisements.  The chilling effect of

14   this regulation on speech is obvious and, as explained below, well substantiated.

15    Affixing the City's warning to Plaintiffs' advertisements, *see, e.g.*, Golder Rep. Ex. D-2,

16   would fundamentally alter consumers' perception of the messages those advertisements convey,

17   *see* Golder Rep. ¶¶ 42, 49-53.  The warning's "prominence" and "severity" would cause

18   "consumers to perceive the Warning Message as one of the primary messages of the

19   advertisement, if not *the* primary message of the advertisement."  *Id.* ¶ 50.  As a result, Plaintiffs'

20   intended positive messages would be overwhelmed, and their billboards, signs, and displays

21   would instead convey negative messages about Plaintiffs' products and brands.  *See id.*  And

22   when those hostile messages invariably are disseminated further through word-of-mouth, the

23   harm to Plaintiffs' brands will not be limited to San Francisco.  *See id.* ¶ 66.

24    It makes no sense for sugar-sweetened beverage producers to pay for advertising that will

25   harm their brands and goodwill, mislead consumers, undermine their messages, and subsidize the

26   City's hostile views.  Accordingly, the Warning Mandate will not end up adding the City's voice

27   to the public debate; it will instead subtract from that debate by driving regulated speakers out of

28   covered media in San Francisco.  *See* Kelly Decl. ¶ 28; Johnson Decl. ¶ 28; Fox Decl. ¶ 27.

1   Private advertisements carrying the City's message will be few and far between, as most

2   beverage producers will react by limiting their advertising to the numerous media (television,

3   radio, social media, print, etc.) that are exempt from the Warning Mandate. *See, e.g.*, Golder

4   Rep. ¶¶ 67-68; Kelly Decl. ¶ 28. With concrete evidence that the most prolific advertisers will

5   withdraw their speech from covered media if the Warning Mandate takes effect, the City cannot

6   dispute that its Warning Mandate will meaningfully chill the speech that it has targeted. *Cf.*

7   *PG&E*, 475 U.S. at 14 (rather than convey hostile message, speakers may conclude "the safe

8   course is to avoid controversy" and not speak at all, "thereby reducing the free flow of

9   information and ideas that the First Amendment seeks to promote" (citation omitted)).

10   Whereas in *CTIA* this Court concluded that the "need for 'corrective' counterspeech

11   [was] minimal," the need for counterspeech here is obvious. *See id.* at 15-16 (noting the

12   "pressure to respond 'is particularly apparent when the [speaker] has taken a position opposed to

13   the view being expressed on his property [by a third party]'" (citation omitted)). But counter-

14   speech is not a meaningful option here. It would transform Plaintiffs' signs from product

15   promotion into a scientific debate. In addition here, because the City's warning already takes up

16   a substantial *20% of each advertisement*, an ad modified to include a suitably large-font response

17   would leave little space for Plaintiffs' originally intended message. By precipitating an acute

18   need for counterspeech, while simultaneously rendering counterspeech infeasible, the City

19   unduly burdens speech. *See Zauderer*, 471 U.S. at 663-64 (Brennan, J., concurring in relevant

20   part) (disclosure requirement that fills up an ad would chill speech and "could not possibly pass

21   constitutional muster"); *CTIA – The Wireless Ass'n v. City & Cty. of San Francisco*, 827 F.

22   Supp. 2d 1054, 1064 (N.D. Cal. 2011) (requiring retailers to "paste [San Francisco's required

23   warning] over their own promotional literature … would unduly interfere with the retailers' own

24   right to speak to customers"), *aff'd*, 494 F. App'x 752 (9th Cir. 2012).[10]

25   ───────────────

26   [10] Requiring regulated parties to dedicate 20% of their signage to the City will also unduly
     burden Plaintiffs' speech by preventing them from utilizing creative content that either cannot fit

27   on the advertisement's remaining space or is incompatible with the tenor and content of the
     City's warning. This burden is especially problematic for CSOAA's members, who provide

28   forums for sugar-sweetened beverage advertising, because it forces them to speak about products

1   When government-compelled speech so profoundly burdens private speech that it

2   suppresses dissent, it diminishes rather than expands public debate and tramples core First

3   Amendment values.  Because the City's Warning Mandate would distort and, as a practical

4   matter, silence Plaintiffs' speech on covered media within city limits, its operation should be

5   enjoined under *Zauderer* or any other level of scrutiny.

6           **2.      Compelled Speech Identified As The Government's Does Not
                       Receive Lesser Scrutiny**

7

8           A final issue bears discussion.  In *CTIA,* this Court indicated that compelled speech that

9   is expressly identified as the speech of the government (or another third party) might be subject

10  to merely rational-basis review even if it does not meet the requirements for review under

11  *Zauderer.*  2015 U.S. Dist. LEXIS 126071, at *51-54.  The Court suggested that speakers' "First

12  Amendment interests are less obvious" where "no one could reasonably mistake that speech as

13  emanating from [the private speaker] itself."  *Id.* at *47.  But the Supreme Court has squarely

14  rejected that view.  It has explained that "[n]othing in *Zauderer* suggests" that the government is

15  "free to require corporations to carry the messages of third parties, where the messages

16  themselves are biased against or are expressly contrary to the corporation's views."  *PG&E*, 475

17  U.S. at 15 n.12; *see also United States v. United Foods, Inc.*, 533 U.S. 405, 413 (2001)

18  (compelled subsidy for commercial speech not saved by the fact that "the party who protests the

19  assessment here is required simply to support speech by others, not to utter the speech itself").

20          Treating compelled speech the same regardless of attribution makes sense because it

21  threatens numerous important First Amendment interests regardless of any risk of misattribution.

22  Forcing a private speaker to pay for and broadcast a government or third party message with

23  which she disagrees as the price for speaking forces her to choose between (1) remaining silent

24  (suppressing her speech); (2) subsidizing and "appear[ing] to agree" with the controversial

25  _____

26  they neither make nor sell.  *See Am. Meat Inst.*, 760 F.3d at 26 (noting *Zauderer*'s reduced
    scrutiny is inapplicable unless "the disclosure mandated ... relate[s] to the good or service
27  offered by the regulated party"); *see also id.* at 33 n.1 (Kavanaugh, J., concurring in the
    judgment) (finding this principle "obvious").
28

1   message (violating her right against compelled association), (3) or responding with counter-

2   speech, further distorting and transforming her intended message.  "This pressure to respond 'is

3   particularly apparent when the owner has taken a position opposed to the view being expressed

4   *on [her] property*.'" *PG&E*, 475 U.S. at 15-16 (emphasis added) (citation omitted)).  The City

5   could not force an individual to subsidize and disseminate the City's opinions, even if attributed

6   to the City, and no different rule applies to commercial entities like Plaintiffs.

7        This Court in *CTIA* suggested that *PG&E*'s reasoning might not apply to commercial

8   speech.  It reasoned that, in this context, compelled attributed speech might actually "enhance[]

9   the marketplace (as well as the marketplace of ideas)," because if the compelled party felt

10  obligated to respond with counterspeech that would simply result in "more speech," which would

11  benefit consumers.  *CTIA*, 2015 U.S. Dist. LEXIS 126071, at *49.  Of course, it is well

12  established that being forced to speak when one would prefer to remain silent is an independent

13  First Amendment wrong.  *See. e.g., Frudden v. Pilling*, 742 F.3d 1199, 1202-03 (9th Cir. 2014).

14  In any event, *CTIA*'s reasoning is inapplicable to *this* case, where the trigger requiring

15  conveyance of the government's message is protected *speech itself.*  Compelling private speakers

16  to append to their speech a hostile message (attributed or not) as the price for speaking will

17  "deter [speakers] from speaking out in the first instance." *PG&E*, 475 U.S. at 10; *see supra* at

18  I.B(1)(b).  That is particularly true here because the Warning Mandate requires advertisers to

19  paste the government's message over *20%* of their own protected message, such that responding

20  would convert the advertisement into a distracting debate, leaving little or no room for the

21  original promotional message.  Thus, regardless of attribution, the City's warning is so distortive

22  of Plaintiffs' advertisements that many have concluded it would be better not to speak.  Kelly

23  Decl. ¶ 28; Johnson Decl. ¶ 28; Fox Decl. ¶ 27.  This will not "advance free discussion." *PG&E*,

24  475 U.S. at 10.  It will reduce speech and diminish public debate.

25            **3.      The Warning Mandate Fails Heightened Scrutiny**

26        Because the Warning Mandate does not contain purely factual and uncontroversial

27  information and unduly burdens protected commercial speech, it cannot satisfy even *Zauderer*'s

28  lesser standard.  By necessity, the City cannot meet its burden to show the Warning Mandate

survives heightened scrutiny.[11]   It fails heightened scrutiny for at least two reasons.  First, the City cannot show that the Warning Mandate will directly and materially advance its asserted interests.  It is fatally under-inclusive, requiring no warnings on most types of advertising media and no warnings for foods and many beverages with equal or greater amounts of sugar and calories.  The warning is also insufficiently informative to truly educate consumers.  Second, the Ordinance burdens far more speech than necessary to achieve its goals, given the obvious alternative of the City conveying its views via its own ads (at its own expense).

### a.   The Ordinance Does Not Directly And Materially Advance The City's Interest

The Warning Mandate is so riddled with exceptions, and the warning itself is so uninformative and misleading, that it will not directly and materially aid informed consumer choice or improve public health.

"[R]egulations are unconstitutionally underinclusive when they contain exceptions that bar one source of a given harm while specifically exempting another in at least two situations." *Metro Lights*, 551 F.3d at 906 (citation omitted).  If a law burdening commercial speech is so permeated with exceptions that it cannot achieve its aim, the law fails.  *See id.* at 905.   In particular, courts have struck down laws "forbidding one type of advertising but not another" that would "merely channel" the target of the government's regulation to another forum.  *Id.* at 905-96 (citation omitted) (discussing *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173 (1999))  And if the exceptions made do not relate to the interest the government seeks to advance, the law likewise fails.  *See id.*  The Warning Mandate fails on both grounds.

The Warning Mandate has broad "exceptions that 'undermine and counteract' the interest the government claims it adopted the law to further.'"  *Id.* at 905 (citation omitted).  It exempts

---

[11] In *RDN*, the Ninth Circuit held that *Sorell* requires "heightened judicial scrutiny of content-based restrictions on non-misleading commercial speech regarding lawful products, rather than … intermediate scrutiny." 2016 U.S. App. LEXIS 140, at *3.  Although it continued to apply *Central Hudson*'s  four-part test, the Court of Appeals gave greater scrutiny—more bite—to each part of that test.  *See, e.g., id.* at *19 (noting Government's "heavier burden" to show the challenged law is tailored to achieving the government's interest).

major segments of sugar-sweetened beverage advertising—including newspapers, magazines, periodicals, circulars, television, radio, the internet, and other electronic media.  And it excludes numerous categories of signage.  *See* Compl. ¶¶ 117-24.  These exceptions ensure that the lion's share of sugar-sweetened beverage advertising will not carry the City's warning—and that under-inclusiveness will become even more pronounced as sugar-sweetened beverage advertisers shift their advertising to exempt media.  *See infra* at I.B(1)(b).  The Warning Mandate also excludes a laundry list of products (such as 100% juices, chocolate milk, candy, and maple syrup) that contain as much or more sugar or calories than the products covered by the Mandate. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011).

The Supreme Court has, under *Central Hudson*, struck down several laws whose exceptions and exemptions similarly undermined the government's asserted interests.  *See, e.g.*, *Greater New Orleans Broad. Ass'n*, 527 U.S. at 189 (law suppressing advertising for private, but not Native American casinos, "would merely channel gamblers to one casino rather than another"); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488-91 (1995); *City of Cincinnati v. Discovery Network*, *Inc.*, 507 U.S. 410, 424 (1993).  The same result should obtain here.

In addition, the Warning Mandate's broad exemption of all print, TV, radio and internet advertising, and numerous categories of signage is inconsistent with the City's asserted interest in promoting health.  *See* City's Responses to CSOAA's First Requests for Admission ¶ 3 ("[T]he City admits that the presence of the warning, rather than its absence from certain media, is what promotes public health."); City's Response to CSOAA First Set of Interrogatories ¶ 1 (admitting that "the appearance of the warning in other media might increase its impact or reach").  The same is true of its exclusion of all food and numerous categories of beverages with added sugar.  The City's asserted purpose "*to inform the public of the presence of added sugars and thus promote informed consumer choice that may result in reduced caloric intake*," S.F. Health Code § 4201 (emphasis added), is incompatible with excluding countless foods and beverages containing added sugar.  This lack of fit between its exceptions and the City's asserted

1   interests is also fatal.  *See Discovery Network*, 507 U.S. at 424 (invalidating regulation because

2   city's "categorical ban on commercial newsracks [while allowing noncommercial newsracks] …

3   bears no relationship *whatsoever* to the particular interests that the city has asserted").

4       Finally, the prescribed warning provides too little information and misleads too greatly to

5   advance the City's stated interest in helping consumers make *informed* choices.  It does not tell

6   consumers anything about the nutritional value of any targeted product.  It does not inform

7   consumers that overconsumption of any food or beverage, regardless of added sugar content,

8   equally contributes to weight gain.  And it does not explain to consumers how total caloric

9   intake, exercise, age, or genetics factor into the equation.  By instead simply singling out

10  particular products for condemnation, the Warning Mandate is "potentially harmful to overall

11  efforts at weight management."  *See* Kahn Rep. ¶¶ 76, 80.

12
13                 **b.**      **The Warning Mandate Burdens Far More Protected**
                                **Speech Than Necessary To Advance The City's Interest**

14      The Warning Mandate also fails heightened scrutiny because it interferes with far more

15  private speech than necessary to advance the City's asserted interests in promoting informed

16  consumer choice and public health.  "[T]he availability of obvious less-restrictive alternatives

17  renders a speech restriction overinclusive."  *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th

18  Cir. 2013).  Because San Francisco is free to itself convey its thoughts about sugar-sweetened

19  beverages, it need not burden any private speech.  The Warning Mandate thus burdens *infinitely*

20  more speech than necessary.  *See, e.g.*, *Linmark Assocs., Inc. v. Willingboro*, 431 U.S. 85, 97

21  (1977) (government could have exercised alternative of engaging in its own speech, educating

22  the community and giving "widespread publicity" to issue); *Evergreen Ass'n v. City of New*

23  *York*, 740 F.3d 233, 250-51 (2d Cir. 2014) (law requiring pregnancy centers to encourage

24  pregnant women to consult a doctor was insufficiently tailored because, *inter alia*, the

25  government could have communicated its message through *its own advertisements*).

26      For all of these reasons, the Warning Mandate cannot survive First Amendment  scrutiny.

27  **II.**     **ENFORCING THE ORDINANCE DURING THE PENDENCY OF THIS
            LAWSUIT WOULD IRREPARABLY HARM PLAINTIFFS**

28      Absent a preliminary injunction, Plaintiffs will suffer irreparable harm because the

Warning Mandate will substantially burden their speech and cause them unquantifiable economic and competitive losses.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Valle Del Sol Inc.*, 709 F.3d at 828 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Warning Mandate will violate Plaintiffs' free speech rights by compelling them to convey and subsidize inaccurate, misleading, and controversial messages with which they disagree—distorting and undermining their own speech. *See* Keane Decl. ¶¶ 23, 27-28; Declaration of Meghan Loper ¶¶ 22-28. Because many ABA members will abandon advertising on covered media as the lesser of two evils, and some CSOAA members may forgo advertising covered beverages entirely,[12] Loper Decl. ¶ 24, much of Plaintiffs' speech will be suppressed. In all of these ways, Plaintiffs will suffer *per se* irreparable harm.[13]

The Warning Mandate will also cause Plaintiffs significant and unquantifiable economic harm because the scripted warning will damage the reputation and goodwill associated with their companies and products. *See, e.g.*, Golder Rep. ¶¶ 9, 63-64; Fox Decl. ¶ 22. A threat to a company's "reputation and goodwill … constitutes irreparable harm, as it is not readily compensable." *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474 (9th Cir. 2015); *see also Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). And those Plaintiffs who try to avoid that damage by

---

[12] Retailers likewise may limit the use of in-store signage advertising sugar-sweetened beverages to avoid controversy or association with the City's message. *See* Golder Rep. ¶ 68.

[13] It is no answer that these Plaintiffs will remain free to speak through media exempted from the Warning Mandate. The silencing of their speech with respect to covered media constitutes irreparable injury. *See Reno v. ACLU*, 521 U.S. 844, 880 (1997) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." (citation omitted)). Indeed, a particular outdoor sign in a particular place "often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). Plaintiffs choose to use the covered media, among others, because they believe that is the most effective way to spread their messages. *See* Keane Decl. ¶¶ 10, 20; Fox Decl. ¶¶ 10-11; Johnson Decl. ¶¶ 10-11; Kelly Decl. ¶¶ 10-11. In addition, in many instances, the location of a sign often "provide[s] information about the identity of the speaker," which "is an important component of many attempts to persuade." *City of Ladue*, 512 U.S. at 43, 56.

1  withdrawing from covered media will be forced to forgo valuable channels of customer
2  communication.

3        Finally, the Warning Mandate will further irreparably harm CSOAA's members by
4  placing them at a dramatic competitive disadvantage with respect to sugar-sweetened beverage
5  advertising.  *See* Loper Decl. ¶¶ 6, 8, 14-20.  CSOAA members actively compete with other
6  forms of media for sugar-sweetened beverage-advertising business.  *Id.* ¶ 19.  But the Warning
7  Mandate targets outdoor advertising while exempting other forms of advertising, and thus "will
8  incentivize [sugar-sweetened beverage] customers to move their business to media that are not
9  subject to the Warning Mandate."  *Id.*  Indeed, following enactment of the Ordinance, CSOAA
10  members' competitors immediately began to trumpet their exempt status as a reason for sugar-
11  sweetened beverage manufacturers and retailers to shift advertising to their outlets, and have
12  continued to do so.  *Id.* ¶ 20.  Not surprisingly, sugar-sweetened beverage manufacturers and
13  retailers—who are among the largest customers of outdoor advertising space, *id.* ¶ 6—have
14  stated that they will do just that.  *See supra* at I.B(1)(b).  This competitive disadvantage, which
15  will result in the loss of customers and related goodwill, is irreparable harm.  *See, e.g., Int'l*
16  *Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) ("A rule putting plaintiffs at
17  a competitive disadvantage constitutes irreparable harm."); *Stuhlbarg Int'l Sales Co. v. John D.*
18  *Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective
19  customers or goodwill certainly supports a finding of the possibility of irreparable harm").
20  Indeed, CSOAA members have *already* begun to experience these harms due to the substantial
21  lead time for placing ads, and the fact that, as amended, the Warning Mandate now applies to any
22  sugar-sweetened beverage advertisements erected after October 20, 2015.  *See* Loper Decl. ¶¶ 6,
23  16-17.

24        As a result of all these harms, the Warning Mandate is already inflicting and—in the
25  absence of injunctive relief, will continue to inflict—both constitutional and incalculable
26  financial harm on Plaintiffs.  A preliminary injunction is needed to prevent those harms.

27  **III.  THE REMAINING FACTORS SUPPORT AN INJUNCTION**

28        The balance of harms and public interest both strongly favor a preliminary injunction.

1   Protecting First Amendment rights is unequivocally in the public interest, and courts in this

2   Circuit "have consistently recognized the significant public interest in upholding First

3   Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted).

4   The public likewise has no interest in paying to defend an unconstitutional law.  Because the

5   City "has no legitimate interest in enforcing an unconstitutional ordinance," it would not be

6   harmed by the issuance of a preliminary injunction.  *KH Outdoor, LLC v. City of Trussville*, 458

7   F.3d 1261, 1272 (11th Cir. 2006).  The City, moreover, has no pressing need to begin enforcing

8   the Ordinance immediately.  Because of the Warning Mandate's chilling effect, Plaintiffs largely

9   would exit covered media.  *See supra* at I.B(1)(b).  As a result, few advertisements in San

10  Francisco would actually carry the City's required warning after the Warning Mandate takes

11  effect.  An injunction, moreover, would not prevent the City from communicating through its

12  own advertising.  The harm to the City from a delay, therefore, is minimal.

13      By contrast, because Plaintiffs will be chilled from speaking in covered media unless a

14  preliminary injunction issues, their harm will be significant and irreparable absent preliminary

15  relief.  Likewise, because the Ordinance will reduce speech—as manufacturers, retailers, and

16  advertisers seek to avoid associating themselves or their products with the City's hostile and

17  misleading message—it will disserve the public interest by making less information available to

18  consumers.  *See CTIA*, 2015 U.S. Dist. LEXIS 126071, at *51 ("[T]he value of commercial

19  speech comes from the information it provides—*i.e.*, more speech, not less.").

20      Finally, because many messages conveyed by the Warning Mandate are inaccurate,

21  preliminary relief will avoid misleading the public.  For all of these reasons, the final two factors

22  also weigh strongly in favor of the entry of a preliminary injunction.

23                                  **CONCLUSION**

24      For the forgoing reasons, Plaintiffs respectfully request that this Court grant this Motion

25  and enjoin enforcement of the Ordinance pending its entry of final judgment in this lawsuit.

26

27

28

1   Dated:  January 12, 2016                    Respectfully submitted,

2                                               LATHAM & WATKINS LLP

3
                                                By  /s/ James K. Lynch
4                                                   James K. Lynch (CA Bar No. 178600)
                                                    Marcy C. Priedeman (CA Bar No. 258505)
5                                                   LATHAM & WATKINS LLP
                                                    505 Montgomery Street
6                                                   Suite 2000
                                                    San Francisco, CA 94111-6538
7                                                   T +1.415.391.0600
                                                    F +1.415.395.8095
8                                                   jim.lynch@lw.com

9                                                   Richard P. Bress (Admitted *Pro Hac Vice*)
                                                    Michael E. Bern (Admitted *Pro Hac Vice*)
10                                                  John S. Cooper (Admitted *Pro Hac Vice*)
                                                    LATHAM & WATKINS LLP
11                                                  555 Eleventh Street, NW
                                                    Suite 1000
12                                                  Washington, DC 20004-1304
                                                    Direct Dial: +1.202.637.1022
13                                                  Fax: +1.202.637.2201
                                                    rick.bress@lw.com
14
                                                    *Attorneys for Plaintiff*
15                                                  The American Beverage Association

16
    Dated:  January 12, 2016
17                                              By  /s/ Theodore B. Olson
                                                    Theodore B. Olson (CA Bar No. 38137)
18                                                  Andrew S. Tulumello (CA Bar No. 196484)
                                                    Helgi C. Walker (Admitted *Pro Hac Vice*)
19                                                  Jacob T. Spencer (Admitted *Pro Hac Vice*)
                                                    GIBSON, DUNN & CRUTCHER LLP
20                                                  1050 Connecticut Avenue, NW
                                                    Washington, DC 20036-5306
21                                                  T +1.202.955.8668
                                                    F +1.202.530.9575
22                                                  TOlson@gibsondunn.com

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Charles J. Stevens (CA Bar No. 106981)
Joshua D. Dick (CA Bar No. 268853)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Direct Dial: +1.415.393.8233
Fax: +1.415.374.8469
CStevens@gibsondunn.com

*Attorneys for Plaintiff*
California State Outdoor Advertising
Association

Dated:  January 12, 2016

By  /s/ Thomas S. Knox
   Thomas S. Knox (CA Bar No. 73384)
KNOX, LEMMON & ANAPOLSKY, LLP
300 Capitol Mall, Suite 1125
Sacramento, CA 95814
Direct Dial: +1.916.498.9911
Fax: +1.916.498.9991
CStevens@gibsondunn.com

*Attorneys for Plaintiff*
California Retailers Association

### ATTESTATION OF CONCURRENCE IN THE FILING

Pursuant to Civil Local Rule No. 5-1(i)(3), I declare that the concurrence has been obtained from each of the above signatories to file this document with the Court.

/s/ James K. Lynch
James K. Lynch