United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br> Defendant. | Case No.  15-cv-03415-EMC <br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Docket No. 50 |

Plaintiffs are the American Beverage Association ("ABA"), California Retailers Association ("CRA"), and California State Outdoor Advertising Association ("CSOAA").  They have filed suit against Defendant the City and County of San Francisco ("City" or "San Francisco"), challenging two ordinances enacted in 2015, which modified the San Francisco Administrative and Health Codes.  Plaintiffs contend these ordinances violate their and their members' constitutional rights.

Currently pending before the Court is Plaintiffs' motion for a preliminary injunction in which they focus on only one of those ordinances – *i.e.*, that which modified the City Health Code. The ordinance, though passed in 2015, does not become operative until July 25, 2016.[1]  *See* Compl. ¶ 20.  In essence, the ordinance requires certain kinds of advertisements related to sugar-

---

[1] Plaintiffs have not delayed in seeking preliminary injunctive relief.  Plaintiffs initiated this lawsuit on July 24, 2015.  *See* Docket No. 1 (complaint).  On the same day, Plaintiffs moved for a preliminary injunction.  *See* Docket No. 14 (motion).  Subsequently, the parties agreed that the City would not enforce the ordinance pending a final judgment in this case.  *See* Docket No. 35 (stipulation and order, filed in August 2015).  A few months thereafter, the Court set a hearing and briefing schedule for the preliminary injunction motion.  *See* Docket No. 45 (stipulation and order, filed in October 2015).

**United States District Court**
For the Northern District of California

1    sweetened beverages ("SSBs") to display a warning from the City that says: "'WARNING:

2    Drinking beverages with added sugar(s)[2] contributes to obesity, diabetes, and tooth decay.  This

3    is a message from the City and County of San Francisco.'"  S.F. Health Code § 4203(a).

4        The pending motion focuses on Plaintiffs' First Amendment challenge to the ordinance.

5    According to Plaintiffs, the ordinance violates their and/or their members' free speech rights by

6    forcing them to include a warning that they would not otherwise give.  In essence, Plaintiffs

7    contend the ordinance compels speech unconstitutionally.  Having considered the parties' briefs

8    and accompanying submissions, as well as the oral argument of counsel, the Court hereby

9    **DENIES** Plaintiffs' motion for a preliminary injunction.

I.     FACTUAL & PROCEDURAL BACKGROUND

A.    Parties

Plaintiffs are three organizations: ABA, CRA, and CSOAA.[3]

- "ABA is a national trade organization representing the non-alcoholic beverage industry, including beverage producers, distributors, franchise companies, and support industries. ABA members bring to market beverages including carbonated soft drinks, bottled water . . . , sports drinks, energy drinks, 100% juices, juice drinks, and ready-to-drink teas." Keane Decl. ¶ 3.  Products sold by ABA members throughout California, including the City, include Coke, Pepsi, and Dr. Pepper.  *See* Keane Decl. ¶ 4.

- "CRA is a statewide trade association representing all segments of the retail industry including general merchandise, department stores, mass merchandisers, restaurants,

---

[2] Added sugar is "sugar that is not naturally present in foods and beverages, which sweetens food but adds no nutrition."  Opp'n at 2; *see also* Kahn Reply Rpt. ¶ 55 (acknowledging that "added sugar contains no essential nutrients").

[3] Although Plaintiffs in this case are these three organizations only, at times, the Court uses the term "Plaintiffs" loosely – *i.e.*, to mean not only Plaintiffs but also their members, as (for the most part) it is their members' free speech rights that are primarily at issue.  *See, e.g.*, Compl. ¶ 30 ("This action is germane to the purpose of ABA and neither the claims asserted nor the relief requested require the participation of its members."); Compl. ¶ 25 ("Plaintiffs also seek an injunction, restraining the City . . . from enforcing or threatening to enforce any part of the Ordinances against Plaintiffs and any of Plaintiffs' members."); Compl. ¶ 154 ("The Speech Ban constitutes impermissible viewpoint discrimination in violation of Plaintiffs' and their members' First Amendment rights.").

1  convenience stores, supermarkets and grocery stores, chain drug, and specialty retail . . . .

2  CRA members sell beverages including carbonated soft drinks, [etc.]"  Williams Decl. ¶ 3.

3  Beverages sold by CRA members throughout California, including the City, include Coke,

4  Pepsi, and Dr. Pepper.  *See* Williams Decl. ¶ 4.

5  •    "CSOAA is a statewide trade association representing the interests of outdoor advertisers

6        in the California Legislature and in local governments across the state.  CSOAA's

7        membership includes 14 outdoor companies and 22 associate members."  Loper Decl. ¶ 3.

8        "CSOAA members offer advertising space throughout the State of California, including in

9        San Francisco.  This advertising space includes billboards . . . ; advertising in airports,

10       malls, stadiums, transit shelters, and other venues; advertising in and on buses [etc.]."

11       Loper Decl. ¶ 5.

12       Defendant is the City of San Francisco.

13       Both Plaintiffs and the City have support from third-party organizations.  More

14  specifically, the Association of National Advertisers, Inc. ("ANA") has filed an amicus brief in

15  support of Plaintiffs.  In turn, various public interest organizations, including but not limited to the

16  American Heart Association and the American Academy of Pediatrics (California), have

17  submitted an amicus brief in support of the City.

18  B.    <u>Ordinance</u>

19       The ordinance being challenged by Plaintiffs is City Ordinance No. 100-15.  It has been

20  codified in the San Francisco Health Code at §§ 4200-06.

21       Section 4201 states the findings and purpose underlying the ordinance.  It provides as

22  follows:

23

24       Human consumption of Sugar-Sweetened Beverages (SSBs) is
         linked to a myriad of serious health problems including, but not
         limited to: weight gain, obesity, coronary heart disease, diabetes,
25       tooth decay, and other health problems.  Scientific evidence shows
         that underlying these chronic health problems is metabolic
26       syndrome (MetS).  MetS is characterized by changes in a body's
         normal biochemistry that can lead to obesity, insulin resistance,
27       hypertension, dyslipidemia (high cholesterol), and visceral fat.
         SSBs are linked to excess weight and obesity, which are putting
28       more Americans on the path to MetS.  Heavy added sugar

**United States District Court**
For the Northern District of California

consumption may itself be a direct cause of MetS by increasing the risk for hypertension, dyslipidemia, and visceral fat.  While most people with MetS are obese, normal-weight individuals can acquire the syndrome as well, given poor dietary habits.  Heavy consumption of sugary drinks has been linked to MetS through a variety of biological pathways, and is therefore a risk factor in chronic disease.

The consumption of soft drinks, according to the American Dental Association, has displaced nutritious beverages and foods from the diet.  According to the American Heart Association, for the American diet, soft drinks and other sugar-sweetened beverages are the primary source of added sugar.  According to the first print (February 2015) of the United States Department of Agriculture's Scientific Report of the 2015 Dietary Guidelines Advisory Committee (the "2015 USDA Report"),[4] although added sugars provide calories, they do not provide other nutrients.

Sugar-sweetened sodas, and fruit drinks containing less than 100% juice by volume, are major sources of added sugars in American diets, contributing an average of 10.58 teaspoons of added sugars each day.  The American Heart Association recommends that adult women consume no more than six teaspoons of added sugars daily, that adult men consume no more than nine teaspoons daily, and that children ages 4-8 years old consume no more than three teaspoons daily.  However, most Americans consume more than 19.6 teaspoons of added sugars per day.  Even regular, moderate consumption of sugary drinks (one 12-ounce can a day) increases the risk of cardiovascular disease mortality by nearly one-third.

The American Heart Association reports that about one in three teen or younger children in the United States are overweight or obese and that childhood obesity is now the number one health concern among American parents, ahead of drug abuse and smoking.  Obese children suffer more often from sleep apnea, asthma, joint problems, fatty liver disease, gallstones, and acid reflux (heartburn).

Obese children are more likely to become obese adults, further increasing their risks for higher rates of type 2 diabetes, heart disease, and some cancers later in life.  Profound mental health and quality of life impacts are seen in children with severe obesity.  Obese children are more prone to low self-esteem, negative body image, and depression.  As of 2010, nearly one-third of children and adolescents in San Francisco were either obese or overweight.  Among adults, consumption of SSBs is associated with a risk of weight gain and obesity, cardiovascular disease, a significantly higher risk of stroke, high blood pressure, type 2 diabetes, dental erosion, and the risk of pancreatic cancer.  The 2015 USDA Report concludes that the consumption of added sugars negatively impacts obesity, type 2 diabetes, cardiovascular diseases and dental caries, and "strong evidence supports reducing added sugar intake to reduce health risks."  (See also, USDA, *Report of the Dietary Guidelines*

---

[4] The Dietary Guidelines for Americans is jointly published by the U.S. Department of Health and Human Services and the U.S. Department of Agriculture every five years.

4

**United States District Court**
For the Northern District of California

*Advisory Committee on Dietary Guidelines for Americans*, 2010.)
In 2011-2012, 41.8% of adults in San Francisco were either obese or overweight.

The World Health Organization recommends that not more than 10% of calories be from added sugars, and the Institute of Medicine (U.S.) recommends not more than 25%. Medical research has shown that for over 70% of adults, 10% or more of calories is from added sugars, and for approximately 10% of adults, 25% or more of calories is from added sugars, and that the risk of mortality from cardiovascular disease increased exponentially with an increase in the percentage of calories from added sugars. The 2015 USDA Report concludes that even though an appropriate pattern of consumption of added sugars for most people is 4% to 6% of total calories, the mean intake of total calories from the consumption of added sugars in the U.S. population is 13%, and from 15% to 17% for children 9 years of age and older, adolescents, and young adults, and the evidence shows that when added sugars in foods exceed 3% to 9% of total calories, a healthful food pattern may be difficult to achieve.

Low-income families are more likely to be affected by obesity and diabetes. For example, the Bayview-Hunters Point neighborhood had more per capita emergency room visits due to diabetes between 2009 and 2011 than any other neighborhood in San Francisco. Eighteen percent of three- to four-year-olds enrolled in San Francisco Head Start were obese, with an additional 13% being overweight. Head Start serves children of low-income families.

According to the American Dental Association, a steady diet of sugary foods and drinks, including juice and sports drinks, can damage teeth. Cavity-causing bacteria in the mouth feed on sugar and produce acids that attack tooth enamel for up to 20 minutes after eating or drinking. In extreme cases, softer enamel combined with improper brushing, grinding of the teeth, or other conditions can lead to tooth loss.

The annual cost of being overweight and obese to California families, employers, the health care industry, and the government is estimated to be $21 billion. The San Francisco Budget and Legislative Analyst estimates that up to $61.8 million in costs incurred by San Franciscans with obesity and diabetes are attributable to sugary beverage consumption. The total national cost of diabetes in 2007 was $174 billion.

For adults in San Francisco, approximately 29% of Caucasians, 50% of Latinos, 29% of Asians, and 43% of African Americans consume one or more sodas each day. Of 9th graders in San Francisco, approximately 31% of Caucasians, 48% of Latinos, 31% of Asians, and 58% of African Americans consume one or more sodas each day. On average, children consumed 11.96 teaspoons of added sugars from sodas and fruit drinks per day – 47% of their total intake of added sugars. A single 12-ounce can of soda contains eight to ten teaspoons of sugar, and typical container sizes of popular sugary drinks marketed to children far exceed the American Heart Association's recommended daily amounts.

1        Research shows that lifestyle interventions are more cost-effective
2     than medications in preventing or delaying type 2 diabetes.  The
American Heart Association reports that U.S. food labels do not
3     distinguish between sugars that naturally occur in foods and added
sugars, making it difficult for consumers to know the amount of
4     added sugars that are in food or beverages.[5]  And food producers
and distributors do not typically communicate this information to
5     consumers, in advertisements or otherwise.  Yet sugar-sweetened
beverages are aggressively marketed, without providing such basic
6     information to consumers, be they children, adolescents, young
adults, or others.  According to the 2015 USDA Report, young
7     adults are among the largest consumers of sugar-sweetened
beverages and are the direct targets of marketing for sugar-
8     sweetened beverages.

9     The City's purpose in requiring warnings for SSBs is to inform the
public of the presence of added sugars and thus promote informed
10    consumer choice that may result in reduced caloric intake and
improved diet and health, thereby reducing illnesses to which SSBs
11    contribute and associated economic burdens.  Posting warnings that
beverages are sugar-sweetened will inform the public before
12    purchases, which will help ensure that San Franciscans make a more
informed choice about the consumption of drinks that are a primary
13    source of added dietary sugar.

14   S.F. Health Code § 4201.

15       Based on the findings and purpose above, the City will be requiring certain kinds of

16   advertisements to contain a warning regarding SSBs.  More specifically,

---

17

18   [5] In July 2015, the Food and Drug Administration ("FDA") issued a notice that it was revising certain provisions of a proposed rule issued in March 2014 "that would amend FDA's labeling regulations for conventional foods and dietary supplements to provided updated nutrition
19   information" on the Nutrition Facts and Supplement Facts labels.  FDA, Food Labeling: Revision of the Nutrition and Supplement Facts Labels, 80 Fed. Reg. 44303, 44303 (July 27, 2015).  Some
20   of the revisions concerned added sugars.

21       According to the notice, new information from the "Scientific Report of the 2015 Dietary
22   Guidelines Advisory Committee" "led the FDA "to reconsider [its] thinking for not establishing a DRV [daily reference value] or requiring the declaration of a percent DV [daily value] for added
23   sugars on the Nutrition Facts and Supplement Facts labels." *Id.*; *see also* Schillinger Rpt. ¶ 29 (taking note of FDA's proposed rule "that the nutrition facts panel display a percent daily
24   recommended value for added sugars to help people limit their consumption of added sugars to 10% of daily calories or less, a limit recommended by the 2015 Dietary Guidelines Advisory
25   Committee").  The 2015 Dietary Guidelines Advisory Committee had recommended "a limit of 10% of daily calories from added sugar."  Schillinger Rpt. ¶ 30; *see also* Willett Rpt. ¶¶ 9, 15;
26   Kahn Reply Rpt. ¶ 68.  This is roughly "equivalent to about 48 grams or 12 teaspoons of sugar, based on a 2000 calorie per day diet."  Willett Rpt. ¶ 60.  Based on the FDA website, it appears
27   that the comment period closed in October 2015, but apparently no concrete action has taken place since.  *See*
28   http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabeliingNutrition/ucm385663.htm (last visited May 17, 2016).

1       any Advertiser who posts an SSB Ad, or causes an SSB Ad to be
posted, in San Francisco shall place on the SSB Ad the following
2       warning . . . (the "Warning"):

3       "WARNING: Drinking beverages with added sugar(s) contributes to
obesity, diabetes, and tooth decay. This is a message from the City
4       and County of San Francisco."

5 S.F. Health Code § 4203(a).[6] "The Warning shall be enclosed in a rectangular border within the

6 printed advertisement," and "[t]he Warning shall occupy at least 20% of the area of each SSB

7 Ad."[7] *Id.* § 4203(b).

8       "SSB" is defined as "any Nonalcoholic Beverage sold for human consumption . . . that has

9 one or more added Caloric Sweeteners and contains more than 25 calories per 12 ounces of

10 beverage," *id.* § 4202, but certain beverages are specifically excluded, including, *e.g.*, milk and

11 milk alternatives and 100% natural fruit or vegetable juice. *See id.*

12       "SSB Ad" is defined as

13       any advertisement, including, without limitation, any logo, that
identifies, promotes, or markets a [SSB] for sale or use that is any of
14       the following: (a) on paper, poster, or a billboard; (b) in or on a
stadium, arena, transit shelter, or any other structure; (c) in or on a
15       bus, car, train, pedicab, or any other vehicle; or (d) on a wall, or any
other surface or material.
16

17 *Id.* Similar to above, certain kinds of advertisements are specifically excluded:

18

19       (a)     any advertisement that is in any newspaper, magazine,
periodical, advertisement circular or other publication, or on
television, the internet, or other electronic media;
20

21       (b)     containers or packages for Sugar-Sweetened Beverages;

22       (c)     any menus or handwritten listings or representations of foods
and/or beverages that may be served or ordered for
consumption in a Retailer's establishment;
23

24

25     [6] The City Director of Health "may by regulation . . . change the text of the Warning based on
26 available medical or scientific information regarding the health impact of [SSBs]." S.F. Health
Code § 4203(c)(1).

27     [7] The City Director of Health "may by regulation . . . modify the minimum area of SSB Ads that
the Warning must occupy to improve or ensure the effectiveness of the Warning." S.F. Health
28 Code § 4203(c)(3).

**United States District Court**
For the Northern District of California

(d)     any display or representation of or other information about, a sugar-sweetened beverage, including, without limitation, any logo, on a vehicle, if the vehicle is being used by any Person who is in the business of manufacturing, distributing or selling the sugar-sweetened beverage in the performance of such business;

(e)     any logo that occupies an area that is less than 36 square inches and is unaccompanied by any display, representation, or other information identifying, promoting, or marketing a sugar-sweetened beverage; or

(f)     any shelf tag or shelf label that states the retail price, order code, description, or size of a product for sale.

*Id.*[8]

Finally, the ordinance exempts certain SSB Ads from coverage – *e.g.*, "any sign, excluding any general advertising sign . . . , permitted by the City before the Operative date" and

> any general advertising sign permitted by the City before the Operative Date that includes an SSB Ad, if the SSB Ad has not been substantially changed for a period of 50 or more years before the Operative Date and the Advertiser provides the Director, on the Director's request, records or other information that substantiates the SSB Ad has not been substantially changed over the 50-year period.

*Id.* § 4203(d).

The City Director of Health "may assess and collect administrative penalties" for a failure to comply with the ordinance. *Id.* § 4204 (providing that Chapter 100 of the San Francisco Administrative Code "shall govern the amount of fees and the procedures for the imposition, enforcement, collection, and administrative review of administrative citations"). "[F]or each placement of an SSB Ad, each day a violation is committed or permitted to continue shall constitute a separate violation of Section 4203." *Id.* § 4204(a).

## II.     DISCUSSION

A.     Legal Standard

"'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

---

[8] As indicated in the City's brief, these exemptions were driven by multiple concerns – for example, jurisdictional and practical. *See* Opp'n at 17 (noting that "placing the warning only on ads viewed in San Francisco would likely pose technological, logistical, or economic burdens that do not exist with fixed signs"; also, "the City avoids potential litigation asserting that it is effectively seeking to regulate outside of its jurisdiction").

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7 (2008) (rejecting the position that, "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm")).  The Ninth Circuit has held that the "serious questions" approach survives *Winter*:  that is, where plaintiffs have raised "serious questions going to the merits" and a hardship balance that tips sharply toward the plaintiff, a preliminary injunction may issue, assuming the other two elements of the *Winter* test are also met. *See Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

In the instant case, the critical issue is the likelihood-of-success factor.

B.     Likelihood of Success on the Merits

    1.     Noncommercial Speech

As a preliminary matter, the Court addresses Plaintiffs' contention that the City ordinance covers not only commercial speech but also noncommercial speech and, because noncommercial speech is at issue, strict scrutiny applies.  Plaintiffs make this noncommercial speech argument because they have, at times in the past, communicated noncommercial messages in their advertisements – *e.g.*, Coke issued advertisements proclaiming "Love Wins" after the Supreme Court's marriage equality ruling, and Plaintiffs have publicized the Pride Parade and the Chinese New Year's Festival on signs depicting Plaintiffs' products and logos.  *See* Mot. at 8 (giving these and additional examples).  According to Plaintiffs, "[e]ven if [their] use of identifying logos or product representations rendered such speech *partly* commercial, those features are so inextricably intertwined with the non-commercial messages that the City's regulation of the whole is subject to strict scrutiny."  Mot. at 8 (emphasis in original).  *See, e.g.*, *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795-96 (1988) (addressing state statute that, *inter alia*, required professional fundraisers, before appealing for funds, to disclose to potential donors the percentage of charitable contributions collected during the previous twelve months that were actually turned over to charity; rejecting state's argument that, "even if charitable solicitations generally are fully

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

protected, this portion of the Act regulates only commercial speech because it relates only to the professional fundraiser's profit from the solicited contribution" – "we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise protected speech").

It is highly debatable whether all of the examples provided by Plaintiffs are situations where commercial and noncommercial speech are, in fact, inextricably intertwined. *See generally Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957-58 (9th Cir. 2012) (noting that, in close questions, a mixed-content publication – *i.e.*, a publication with both commercial and noncommercial speech elements – is evaluated for, *e.g.*, whether the publication is in an advertising format, whether the publication references a specific product, and what is the underlying economic motive of the speaker); *see also Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518, 521 (7th Cir. 2014) (noting that "[v]ery often the commercial message is general and implicit rather than specific and explicit"; also emphasizing that "the inextricably intertwined doctrine applies only when it is legally or practically impossible for the speaker to separate out the commercial and noncommercial elements of his speech" – "[b]ut simply combining commercial and noncommercial elements in a single presentation does not transform the whole into noncommercial speech").

However, even assuming some of these examples are problematic under the First Amendment, Plaintiffs are presenting a *facial* challenge to the ordinance.  In a facial challenge (such as with a claim of overbreadth), the plaintiff must establish that the challenged law infringes upon a "'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'"  *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003); *cf. Cal. Teachers Ass'n v. Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) (stating that "[t]he touchstone of a facial vagueness challenge in the First Amendment context . . . is not whether some amount of legitimate speech will be chilled; it is whether a substantial amount of legitimate speech will be chilled").  *See First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043, 1051 (N.D. Cal. 2015) (stating that, "even if the Ordinance targets non-commercial speech when applied to First Resort, that would not ipso facto demonstrate that it does so in all circumstances – as required in a facial challenge").  Plaintiffs

**United States District Court**
For the Northern District of California

have failed to establish that a substantial amount of noncommercial speech will be affect judged in relation to the amount of commercial speech regulated.  Accordingly, Plaintiffs' facial challenge predicated on noncommercial speech is not likely to succeed.

      2.    <u>Commercial Speech</u>

          a.    <u>Heightened Scrutiny</u>

      Because commercial speech is at issue in this facial challenge, and the challenged ordinance requires disclosure rather than suppression of speech, strict scrutiny is not required under *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626 (1985).  In *Zauderer*, the plaintiff, an attorney, ran an advertisement in which he "publiciz[ed] his willingness to represent women who had suffered injuries resulting from their use of a contraceptive device known as the Dalkon Shield Intrauterine Device." *Zauderer*, 471 U.S. at 630.  In the advertisement, the plaintiff stated that "'[t]he case are handled on a contingent fee basis of the amount recovered. If there is no recovery, no legal fees are owed by our clients.'" *Id.* at 631.  Based on the advertisement, the state Office of Disciplinary Counsel filed a complaint against the plaintiff, alleging that the plaintiff had violated a disciplinary rule because the advertisement "fail[ed] to inform clients that they would be liable for costs (as opposed to legal fees) even if their claims were unsuccessful" and therefore was deceptive.  *Id.* at 633.  The state Supreme Court agreed with the state Office of Disciplinary Counsel.  The plaintiff appealed, asserting that his First Amendment rights had been violated.

      On appeal, the United States Supreme Court made a distinction between "disclosure requirements and outright prohibitions on speech." *Id.* at 650.  While, "in some instances compulsion to speak may be as violative of the First Amendment as prohibitions on speech," here, the state was not "'prescrib[ing] what shall be orthodox in politics, religion, [etc].'" *Id.* at 651. Instead,

> [t]he State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available.  Because the extension of First Amendment protection to commercial speech is justified principally

> by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in not providing any particular factual information in his advertising is minimal.  Thus, in virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interest than do flat prohibitions on speech, "[warnings] or [disclaimers] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception."

*Id.*  The Court then "recognize[d] that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech.  But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."  *Id.*  The Court ultimately concluded that this standard was satisfied in the case under consideration.

In spite of *Zauderer*, Plaintiffs protest that heightened scrutiny is warranted under *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638 (9th Cir. 2016).  There, the Ninth Circuit held that *Central Hudson*'s intermediate scrutiny test for commercial speech should not be applied when there are content- or speaker-based restrictions on nonmisleading commercial speech regarding lawful goods or services; rather, heightened judicial scrutiny should apply under *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011).

Plaintiffs' argument is without merit for several reasons.  First, *Retail Digital* addressed a restriction on commercial speech.  In contrast, the instant case involves not a *restriction* on commercial speech, but rather the compelled *disclosure* of information.  Thus, the applicable legal framework is *Zauderer*, not *Retail Digital*.  *See CTIA v. City of Berkeley*, No. 15-cv-02529-EMC, 2016 U.S. Dist. LEXIS 10332, at *8-9 (N.D. Cal. Jan. 27, 2016) (hereinafter *CTIA II*) (noting that "nothing in *Retail Digital*'s holding or reasoning suggests *Sorrell* did away with the Supreme Court's distinction (as articulated in *Zauderer* and embraced in *Milavetz*[9]) between restrictions on commercial speech and compelled disclosure of such speech").

Second, while Plaintiffs assert that *Zauderer* is not applicable because *Zauderer* governs only where the governmental interest is the prevention of consumer deception, this Court has

---

[9] *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010).

United States District Court
For the Northern District of California

1    already rejected that argument in another case.  *See CTIA v. City of Berkeley*, No. C-15-2529

2    EMC, 2015 U.S. Dist. LEXIS 126071, at *40-41 (N.D. Cal. Sept. 21, 2015) (hereinafter *CTIA I*)

3    (noting that several circuit courts have rejected that same argument).  *Zauderer* applies where the

4    government asserts an interest in, *e.g.*, public health and safety.  *See, e.g., id.*; *see also Am. Meat*

5    *Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (addressing a federal regulation that

6    required disclosure of country-of-origin information about meat products); *Nat'l Elec. Mfrs. Ass'n*

7    *v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) (addressing a state statute that required manufacturers of

8    some mercury-containing products to label their products and packaging to inform consumers that

9    the products contain mercury).

10         Accordingly, the Court considers the ordinance's constitutionality under *Zauderer*.

11              b.    <u>*Zauderer*</u>

12         As this Court has previously noted in *CTIA I*, the *Zauderer* test is essentially a rational

13   basis/rational review test.  *See CTIA I*, 2015 U.S. Dist. LEXIS 126071, at *39.  More specifically,

14   under *Zauderer*, where there is a compelled disclosure in the context of commercial speech, the

15   compelled disclosure does not violate the First Amendment so long as the disclosure requirement

16   is reasonably related to the state's interest.[10]  *See Zauderer*, 471 U.S. at 651 (holding that "an

17   advertiser's rights are adequately protected as long as disclosure requirements are reasonably

18   related to the State's interest").

19         The Ninth Circuit has indicated that, under *Zauderer*, the application of rational basis

20   review may predicated on a showing that the compelled disclosure in the commercial context is

21   factual.  *See, e.g., Videosoftware Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 953, 966 (9th

22   Cir. 2009) (stating that "the [the state statute's] labeling requirement is unconstitutionally

23

24   [10] Plaintiffs suggest that, in the instant case, the *Zauderer* rational review should be ratcheted up in
     some way because the warning is required only when Plaintiffs decide to speak in the first place.
25   *See* Mot. at 4 (arguing that the ordinance at issue here is different from the ordinance at issue in
     this Court's CTIA case because the latter compelled speech "by completion of a transaction" while
26   the former is triggered "by the utterance of speech that the City disfavors") (emphasis in original).
     There is some logic to this argument – the ordinance arguably taxes speech per se.  However,
27   *Zauderer* posed a similar situation (the attorney was sanctioned because his advertisement, *i.e.*,
     his speech, did not disclose to clients that they would be liable for costs (as opposed to legal fees)
28   even if their claims were unsuccessful).  Nevertheless the Supreme Court required only rational
     basis review.

compelled speech under the First Amendment because it does not require the disclosure of purely factual information[] but compels the carrying of the State's controversial opinion").  However, the Court notes that it is not clear whether *Zauderer* itself imposed a factual predicate requirement – or, for that matter, a "factual and uncontroversial" one – before rational review could apply.  In *Zauderer*, the Supreme Court held that disclosure requirements in the commercial context are constitutional so long as they "are reasonably related to the State's interest."  *Zauderer*, 471 U.S. at 651.  It is only in a prior paragraph that the Supreme Court noted that the state's "prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available."  *Id.* Arguably, the Court's reference to "factual and uncontroversial" was simply a description of what the state's compelled disclosure was; it is not clear whether the Court necessarily held that a compelled disclosure must be factual and uncontroversial before rational review can be applied.

For purposes of this opinion, however, the Court proceeds with the assumption that there is a factual *and* uncontroversial predicate to *Zauderer*'s rational review test.[11]  Proceeding with this understanding, the Court reaffirms its analysis in *CTIA* – *i.e.*, that the "factual and uncontroversial" requirement of *Zauderer* means, at most, that the compelled disclosure must convey a fact rather than an opinion and that, generally speaking, it must be accurate.  *See CTIA II*, 2016 U.S. Dist. LEXIS 10332, at *18-19 (stating that "'[u]ncontroversial' should generally be equated with the term 'accurate'; in contrast, 'factual' goes to the difference between a 'fact' and an 'opinion'").  As noted in *CTIA I*, the "uncontroversial" requirement should not be read expansively to mean something beyond accuracy, especially as the term "'uncontroversial'

_____

[11] In a number of unpublished decisions, the Ninth Circuit has assumed that under *Zauderer*, the compelled disclosure must be both "factual" and "uncontroversial."  *See Crazy Ely W. Vill., LLC v. City of Las Vegas*, 618 Fed. Appx. 904, 906 (9th Cir. 2015) (stating that "[t]he government may compel 'purely factual and uncontroversial' speech"); *S. Cal. Inst. of Law v. Biggers*, 613 Fed. Appx. 665, 666 (9th Cir. 2015) (stating that "the required disclosure of past bar exam results easily satisfies [the *Zauderer*] standard: such requirement relates only to disclosure of 'purely factual and uncontroversial information,' and is reasonably related to CBE's legitimate interest"); *CTIA – Wireless Ass'n v. City & County of San Francisco*, 494 Fed. Appx. 752, 753 (9th Cir. 2014) (stating that "any governmentally compelled disclosures to consumers must be 'purely factual and uncontroversial'").  But the Ninth Circuit has not closely examined in a published decision what *Zauderer* requires anything other than focusing on the factual nature of the compelled disclosure, as in *Videosoftware Dealers*.

appeared only once in *Zauderer*" and, in *Milavetz*, 559 U.S. at 229, which was decided after *Zauderer*, the Supreme Court did not use that term at all and instead referred to factual and accurate information only.  *CTIA I*, 2015 U.S. Dist. LEXIS 126071, at *59-60 (also stating that "a court should tread carefully before deeming compelled speech controversial for *Zauderer* purposes").  The Sixth Circuit underscored the same point in *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 559 n.8 (6th Cir. 2012) (noting that the *Milavetz* Court used "the language *required factual information and only an accurate statement* when describing the characteristics of a disclosure that is scrutinized for a rational basis") (emphasis in original), and further pointed out that "whether a disclosure is scrutinized under *Zauderer* turns on whether the disclosure conveys factual information or an opinion, not on whether the disclosure emotionally affects its audience or incites controversy."  *Id.* at 569.  Moreover, the factual and uncontroversial requirement, if extant, should not "be so easily manipulated that it would effectively bar any compelled disclosure by the government," particularly "where public health and safety are at issue."  *CTIA I*, 2015 U.S. Dist. LEXIS 126071, at *60-61.  As this Court emphasized in *CTIA II*, "[a] 'controversy' cannot automatically be deemed created any time there is a disagreement about the science behind a warning because science is almost always debatable at some level."  *See CTIA II*, 2016 U.S. Dist. LEXIS 10332, at *19.

   In the instant case, the warning required by the ordinance likely passes the factual and accurate requirement.

### i.   Tooth Decay

   As an initial matter, the Court notes that the battle over the factual and uncontroversial requirement really concerns obesity and diabetes, and not tooth decay.  That is, there is no real dispute that SSBs, because of their sugar content, do contribute to tooth decay.  The City's expert, Dr. Schillinger, has presented testimony that

> [t]he causal link between dietary sugars and tooth decay has long been firmly established, and the basic biological mechanisms are well understood.  In fact, the causal relationship between sugar and tooth decay was definitively established as early as the 1930s, based on a randomized controlled trial carried out in Sweden.  We now understand that dietary sugars, including in the form of SSBs,

provide a substrate for oral bacteria that cause cavities to flourish and to generate enamel-demineralizing acids.  Modifying factors such as fluoride and dental hygiene would not be needed if we tackled the single cause – added sugars.  Quantitative analyses show a dose-response relationship between the sugar or its monosaccharide intakes (such as fructose) and the progressive lifelong development of cavities and resultant tooth loss.  This results in a substantial dental health burden throughout life.  While processed starches have cavity-causing potential when accompanying sucrose, human studies do not provide unequivocal data of their ability to cause cavities in the absence of sugar.

Schillinger Rpt. ¶ 22.  Dr. Schillinger's testimony is not rebutted.  For example, Plaintiffs' expert, Dr. Kahn, does not appear to opine on tooth decay at all, either in his opening or reply report.

Plaintiffs protest that the warning required by the ordinance is misleading because it suggests that "consuming beverages with added sugar is dangerous regardless of one's diet or lifestyle" and that "consuming beverages with added sugar necessarily and inevitably contributes to . . . tooth decay at any level of consumption."  Mot. at 6.  But this argument is unavailing.  The ordinance simply says SSBs "contribute" to tooth decay; it does not say that SSBs inevitably result in or will necessarily cause tooth decay.  Nor would a reasonable consumer so construe the warning.[12]

Moreover, Plaintiffs do not fundamentally dispute that it is accurate to say that SSBs do, in the aggregate, "contribute" to tooth decay.  *See* Schillinger Rpt. ¶ 22.  No reasonable consumer would likely construe the warning as specific to him or her; instead, a reasonable consumer would understand the warning is directed to the general public and that the statement that SSBs are a contributing factor is to be viewed in the larger context of public health.[13]

---

[12] Although the *Zauderer*-related case law does not specifically reference how a "reasonable consumer" would understand a compelled disclosure, the Court is hard pressed to see what other framework should apply.  Moreover, at the hearing, the parties did not dispute that the warning should be evaluated from the perspective of a reasonable consumer.  *Cf. Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1182 n.8 (9th Cir. 2003) (stating that, for a false advertising claim brought pursuant to California Business & Professions Code § 17200, a "'plaintiff must prove that defendants' statements are misleading to a reasonable consumer'").

[13] To the extent Plaintiffs suggest that the mere use of the term "contribute" is misleading, the Court does not agree.  The term "contributes" is weaker than the term "causes":  if the warning here is deemed misleading, this would cast substantial doubt on disclosures which mandate the term "causes."  *See, e.g.*, https://www.federalregister.gov/articles/2010/11/12/2010-28538/required-warnings-for-cigarette-packages-and-advertisements#h-19 (last visited May 17, 2016) (discussing cigarette warnings, one of which is "Smoking Causes Lung Cancer, Heart

1    As for Plaintiffs' contention that the ordinance is misleading because it identifies and

2    singles out one of many cause(s) for tooth decay, that position lacks merit because such an

3    argument would credit an underinclusiveness argument rejected in *Zauderer*:

> [W]e are unpersuaded by appellant's argument that a disclosure
> requirement is subject to attack if it is "under-inclusive" – that is, if
> it does not get at all facets of the problem it is designed to
> ameliorate.  As a general matter, governments are entitled to attack
> problems piecemeal, save where their policies implicate rights so
> fundamental that strict scrutiny must be applied.  The right of a
> commercial speaker not to divulge accurate information regarding
> his services is not such a fundamental right.

9    *Zauderer*, 471 U.S. at 651 n.14.  *See also Nat'l Elec.*, 272 F.3d at 116 (stating that, "[a]bsent

10   interference with such a fundamental right, a state may choose to tackle a subsidiary cause of a

11   problem rather than its primary cause, particularly where that primary cause lies out of its reach";

12   thus, the state statute, which required mercury-containing light bulbs to be labeled, was "rationally

13   related to the state's goal, notwithstanding that the statute may ultimately fail to eliminate all or

14   even most mercury pollution in the state").  The government has the power to tackle less than all

15   causes of a public health problem, at least so long as it has a reasonable basis for doing so under

16   *Zauderer*.  Perforce, the government must have the ability to focus on less than all potential causes

17   of a public health problem, at least where the government has a reasonable basis for doing so.

18   Here, the City had a reasonable basis to identify SSBs as a contributor to tooth decay.  For

19   example, the portion size for a standard soft drink bottle is now 20 ounces and a "20-ounce single

20   serving bottle provides 65 grams of sugar (equivalent to 16 teaspoons)."  Willett Rpt. ¶ 15; *see*

21   *also* Willett Rpt. ¶ 60 (stating that even a "12 oz. serving of soda contains on average . . . 39 grams

22   of sugar, which is equivalent to about ten teaspoons of table sugar").  It is not surprising that a

23   food/beverage source that provides a significant amount of sugar in one portion size would be

24   "targeted," particularly where it does not provide any nutritive value.  *Compare, e.g.*, Willett Rpt.

25

26   ───────────────────────────────

27   Disease, Emphysema, and May Complicate Pregnancy"); 21 C.F.R. § 1143.5 (governing required
     warning statements for cigars – *e.g.*, "Cigar smoking can cause lung cancer and heart disease"); 27
     Cal. Code Regs. § 25601 (Proposition 65, requiring communication of a message that "the

28   chemical in question is known to the state to cause cancer, or birth defects or other reproductive
     harm").

United States District Court
For the Northern District of California

1  at 3 n.2 (noting that 100% fruit juice "contains a number of healthful vitamins and nutrients" and

2  that "[m]ilk also contains a number of important vitamins and minerals, including calcium,

3  vitamin D and magnesium, as well as protein"; adding that amounts consumed of juice and milk

4  are typically smaller, *i.e.*, in comparison to consumption of SSBs).  Plaintiffs cite to a 2015 letter

5  written by the American Dental Association ("ADA") to the U.S. Secretary of Health and Human

6  Services and U.S. Secretary of Agriculture in which it states:

7

8      We recognize the growing popularity of singling-out sugar-
       sweetened beverages as a key driver of dental caries.  Advocates
9      postulate that lowering sugar-sweetened beverage consumption rates
       will lower the prevalence of dental caries.  Unfortunately, the
10     evidence is not yet sufficient to single out any one food or beverage
       product as a key driver of dental caries.

11  Letter, dated May 8, 2015, *available at*

12  http://www.ada.org/~/media/ADA/Advocacy/Files/ltr_150508_hhs_dgac2015_nosig.ashx (last

13  visited May 17, 2016).  That SSBs may not be a "key driver" is not dispositive.  The City still had

14  a reasonable basis to target SSBs for the reasons stated above.

15      Accordingly, the Court finds that the warning that drinking SSBs "contributes" to tooth

16  decay is likely factual and accurate.  The City has a legitimate interest in public health and safety,

17  and the warning that SSBs contribute to tooth decay is reasonably related to the City's interest in

18  public health and safety.  *See Zauderer*, 471 U.S. at 651.

19      To the extent Plaintiffs suggest that rational review still cannot be satisfied because of the

20  size of the warning, the Court is not persuaded.  The City had a reasonable basis for requiring that

21  the warning constitute 20% of the advertisement.  The warning had to be of a sufficient size to be

22  salient – *i.e.*, noticed and attended to – and research on health warnings for tobacco products has

23  led the World Health Organization ("WHO") for instance, to recommend that tobacco product

24  packaging and labeling bear a health warning of 50% or more, but no less than 30%, of the

25  principal display areas.  *See* Hammond Rpt. ¶¶ 17, 20-22 (also noting that 180 countries have

26  ratified the WHO's approach); Guidelines for Implementation of Article 11 of the WHO

27  Framework Convention on Tobacco Control ¶ 12, *available at*

28  http://www.who.int/fctc/guidelines/article_11.pdf.  By comparison, 20% is relatively modest.  *Cf.*

**United States District Court**
For the Northern District of California

*also* Hammond Rpt. ¶ 35 ("Two additional studies [regarding cigarette warnings] have demonstrated that increases in the salience of warnings through the use of pictorials further increases the efficacy of health warnings that cover 20% of cigarette advertisement space by increasing message processing and recall.").  Moreover, to the extent Plaintiffs suggest that a warning commanding less space than 20% would still be effective, that is not dispositive as, in *Zauderer*, the Supreme Court "declined to apply a 'least restrictive means' analysis to disclosure requirements and stated: 'We do not think it appropriate to strike down such requirements merely because other possible means by which the State might achieve its purposes can be hypothesized.'" *Consolidated Cigar Corp. v. Reilly*, 218 F.3d 30, 55 (1st Cir. 2000); *cf. Disc. Tobacco*, 674 F.3d at 561 n.10 (in tobacco warning case, addressing plaintiffs' reliance on *Entertainment Software Association v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006), where the Seventh Circuit found unconstitutional a compelled disclosure that covered only approximately 10% of the package; noting that the Seventh Circuit's "conclusion that the sticker failed to be narrowly tailored because of its size compared to the size of a video-game box followed the court's decision to employ *strict scrutiny*" rather than a lesser standard of review) (emphasis added).  As discussed below, the burden imposed by the 20% size requirement is not insubstantial, and could raise serious questions on the merits, but is not sufficient to establish that the ordinance is likely unconstitutional.

ii.    Obesity/Diabetes

For the warning on obesity/diabetes, Plaintiffs make the same basic arguments as above – *i.e.*, that the warning is misleading because it suggests that (1) "consuming beverages with added sugar is dangerous regardless of one's diet or lifestyle," (2) "consuming beverages with added sugar necessarily and inevitably contributes to obesity [and] diabetes," and (3) "consuming beverages with added sugar uniquely contributes" to obesity and diabetes.  Mot. at. 6.

Similar to above, the Court is not persuaded that Plaintiffs are likely to prevail on the merits of their constitutional claim.  Again, the required disclosure only says that SSBs "contribute" to obesity and diabetes, not that they will necessarily result in diabetes or obesity in any particular case; nor does the disclosure state that SSBs are the sole or even dominant cause.  A

19

**United States District Court**
For the Northern District of California

1  reasonable consumer is not likely to understand the warning to impart either message as ascribed

2  by Plaintiffs.

3        There is no real dispute as to the literal accuracy of the required warning.  Although there

4  may be a legitimate scientific debate as to how exactly SSBs contribute (*e.g.*, Plaintiffs' and the

5  City's experts disagree as to whether SSBs contribute to diabetes through their glycemic effects

6  and the metabolic role of fructose, *see* Willett Rpt ¶ 11; Schillinger Rpt. ¶ 21; Kahn Reply Rpt. ¶

7  30), both sides agree that, at the very least, SSBs can contribute to weight gain because they

8  provide calories, and that weight gain can lead to obesity and diabetes.  *See, e.g.*, Kahn Reply Rpt.

9  ¶ 7 (stating that the City's experts "and I agree that excess consumption of calories will lead to

10  weight gain and that may lead to obesity and diabetes"; adding that "[e]xcess consumption occurs

11  when at any level of energy intake the number of calories consumed exceeds the number of

12  calories expended").  Thus, the statement that SSBs contribute is both factual and accurate.  While

13  it is true that individuals respond differently to different diets depending on behavior (reduction of

14  other sources of calories, amount of exercise, genetic predisposition, etc.), as noted above, no

15  reasonable consumer would likely construe the warning as specific to him or her and instead

16  would understand the warning is directed to the general public, and that warning is to be viewed in

17  the larger aggregative context of public health.  Accordingly, the Court concludes that the warning

18  related to obesity/diabetes is factual and accurate within the meaning of *Zauderer*.

19        Plaintiffs point out that SSBs are not the only source of calories; practically all foods and

20  beverages provide calories.  *See* Kahn Reply Rpt. ¶ 10 (stating that "any calories – whatever their

21  source – can contribute to obesity and diabetes if more calories are consumed than expended").

22  Moreover, even if added sugar is the focus, there are many beverages with added sugars that have

23  not been targeted (*e.g.*, certain kinds of flavored milk), and no foods with added sugars have been

24  targeted at all.  In short, Plaintiffs again contend that, by singling out SSBs, the City has implicitly

25  imparted the message that SSBs uniquely contribute to obesity and diabetes in a way that other

26  foods and beverages do not (*i.e.*, in a noncaloric way).

27        But Plaintiffs' position is problematic because, as noted above, to disallow the required

28  disclosure of less than all contributing factors, even where there is a reasonable basis for selecting

United States District Court
For the Northern District of California

the identified factors, would be contrary to *Zauderer* which rejected the underinclusiveness assignment.  That argument is also inconsistent with the rational basis test of *Zauderer* which eschews the less restrictive alternative test.

Here, the City had a reasonable basis for requiring the disclosure of SSBs as a contributing factor to diabetes and obesity.  SSBs are a significant source of calories.  The City's expert, Dr. Willett, states in his report that SSBs are the fourth leading source of calories in diets for adults and the third for children.  *See* Willett Rpt. ¶ 18 (citing the Dietary Guidelines for Americans, 2010).  Plaintiffs' expert, Dr. Kahn, implies that this fact is misleading because "[m]anipulating what constitutes a source (e.g., all meat or divided into types of meat) can lead to many variations of what are the largest to smallest source of calories."  Kahn Reply Rpt. ¶ 52.  However, Dr. Kahn does not dispute that this conclusion was reached in the Dietary Guidelines for Americans, a joint publication of the U.S. Department of Health and Human Services and the U.S. Department of Agriculture.  *Cf.* 7 U.S.C. § 5341(a)(2) (providing that the information and guidelines in the Dietary Guidelines for Americans "shall be based on the preponderance of the scientific and medical knowledge which is current at the time the report is prepared").  Moreover, Dr. Kahn does not explain specifically how the Dietary Guidelines improperly grouped sources.  Accordingly, Dr. Kahn's statement is of little value here and does not establish the City's action was unreasonable.

Plaintiffs protest that SSBs represent only 5% of total caloric intake.  Plaintiffs make this assertion based on a statement by the City's own expert, Dr. Willett, that added sugars (not just SSBs) account for about 13% of calories and that SSBs account for 39% of all added sugar intake (*i.e.*, 13 x 39% = 5).  *See* Kahn Reply Rpt. ¶ 43 (citing Willett Rpt. ¶ 18).  But Plaintiffs' deductive calculation, even if mathematically correct, is not persuasive in light of the fact that a single-serving size of many SSBs represents a substantial number of calories.  For example, a standard serving size for a soda is 20 ounces and that imparts as many as 240 calories.  *See* Willett Rpt. ¶ 15 (noting that "the portion size of sodas has increased substantially, from a 6.5-oz standard soft drink bottle in the 1950s to a typical 20-oz bottle today"; adding that "[t]he 20-ounce single

serving bottle provides 65 grams of sugar (equivalent to 16 teaspoons) and 240 calories").[14]

Assuming a diet of 2,000 calories per day, one serving size of soda represents more than 10% of

the total caloric intake.  For young children, 240 calories is likely an even higher percentage of

total caloric intake, which is especially problematic given that there is undisputedly a child obesity

problem, both in the country and in San Francisco, and there is evidence that SSBs contribute a

significant portion of calories for children in particular.  *See* Willett Rpt. ¶ 17 (noting that "US

children and youth obtain 224 calories per day from SSBs on average, which is nearly 11% of

their daily total caloric intake"); Schillinger Rpt. ¶ 9 (stating that a 2011 report "found that 32% of

San Francisco youth were overweight or obese").

Second, to the extent Plaintiffs argue that, at the very least, other sources of added sugar

should have been targeted for disclosure, they fare no better.  Putting aside the fact that SSBs

provide no nutritive value, which is not necessarily the case with other sources of added sugar

(*e.g.*, flavored milk or even many foods with added sugar), SSBs are a significant source of added

sugar.  As recognized in the Dietary Guidelines, "[a]s a percent of calories from total added

sugars, the major sources of added sugars in the diets of Americans are soda, energy drinks, and

sports drinks (36% of added sugar intake), grain-based desserts (13%), sugar-sweetened fruit

drinks (10%), dairy based desserts (6%), and candy (6%)."  Dietary Guidelines for Americans,

2010, at 28, *available at* http://health.gov/dietaryguidelines/2010/ (last visited May 17, 2016).

Furthermore, there is no dispute that the Dietary Guidelines recommend a daily limit of

10% (*i.e.*, of total calories) for added sugars.  *See* note 5, *supra*.  But, *e.g.*, a single serving of soda

(20 ounces) exceeds that 10% recommended daily limit (assuming total calories of 2,000).  And,

similar to above, the situation is even worse for young children.[15]  *See* Willett Rpt. ¶ 9 (noting that

---

[14] Even a 12-ounce serving size of soda contains a large number of calories.  *See* Willett Rpt. ¶ 60 (stating that "[a] typical 12 oz. serving of soda contains on average 140-150 calories and 39 grams of sugar, which is equivalent to about ten teaspoons of table sugar").

[15] Even Plaintiffs' expert, Dr. Kahn, implicitly recognizes that beverages with added sugar pose a greater concern for children compared to adults, as for added sugar consumption in adults, 33% comes from beverages, while, for children and adolescents, the percentage is 41%.  See Kahn Reply Rpt. ¶ 50 (although arguing that "those proportions are likely less today, since overall sugar consumption continues to decline").

United States District Court
For the Northern District of California

"standard single serving sizes of SSBs provide all (in a 20-ounce serving of many SSBs) or nearly all (in a 12-ounce serving) of the recommended maximum daily added sugar amount for most adults, and more in children"); Schillinger Rpt. ¶ 31 (stating that, based on the Guidelines, a 12-year-old girl whose daily calorie intake is 1,600 calories should limit intake of added sugar to less than 160 calories).  The City has also provided evidence indicating that, aside from children, certain groups in the community are also particularly affected by added sugars in their diets.  *See* Willett Rpt. ¶ 8 (stating that "[c]onsumption levels [in the United States] are higher among African-Americans, Hispanics and low-income individuals – the groups with disproportionally high prevalence of obesity and obesity related chronic diseases"); Willett Rpt. ¶ 17 (stating that "industry data . . . report[s] that the soda-drinking half of the [U.S.] population are more likely to be male, young, single, poorly educated, low-income, blue-collar, Hispanic, African American, and living in the South or Midwest"), and not just at the national but also at the local level.  *See* Schillinger Rpt. ¶ 9 (noting that "[o]besity rates are high locally as well" – *e.g.*, "[a] 2011 report measured obesity rates among 5th, 7th and 9th graders and found that 32% of San Francisco youth were overweight or obese[;] [i]n San Francisco, 46.4% of adults are obese or overweight, including 61.7% of Hispanics and 51.3% of African Americans").

The Court thus concludes that it is likely the City's mandated warning (and its use of the term "contribute") is factual and accurate, even as to obesity and diabetes, and the City had a reasonable basis for identifying SSBs as a cause.  The City has a legitimate interest in public health and safety, and the warning that SSBs contribute to obesity and diabetes is reasonably related to the City's interest in public health and safety, particularly in light of the evidence indicating that SSBs are a significant source of calories as well as a significant source of added sugar.  *See Zauderer*, 471 U.S. at 651.

### iii.    Chilling Effect

Plaintiffs argue that, even if *Zauderer* rational review is satisfied (for tooth decay or obesity/diabetes), the ordinance is still unconstitutional because *Zauderer* recognized that "unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech."  *Zauderer*, 471 U.S. at 651.  According to Plaintiffs, the

**United States District Court**
For the Northern District of California

1  ordinance here will result in chilled speech because (1) the primary message of an advertisement

2  containing the warning will *be* the warning (given, *e.g.*, its required size, which is 20% of the

3  advertisement) so Plaintiffs will not want to engage in any advertising in the first place (at least

4  not on the covered media), and (2) Plaintiffs cannot practically engage in counterspeech to address

5  the warning because the size of the warning is substantial (again, 20% of the advertisement) and,

6  in any event, counterspeech would transform the advertisement from product promotion into a

7  scientific debate.

8      Although the Court did consider the issue of chilling effects in *CTIA*, *see generally CTIA I*,

9  2015 U.S. Dist. LEXIS 126071, at *50-52, 66-67, it takes this opportunity to examine more

10  closely whether a specific analysis of chilling effect is required under *Zauderer*.  The relevant text

11  from *Zauderer* is as follows:

12

13          We do not suggest that disclosure requirements do not implicate the
            advertiser's First Amendment rights at all.  We recognize that

14          unjustified or unduly burdensome speech requirements might offend
            the First Amendment by chilling protected commercial speech.  *But*

15          we hold that an advertiser's rights are adequately protected as long
            as disclosure requirements are reasonably related to the State's

16          interest . . . .

17  *Zauderer*, 471 U.S. at 651 (emphasis added).

18      *Zauderer* simply requires that a disclosure requirement be reasonably related to the

19  government's interest, and nothing more.  In *Zauderer*, the Supreme Court assumed there may be

20  chilling effects, but held that, as long as the disclosure requirements "are reasonably" related to the

21  State's interest, the advertiser's rights are "adequately protected."  *Id.*  At least one circuit court

22  appears to have adopted this analysis.  *See Disc. Tobacco*, 674 F.3d at 556 (noting that, in

23  *Milavetz*, "the Court upheld the required disclosures without separately analyzing whether they

24  were unjustified or unduly burdensome," which "makes sense because the *Zauderer* rule is that

25  when disclosure requirements are 'reasonably related to the State's interest in preventing

26  deception of consumers,' the rights of an advertiser are adequately protected").  Accordingly, the

27  possible chilling effects asserted by Plaintiffs does not alter fundamentally the analytical

28  framework under *Zauderer*.  Instead the degree of any chilling effect is subsumed under the

24

*Zauderer* test.  If, for instance, the disclosure requirement was so burdensome and chilling (*e.g.*, if the warning had to cover 80% of the ad), it may not be "reasonably related" to the state's interest even under *Zauderer*.

To the extent Plaintiffs contend the warning required by the ordinance in fact unreasonably burdens Plaintiffs, they are not likely to prevail.  Plaintiffs claim that the primary message of an advertisement containing the warning will be the warning (and not the advertisement) given its required size, which is 20% of the advertisement.  However, as the City points out, the required warning is text only; it is not pictorial.  Thus, the force of the pictorial advertisement is not likely to be overcome by the text warning.  *See* Hammond Rpt. ¶ 47 (pointing out that advertisements usually use "full color, pictures and brand imagery"; adding that "[r]esearch across a wide variety of domains has unequivocally demonstrated that pictorial information is far more salient compared to text only information") (emphasis omitted).  As noted by the City's expert, David Hammond, "[a] paper published in the *Journal of the American Medical Association* – one of the leading medical journals in the world – demonstrated that advertising messages are still effective in the presence of health warnings on ads.  For example, recall of brand information in the advertisement remained very high in the presence of health warning."  Hammond Rpt. ¶ 46.

The Court acknowledges that Plaintiffs' expert, Peter Golder, has challenged Dr. Hammond's statements, emphasizing that

> [b]rand recall . . . is not the same as advertising message recall.  A consumer may recall what brand was represented in the advertisement, but not recall the message and language of the advertisement.  The tobacco study cited by Dr. Hammond not only acknowledged the distinction between the two concepts but also found that, in the presence of a warning message, consumers' recall of the advertising message (or "heading") was lower than their recall of the warning message.

Golder Rpt. ¶ 32.  But the Court is not persuaded by Dr. Golder's analysis because, at least for the products at issue in this case – SSBs – the advertising message is, in effect, the brand, and brand recall is not particularly affected by a text warning message.

Moreover, as noted above, the 20% size requirement, while substantial, is not without precedent.  Plaintiffs' claims that they could not really engage in counterspeech because of the size

25

of the warning (20% of the advertisement) are dubious.  Not only is 80% of the space available, Plaintiffs have shown that they have employed pithy advertising on how to achieve balanced diets and lifestyles.  *See, e.g.*, Keane Decl., Ex. A (advertisement stating, "Balance what you eat, drink, and do").  To be sure, the 20% size requirement is not insubstantial and as discussed below makes this a close question whether Plaintiffs have raised at least serious questions on the merits.  Nonetheless, for the reasons discussed above, the Court concludes the size requirement does not likely render the ordinance unconstitutional.

The Court also finds unconvincing Plaintiffs' claim that they will not engage in any advertising in the covered media if the ordinance is allowed to go into effect.  Although Plaintiffs have submitted declarations from some of the major beverage companies stating that they will withdraw advertisements covered by the ordinance if the ordinance goes into effect,[16] the Court does not find those declarations particularly compelling.  As the City points out, these declarations are self-serving in nature.  *Cf. Consolidated Cigar*, 218 F.3d at 55 (rejecting companies' argument that "the twenty-percent coverage of the warnings will so burden cigar manufacturers that they will cease advertising altogether[;] [t]he companies offer precious little to support this difficult-to-believe proposition, and we find it unpersuasive"; adding that "[o]ther industries, including the manufacturers of cigarettes and smokeless tobacco products, have successfully incorporated warning schemes into their advertising practices, and cigars present no special considerations that lead us to believe a different result will ensue here").  Moreover, the explanation as to why the companies will entirely withdraw from the covered media is not entirely satisfactory.  For example, the PepsiCo declaration states as follows:

---

[16] *See* Johnson Decl. ¶ 28 ("[I]f the Ordinance is allowed to take effect, PepsiCo intends to withdraw from advertising burdened by the Ordinance on covered media in the City."); Fox Decl. ¶ 27 ("[I]f the ordinance is allowed to take effect, DPSG [*i.e.*, Dr. Pepper] intends to cease advertising that is burdened by the Ordinance.").  Notably, Coke does not appear to make such a statement in its declaration, although it does state (as do PepsiCo and Dr. Pepper) that it "does not expect to enter into contracts for future advertisements on covered media . . . unless the Company knows with certainty that such advertisements would not be subject to the mandated warning." Kelly Decl. ¶ 28; *see also* Johnson Decl. ¶ 29; Fox Decl. ¶ 29.

United States District Court
For the Northern District of California

21.     If allowed to take effect, the Ordinance will force PepsiCo to either convey the City's warning or cease advertising on covered media.

22.     PepsiCo is concerned that displaying the City's large, mandated Warning on PepsiCo's own billboards, posters, and similar media would distort PepsiCo's intended messages.

23.     Because of its size, format, and content – including its all-capitals "WARNING" – PepsiCo is concerned that the required Warning would substantially overwhelm PepsiCo's intended messages on advertisements impacted by the Ordinance.

24.     PepsiCo considers it infeasible to respond to the City's message in the same advertisement.  Trying to do so would turn an advertisement into a scientific debate.  Given the requirements imposed by the City, there would also be too little room left for the original message.

25.     Because PepsiCo's advertising burdened by the Warning Mandate at issue in this case would be significantly less effective at conveying PepsiCo's intended message, the value to PepsiCo of any advertising on covered media would be substantially diminished.

26.     The Warning Mandate would also make advertising on covered media within City limits significantly more costly to PepsiCo.  Although PepsiCo likely would be required to pay for 100% of its advertising space, it would be entitled to utilize only 80% of that space, effectively making each square foot of usable advertising space 25% more expensive, while subsidizing and underwriting 100% of the cost of the City's message.

27.     Generally speaking, PepsiCo believes that the harm to PepsiCo's and its products' brand and messages from conveying the City's Warning would significantly outweigh any reduced benefit resulting from continuing to advertise on covered media.

28.     As a result, if the Ordinance is allowed to take effect, PepsiCo intends to withdraw from advertising burdened by the Ordinance on covered media in the City.

Johnson Decl. ¶¶ 21-28.

Based on the above statements, the PepsiCo declaration arguably suggests that there would be *no* benefit at all to an advertisement with the warning.  However, that claim, to the extent made, is not especially credible given that tobacco companies have still profited even with the required warnings on the tobacco products themselves.  To the extent the PepsiCo declaration simply states that the burden of the warning outweighs the benefit of the advertising with the warning, that claim, while plausible, is not sufficiently substantiated.  Plaintiffs do not substantiate what kind of revenue covered media advertising has generated in the past (*i.e.*, pre-warning) and the level of

27

revenue which is expected if covered media advertising would be required to have the warning. Without specifics, it is difficult to evaluate the claim that the burden exceeds the benefit and credibility of the claim that Plaintiffs will cease affected advertising.  Notably, PepsiCo's professed willingness to completely abandon the covered media seems at odds with its claim that the covered media is of significant value.  *See* Johnson Decl. ¶ 10 ("PepsiCo believes that utilizing different forms of media allows it to most effectively convey its message to consumers.").  The bottom line is that the beverage companies' assertion that they would altogether stop advertising in the covered media (rather than, *e.g.*, reducing advertising or even run test advertising) is of questionable credibility.[17]

          c.    Summary

      For the foregoing reasons, the Court concludes that Plaintiffs are not likely to succeed on the merits of their First Amendment claim.  The warning required by the City ordinance is factual and accurate, and the City had a reasonable basis for requiring the warning given its interest in public health and safety.  Plaintiffs' arguments of chilling effect are not sufficiently substantiated but, even if there were an arguable chilling effect, *Zauderer* dictates that a compelled disclosure need only be reasonably related to the government's interest in order for the advertiser's rights to be adequately protected.

      This is not to say that Plaintiffs' constitutional argument is not without force.  The Court

---

[17] In this regard, the Court notes that pharmaceutical companies still advertise even though their advertisements are required to include information about side effects, contraindications, and effectiveness.  *See* 21 C.F.R. § 202.1(e)(1) (requiring prescription drug advertisements to "present a true statement of information in brief summary relating to side effects, contraindications (when used in this section, 'side effects, contraindications' include side effects, warnings, precautions, and contraindications and include any such information under such headings as cautions, special considerations, important notes, etc.) and effectiveness"; adding that "[a]dvertisements broadcast through media such as radio, television, or telephone communications systems shall include information relating to the major side effects and contraindications of the advertised drugs in the audio or audio and visual parts of the presentation and unless adequate provision is made for dissemination of the approved or permitted package labeling in connection with the broadcast presentation shall contain a brief summary of all necessary information related to side effects and contraindications").  Although the regulation specifies that only a "brief summary" is required, as anyone who has witnessed a television advertisement for pharmaceutical products will know, the scope of the information required about potential adverse side effects often makes the disclosure seemingly as long as the advertising message itself.  This apparently has not deterred pharmaceutical companies from advertising.

United States District Court
For the Northern District of California

28

1  acknowledges that the size requirement of 20% and the burden it imposes on advertisers makes

2  this case a closer question, in the Court's view, compared to *CTIA I* and *CTIA II*.  Nonetheless,

3  under rational basis review applicable under *Zauderer*, Plaintiffs are not likely to succeed on the

4  merits of their First Amendment claim.

5  C.   Likelihood of Irreparable Harm and Balance of Equities

6       As to irreparable harm, much of Plaintiffs' claim is dependent on the success of their First

7  Amendment claim – *i.e.*, if the claimed irreparable harm is a violation of Plaintiffs' First

8  Amendment rights, then there is no such irreparable harm if Plaintiffs do not prevail on that claim.

9       Plaintiffs also identify harm to goodwill and reputation as another irreparable harm.

10  However, Plaintiffs' showing is not particularly convincing.  Many consumers are likely to be

11  familiar with the high sugar content of soft drinks and other SSBs, and many are aware of

12  potential weight gain due to calories therefrom and risk of tooth decay.  And Plaintiffs may engage

13  in counterspeech to combat the asserted harm, not only in the advertisement containing the

14  warning itself but also through other means and media.

15       Finally, the Court notes that, to the extent Plaintiffs rely on their expert, Dr. Golder, to

16  substantiate the alleged harm that the warning would cause, *see generally* Golder Rpt. ¶ III.9

17  (opining that the warning will "weaken, neutralize, or even counteract [the advertiser's] intended

18  messages" and further will harm "companies' brand names and brand associations"), Dr. Golder is

19  not particularly persuasive.  His opinion does not rely on, *e.g.*, any survey evidence particular to

20  the issue here.

21       Accordingly, the Court concludes that Plaintiffs have not adequately shown that

22  irreparable harm is likely, nor that the balance of equities weighs in their favor.

23  D.   Public Interest

24       As for the public interest, this factor does not weigh in Plaintiffs' favor either, largely

25  because of the weakness of their First Amendment claim on the merits.  Moreover, as indicated

26  above, the public interest weighs in favor of the City, as the City is taking legitimate action to

27  protect public health and safety.

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

E.      Serious Questions Going to the Merits and Balance of Hardships

For the foregoing reasons, the Court concludes that the four-element *Winter* test counsels against a preliminary injunction.  Furthermore, even when the Court evaluates Plaintiffs' motion under the alternative "serious questions" approach that survived *Winter*, Plaintiffs do not fare any better.  The Court again acknowledges that, arguably, Plaintiffs have raised serious questions going to the merits, in particular, given the 20% size of the mandated warning.  Nevertheless, to prevail under the "serious questions" approach, Plaintiffs must show that the balance of hardships tips *sharply* in their favor.  *See Alliance for the Wild Rockies*, 632 F.3d at 1132.  Plaintiffs have not met this rigorous showing.  San Francisco has shown it has a legitimate interest in advancing public health, and the health problem facing San Francisco attributable in part to SSBs, as noted above, is a serious one.  As set forth in the Schillinger expert report, obesity is a problem not only at a national but also at a local level: "A 2011 report measured obesity rates among 5th, 7th and 9th graders and found that 32% of San Francisco youth were overweight or obese.  In San Francisco, 46.4% of adults are obese or overweight, including 61.7% of Hispanics and 51.3% of African Americans."  Schillinger Rpt. ¶ 9.  In contrast, Plaintiffs' claim of chilling effect and severe hardship is not convincing.  Thus, even if Plaintiffs have raised serious questions on the merits, they have not demonstrated the balance of hardships falls sharply in their favor.

///

///

///

///

///

///

///

///

///

///

///

### III.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for a preliminary injunction.  Plaintiffs are not likely to succeed on the merits of their First Amendment claim, and it is unlikely that they would suffer irreparable harm if the ordinance were to go into effect.  Even if Plaintiffs had established serious questions going to the merits, balancing of hardships does not tip sharply in their favor.

This order disposes of Docket No. 50.


**IT IS SO ORDERED**.


Dated: May 17, 2016

_____
EDWARD M. CHEN
United States District Judge