LATHAM & WATKINS LLP
  Steven M. Bauer (CA Bar No. 135067)
    steven.bauer@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

LATHAM & WATKINS LLP
  Richard P. Bress (Admitted *Pro Hac Vice*)
    rick.bress@lw.com
  Michael E. Bern (Admitted *Pro Hac Vice*)
    michael.bern@lw.com
  George C. Chipev (Admitted *Pro Hac Vice*)
    george.chipev@lw.com
  Caroline A. Flynn (CA Bar No. 296691)
    caroline.flynn@lw.com
  Shannon Grammel (Admitted *Pro Hac Vice*)
    shannon.grammel@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

*Attorneys for Plaintiffs*
American Beverage Association and California
Retailers Association

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION, CALIFORNIA RETAILERS ASSOCIATION, AND CALIFORNIA STATE OUTDOOR ADVERTISING ASSOCIATION,<br><br>        Plaintiffs,<br><br>        v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Defendant. | CASE NO. 3:15-cv-03415-EMC<br><br>**PLAINTIFFS' MOTION TO EXCLUDE IN PART THE EXPERT REPORT AND TESTIMONY OF DR. CAROL A. SCOTT**<br><br>Date:      May 20, 2021<br>Time:     1:30 p.m.<br>Judge:    Hon. Edward M. Chen<br>Courtroom: Courtroom 5, 17th floor |

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

NOTICE OF MOTION ...................................................................................................... 1

RELIEF SOUGHT .............................................................................................................. 1

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    Dr. Scott's Survey Structure And Conclusions ........................................... 3

    B.    Dr. Kivetz's And Dr. Isaacson's Rebuttal Reports ..................................... 7

LEGAL STANDARD .......................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

    A.    Questions 11 And 12 Did Not Test What Messages The Amended
        Warning Conveys ...................................................................................... 10

    B.    Questions 11 And 12 Did Not Reliably Test The Extent To Which The
        Amended Warning Affected Participants' Attitudes And Beliefs About
        Beverages With Added Sugar ................................................................... 12

    C.    Questions 11 And 12 Did Not Reliably Test Respondents' Attitudes And
        Beliefs About Beverages With Added Sugar ............................................ 14

CONCLUSION .................................................................................................................. 18

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ADT Security Services v. Security One International, Inc.*,
No. 11–CV–5149 YGR, 2013 WL 10542929 (N.D Cal. Sept. 15, 2013) ..............................10

*American Beverage Association v. City & County of San Francisco (ABA II)*,
871 F.3d 884 (9th Cir. 2017), *reh'g granted*, 880 F.3d 1019 (9th Cir. 2018),
*reh'g en banc*, 916 F.3d 749 (9th Cir. 2019) ......................................................................3, 4

*American Beverage Association v. City & County of San Francisco (ABA III)*,
916 F.3d 749 (9th Cir. 2019) ......................................................................................3, 4

*American Home Products Corp. v. Procter & Gamble Co.*,
871 F. Supp. 739 (D.N.J. 1994) ......................................................................................14

*Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.*,
684 F.2d 1316 (9th Cir. 1982) ........................................................................................12

*Calista Enterprises Ltd. v. Tenza Trading Ltd.*,
43 F. Supp. 3d 1099 (D. Or. 2014) ..................................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).............................................................................................2, 8, 12

*Daubert v. Merrell Dow Pharmacueticals, Inc.*,
43 F.3d 1311 (9th Cir. 1995) ......................................................................................9, 10

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*,
618 F.3d 1025 (9th Cir. 2010) ........................................................................................9

*Gucci America, Inc. v. Guess?, Inc.*,
831 F. Supp. 2d 723 (S.D.N.Y. 2011)..........................................................................10, 12

*Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline
Beecham Corp.*,
960 F.2d 294, 297 (2d Cir. 1992)....................................................................................11

*Keith v. Volpe*,
858 F.2d 467 (9th Cir. 1988) ..........................................................................................8

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)......................................................................................................8

*M2 Software, Inc. v. Madacy Entertainment*,
421 F.3d 1073 (9th Cir. 2005) ......................................................................................8, 9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Messick v. Novartis Pharmaceuticals Corp.*,
    747 F.3d 1193 (9th Cir. 2014) ...................................................................12

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)..................................................................................9

*Parallel Networks Licensing, LLC v. Microsoft Corp.*,
    777 F. App'x 489 (Fed. Cir. 2019) ..............................................................12

*Procter & Gamble Co. v. Ultreo, Inc. (P&G)*,
    574 F. Supp. 2d 339 (S.D.N.Y. 2008).........................................2, 11, 12

*Scott Fetzer Co. v. House of Vacuums Inc.*,
    381 F.3d 477 (5th Cir. 2004) .......................................................................15

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984)........................................................................15

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) .........................................................15

*Wendt v. Host International, Inc.*,
    125 F.3d 806 (9th Cir. 1997) .........................................................................9

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)......................................................................................1

**STATUTES**

City's Ordinance No. 26-20,
    https://sfgov.legistar.com/View.ashx?M=F&ID=8078165&GUID=AA264DC0
    645-D-4F27-BFE0-C4160BB20F81 .............................................................1

S.F. Health Code § 4203(a)........................................................................................1

**OTHER AUTHORITIES**

Shari Seidman Diamond, *Reference Guide on Survey Research in Reference*
    *Manual on Scientific Evidence* (3d ed. 2011),
    https://www.fjc.gov/sites/default/files/2012/SciMan3D09.pdf...........................14

79 Fed. Reg. 11,880 (Mar. 3, 2014)............................................................................4

81 Fed. Reg. 33,742 (May 27, 2016) .........................................................................17

Federal Rule of Evidence 702.............................................................................2, 8

Federal Rule of Evidence 702(a) ...............................................................................12

| | Page(s) |
|---|---|

*Handbook of Recommended Procedures for the Trial of Protracted Cases*, 25 F.R.D. 351 (1960) ........................................................................................................9

Richard E. Nisbett & Timothy D. Wilson, *Telling more than we can know: Verbal reports on mental processes*, 84 Psych. Rev. 231 (1977) ........................................14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on May 20, 2021, at 1:30 p.m., in Courtroom 5 of the United

States District Court for the Northern District of California, located at 450 Golden Gate Avenue,

17th Floor, San Francisco, California, 94102-3489, Plaintiffs American Beverage Association,

California Retailers Association, and California State Outdoor Advertising Association will, and

hereby do, move the Court to exclude Paragraphs 11, 29, 39-41, and 43, and Exhibits 7-5A, 7-5B,

and 7-5C of the expert report, and any associated testimony or evidence, by Dr. Carol A.

Scott, Ph.D.

## RELIEF SOUGHT

Certain portions of the survey conducted by Dr. Scott and detailed in Paragraphs 11, 29,

39-41, and 43, and Exhibits 7-5A, 7-5B, and 7-5C of her expert report are irrelevant and suffer

from technical and methodological errors so pervasive that they should not be relied upon by this

Court for whatever purpose Defendant City & County of San Francisco has propounded them, and,

accordingly, should be excluded pursuant to Federal Rule of Civil Procedure 702.

## INTRODUCTION

Defendant City & County of San Francisco (the "City") submitted an expert report in this

case by Dr. Carol A. Scott, Ph.D. Dr. Scott's report includes a consumer survey purporting to

address two topics: (1) "the messages that consumers are likely to receive from advertising

posters" that include the City's required warning on ads for beverages with added sugar, S.F.

Health Code § 4203(a) (the "Amended Warning"); and (2) consumers' "attitudes and beliefs about

sugar-sweetened beverages." Expert Report of Dr. Carol A. Scott ¶¶ 7, 29 ("Scott Rpt."),

Declaration of Richard P. Bress ("Bress Decl.") Ex. I. The City relies on Dr. Scott's report in an

attempt to meet its burden to show that the Amended Warning conveys only "purely factual and

uncontroversial information," as is required to make the City's Ordinance No. 26-20,

https://sfgov.legistar.com/View.ashx?M=F&ID=8078165&GUID=AA264DC0-645D-4F27-

BFE0-C4160BB20F81 (the "Amended Ordinance") eligible for the standard of First Amendment

review set forth in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

As Plaintiffs' expert Dr. Ran Kivetz explains in his rebuttal report, Dr. Scott's survey and conclusions are deeply flawed. *See generally* Rebuttal Expert Report of Dr. Ran Kivetz ("Kivetz Rpt."), Bress Decl. Ex. C. Although Dr. Scott's design flaws extend to and diminish the reliability of the initial portion of her survey, which was designed to assess what messages consumers are likely to receive from advertisements containing the Amended Warning, Plaintiffs appreciate that this portion of the survey is at least relevant and they do not seek to exclude it at this time. Indeed, as Plaintiffs' experts have explained, that portion of Dr. Scott's survey actually supports Plaintiffs' case. *See* Kivetz Rpt. ¶¶ 49-80; Supplemental Expert Rebuttal Report of Professor Peter N. Golder ¶¶ 21-35, 42, 56-57 ("Golder Reb. Rpt."), Bress Decl. Ex. B-2; *see also* Plaintiffs' Motion for Summary Judgment ("MSJ") at Statement of the Case § E; *id.* at Argument § I.A.

This motion instead is narrowly drawn to seek only the exclusion of the second portion of Dr. Scott's survey—Questions 11-12—and all associated testimony or evidence, as unreliable and irrelevant, and therefore inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This portion of Dr. Scott's survey should be excluded for three principal reasons.

*First*, Dr. Scott asked the wrong questions. Plaintiffs allege that the Amended Warning conveys inaccurate and misleading messages, including that: (1) drinking beverages with added sugar can itself cause weight gain and related diseases, (2) drinking beverages with added sugar is inherently hazardous, and (3) beverages with added sugar are more likely to cause weight gain and related diseases than other equally caloric foods and beverages without added sugar. The relevant issue, therefore, is whether "consumers are *taking away the message* that the plaintiff contends the [Amended Warning] is conveying." *Procter & Gamble Co. v. Ultreo, Inc. (P&G)*, 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008) (emphasis added) (citation omitted). But the second portion of Dr. Scott's survey did not address that issue at all. Instead, it assessed participants' *attitudes and beliefs* about sugar-sweetened beverages. The lack of fit between the relevant issue in this case and this portion of her survey requires its exclusion.

*Second*, even if it were relevant whether the Amended Warning impacted participants' attitudes and beliefs about sugar-sweetened beverages, Dr. Scott's questions failed to reliably

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    measure that. Because the second part of Dr. Scott's survey (1) did not reference the sample

2    advertisements containing the Amended Warning, (2) did not make the sample advertisements

3    available to participants, and (3) drew an explicit distinction between this "last section" of the

4    survey and the questions that preceded it, Dr. Scott's survey design "led participants *away from*

5    *the Warning*, prompting participants to base their answers on their preexisting beliefs" rather than

6    any impact of the Amended Warning on their preexisting beliefs. Kivetz Rpt. ¶¶ 84-92; *see also*

7    Expert Report of Professor Peter N. Golder ¶¶ 12, 60-63 ("Golder Rpt."), Bress Decl. Ex. B-1.

8    Third, the questions themselves were blatantly leading and at a minimum ambiguous,

9    rendering their results unreliable.

10    For all those reasons, the final portion of Dr. Scott's survey is unreliable and irrelevant for

11    evaluating what messages the Amended Warning conveys. Dr. Scott's opinions regarding

12    Questions 11 and 12 of this survey, as well as the responses to that portion of the survey, which

13    are detailed in Paragraphs 11, 29, 39-41, and 43, and Exhibits 7-5A, 7-5B, and 7-5C of her expert

14    report, should be excluded as incompatible with the requirements of Rule 702 and *Daubert*.

15    **BACKGROUND**[1]

16    **A.**      **Dr. Scott's Survey Structure And Conclusions**

17    In 2015, the City and County of San Francisco enacted an ordinance requiring certain

18    advertisements for beverages to include a City-scripted black-box warning cautioning about

19    supposed health risks of drinking beverages with added sugar. A three-judge panel of the Ninth

20    Circuit and an en banc panel both found that Plaintiffs were "likely [to] succeed on the merits" of

21    their First Amendment claim. *Am. Beverage Ass'n v. City & Cnty. of San Francisco (ABA III)*,

22    916 F.3d 749, 753 (9th Cir. 2019) (en banc); *see also generally Am. Beverage Ass'n v. City &*

23    *Cnty. of San Francisco* (*ABA II*), 871 F.3d 884 (9th Cir. 2017), *reh'g granted*, 880 F.3d 1019 (9th

24    Cir. 2018), *reh'g en banc*, 916 F.3d 749 (9th Cir. 2019).

25    One of the key questions in the litigation over the City's original warning was whether it

26    conveyed the kind of "purely factual and uncontroversial information" that qualifies for review

27

---

28    [1] Plaintiffs' concurrently filed Motion for Summary Judgment details the full factual and procedural background of this litigation.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

under *Zauderer*. The original Ninth Circuit panel concluded it did not, holding among other things that the original warning "convey[ed] the message that sugar-sweetened beverages contribute to [the listed] health conditions regardless of the quantity consumed or other lifestyle choices." *ABA II*, 871 F.3d at 895. That message was "at a minimum, controversial," the panel majority found, because it conflicts with FDA statements recognizing that beverages with added sugar can be consumed safely as part of a healthy dietary pattern. *Id.* The panel majority also concluded that "the warning conveys the message that sugar-sweetened beverages are less healthy than other sources of added sugars and calories and are more likely to contribute to obesity, diabetes, and tooth decay than other foods." *Id.* The panel majority found that message "misleading" and "deceptive" in light of the FDA's contrary conclusion that "'added sugars, including sugar-sweetened beverages, are no more likely to cause weight gain in adults than any other source of energy.'" *Id.* at 895-96 (quoting 79 Fed. Reg. 11,880, 11,904 (Mar. 3, 2014)). The en banc Ninth Circuit unanimously agreed that the original warning likely violated the First Amendment, but the majority concluded that there was no need to "decide whether the warning … [was] factually accurate and noncontroversial," because even if so, the City could not meet its "burden" under *Zauderer* "of proving that the warning is neither unjustified nor unduly burdensome." *ABA III*, 916 F.3d at 756-57.

In response to the Ninth Circuit's decision, the Board of Supervisors enacted the Amended Ordinance, which altered the size and language of the City's original warning. Plaintiffs then amended the Complaint to reflect these changes, and the parties agreed to a schedule for dispositive and *Daubert* motions. The City engaged Dr. Scott as an expert to "provide empirical evidence to determine whether or not the presence of the City's warning is likely to prevent the manufacturer from conveying its own product message in the advertisement" and "determine whether the presence of the City's warning on advertising posters would lead consumers to believe that sugar-sweetened beverages are uniquely different in their effects from sugar-sweetened foods, and that sugar-sweetened beverages cause weight gain regardless of other dietary and lifestyle factors." Scott Rpt. ¶ 7.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

Dr. Scott's survey relied on a sample of 400 consumers. This sample was not representative of the population that would see the advertisements and associated warnings. Among other things, Dr. Scott oversampled teenagers between 15 and 17, making them 25% of participants even though they account for only 3.8% of the total United States population (and 2% of San Francisco's population). Kivetz Rpt. ¶¶ 134, 136-37. In addition, although the Amended Ordinance applies solely to advertisements displayed within San Francisco, only 11% of Dr. Scott's participants were even located in California. *Id.* ¶ 135. And only *three* participants (less than 1%) lived in San Francisco. *Id.*

Survey participants were instructed to view various advertisements online and answer a sequence of questions. *Id.* ¶ 29. According to Dr. Scott, the initial portion of the survey attempted to "assess the messages that consumers are likely to receive from advertising posters for soft drinks that include a warning from the City regarding the potential effects of sugar-sweetened beverages on weight gain, obesity and diabetes." *Id.* ¶ 14. The participants were shown three advertisements simultaneously and then individually. Test group participants were shown ads with the Amended Warning, while the control group was shown the same ads without the warning. *See id.* ¶¶ 22-25. Dr. Scott asked both groups two open-ended questions (meaning that the participant wrote in a response): (Question 5) "What message(s), if any, are being communicated by this poster?" and (Question 6) "Any other message(s) communicated by this poster?" *Id.* ¶ 39-40. After these questions, participants answered a closed-ended question (Question 7) in which they were shown, depending on the specific ad, between seven to nine "messages tailored for the particular brand and poster product message." *Id.* ¶ 41. For the first shown ad, if participants selected any of the two messages that related to the Amended Warning (i.e., "Beverages with added sugar can cause weight gain, which increases the risk of obesity and type 2 diabetes" or "Drinking [Pepsi/Dr. Pepper/Coca-Cola] can cause weight gain, which increases the risk of obesity and type 2 diabetes"), they were asked what "entity(s), company(s) or organization(s) do you think provided this message?" *Id.* ¶ 43 (alteration in original).

The final section of the survey, containing Questions 11 and 12, was separated from the initial section by an instruction explaining to participants that this section was focused on

something different:  "The last section of this survey *focuses on your attitudes and beliefs* about *sugar-sweetened beverages* such as some sodas, fruit juices, energy drinks, flavored waters, etc." Scott Rpt. Ex. 4 at 8 (emphasis added); *see* Scott Rpt. ¶ 44.  Consistent with that instruction, this section did not ask participants about the messages conveyed by the advertisements that they had previously seen.  Instead, it consisted of two closed-ended questions about participants' "attitudes and beliefs" about the health effects of "sugar-sweetened beverages."

Questions 11 and 12 asked participants to identify the extent to which they agreed or disagreed with two statements using a five-point scale from "strongly agree" to "strongly disagree" (with an additional "don't know/not sure" option).  Question 11 asked participants to identify their level of agreement or disagreement with the statement that "The calories in sugar-sweetened beverages would make one gain weight in a different way than calories in sugar-sweetened foods, that is, a calorie consumed in a sugar-sweetened beverage has a different effect than a calorie consumed in sugar-sweetened foods."  Participants were next asked to react to a statement in either Question 12-A ("You can offset the effects of sugar-sweetened beverages on weight gain by reducing the quantity you drink, doing more exercise to burn the calories, and/or reducing the calories you consume in other foods.") *or* Question 12-B ("You cannot offset the effects of sugar-sweetened beverages on weight gain by reducing the quantity you drink, doing more exercise to burn the calories, and/or reducing the calories you consume in other foods.").  Scott Rpt. ¶ 44.  In contrast to the initial portion of the survey, when participants were asked Questions 11 and 12, they were not directed to consider the sample advertisements they had previously been shown or given the opportunity to review the advertisements before answering the questions.

According to Dr. Scott, the results of her survey indicate: (1) most consumers perceive both the brand's message and the Amended Warning, and their "perception of the brand messages is likely to remain very high" despite the salient Amended Warning covering 10% of the advertisement; and (2) "exposure to the City's warning message in the specified type of text box is not likely to cause consumers to believe that sugar-sweetened beverages are unique in their capacity to affect one's weight or that any negative consequences of these beverages cannot be offset by other dietary and exercise factors."  *Id.* ¶ 16; *see also id.* ¶¶ 9, 11, 37, 43.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**B.    Dr. Kivetz's And Dr. Isaacson's Rebuttal Reports**

On September 18, 2020, Plaintiffs submitted a rebuttal report from Dr. Ran Kivetz, an internationally recognized expert on the design and execution of consumer perception surveys, marketing, and psychology. Dr. Kivetz's rebuttal report identifies numerous flaws in Dr. Scott's overall survey design that undermine the validity of her conclusions. *See* Kivetz Rpt. ¶¶ 17-25. He explains why, in particular, the serious methodological flaws in the final portion of her survey render the questions and the results irrelevant and unreliable. *Id.* ¶¶ 81-117.

Plaintiffs also submitted a rebuttal report from Dr. Bruce Isaacson containing a consumer survey that corrects for the flaws in Dr. Scott's methodology. Unlike Dr. Scott's, Dr. Isaacson's consumer survey directly assessed whether the messages Plaintiffs allege are conveyed by advertisements with and without the Amended Warning. His survey shows, among other things, that:

- 84% of participants shown ads with the Amended Warning understood the ads to convey that "[d]rinking the beverage shown in the ad is likely to make you gain weight." Expert Rebuttal Report of Dr. Bruce Isaacson ¶ 87 ("Isaacson Rpt."), Bress Decl. Ex. D.

- 73% of participants shown ads with the Amended Warning understood the ads to convey that "[d]rinking the beverage shown in the ad is likely to make you develop type 2 diabetes." *Id.*

- 56.1% of participants shown ads with the Amended Warning viewed the ad as "communicat[ing] or impl[ying] that drinking the beverage in the ad is likely to make you gain weight or make you develop type 2 diabetes, even if you drink it in moderation." *Id.* ¶ 17(iii)(d).

- Nearly half (46.8%) of participants shown ads with the Amended Warning viewed the ad as "communicat[ing] or impl[ying] that drinking the beverage in the ad is more likely to make you gain weight or make you develop type 2 diabetes than another beverage that has the same amount of calories but does not contain added sugar." *Id.* ¶ 17(iv)(d).

- Over 76% of participants shown the Amended Warning answered that "based on the ad, you <u>cannot</u> drink this beverage as part of a healthy diet." *Id.* at ¶ 17(v)(a).

In each instance, Dr. Isaacson finds a substantial statistically significant difference between the test group and the group not exposed to the Amended Warning.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

1      Dr. Isaacson's results support Plaintiffs' claim that consumers will understand the

2 Amended Warning to convey the misleading and inaccurate messages that Plaintiffs allege. *See*

3 MSJ at Statement of Case § D. They also underscore that to assess whether the Amended Warning

4 will convey false and misleading messages to consumers, it is necessary to test what messages are

5 actually conveyed by advertisements with and without the Amended Warning, rather than merely

6 testing consumers' attitudes or beliefs, as Dr. Scott did in the second portion of her survey.

7                                  **LEGAL STANDARD**

8      An expert may testify to opinions if "(a) the expert's scientific, technical, or other

9 specialized knowledge will help the trier of fact to understand the evidence or determine a fact in

10 issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

11 reliable principles and methods; and (d) the expert has reliably applied the principles and methods

12 to the facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 588-89. Rule 702

13 imposes a "gatekeeping obligation" on courts to "'ensure that any and all scientific testimony,'"

14 including testimony based on "'technical[] or other specialized knowledge,'" "'is not only

15 relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citations

16 omitted). The court must ensure that expert testimony, whether based on "professional studies or

17 personal experience, employs in the courtroom the same level of intellectual rigor that

18 characterizes the practice of an expert in the relevant field." *Id.* at 152; *see also M2 Software, Inc.*

19 *v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005) ("Admissibility of a survey is a threshold

20 question that must be resolved by a judge."). The party offering the expert testimony, including a

21 survey, bears the burden of proving its admissibility. *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir.

22 1988).

23      Survey evidence should not be admitted if it is not "conducted according to accepted

24 principles and [is not] relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,*

25 *Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814

26 (9th Cir. 1997)); *accord M2 Software*, 421 F.3d at 1087; *see also Calista Enters. Ltd. v. Tenza*

27 *Trading Ltd.*, 43 F. Supp. 3d 1099, 1111 (D. Or. 2014) (explaining that a survey can be excluded

28 where "there are substantial design defects in the survey or its execution is defective"). To be

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

admissible, there must be a "'fit' between the expert testimony and the issue in the case, such that the expert testimony will assist the trier of fact and will not mislead it. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 & n.17 (9th Cir. 1995). The *Handbook of Recommended Procedures for the Trial of Protracted Cases*, 25 F.R.D. 351 (1960), meanwhile, lists several factors to evaluate if a survey was conducted reliably, including but not limited to: (1) a proper universe was selected and examined; (2) a representative sample was drawn from that universe; (3) the mode of questioning the interviewees was correct; and (4) the sample design, the questionnaire, and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys. *Calista Enters.*, 43 F. Supp. 3d at 1111-12.

## ARGUMENT

Overall, Dr. Scott's survey was poorly designed and provides no meaningful support to the City's defenses in this case. Plaintiffs' motion to exclude, however, is focused narrowly on a discrete section of the survey that is insufficiently relevant or reliable to warrant any consideration at all. Questions 11 and 12 suffer from specific and fundamental methodological flaws. Those flaws render the questions and results irrelevant and unreliable with respect to their intended purpose: to show that the Amended Warning conveys only "purely factual and uncontroversial information about the terms under which [the products] will be available." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018). These questions did not ask participants what messages are conveyed by the Amended Warning or the ad containing it. They did not assess whether the Amended Warning *affected* participants' "attitudes and beliefs" about sugar-sweetened beverages, because they were explicitly set apart from the earlier questions referencing the sample ads, they did not refer to the previously-viewed sample, and Dr. Scott did not permit participants to access those sample ads when answering them. And, finally, these questions did not reliably measure even what they *did* ask about—participants' attitudes and beliefs about sugar-sweetened beverages—in a reliable way, because the questions themselves were both leading and, in important respects, ambiguous. Each of these flaws was a serious error,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

and cumulatively they rob this section of Dr. Scott's survey of the basic relevance and reliability necessary for its admission into evidence.[2]

### A. Questions 11 And 12 Did Not Test What Messages The Amended Warning Conveys

As explained above, a central issue in this case is what messages are conveyed by the City's Amended Warning. The first part of Dr. Scott's survey purported to assess just that: the Amended Warning's impact on the *messages* received by consumers viewing the test ads. But the second part of Dr. Scott's survey was separated from the first by an instruction that explained it was focused on something very different: "The last section of this survey focuses on your *attitudes and beliefs* about sugar-sweetened beverages such as some sodas, fruit juices, energy drinks, flavored waters, etc." Scott Rpt. Ex. 4 at 8 (emphasis added); *see also* Scott Rpt. ¶ 29. True to that instruction, this section of Dr. Scott's survey did not test what messages the Amended Warning conveyed. As a result, it did not "fit" the inquiry it was designed to inform, and is therefore irrelevant and excludable under Rule 702 and *Daubert*. *See Daubert*, 43 F.3d at 1321 & n.17.

The predicate question under *Zauderer* is whether the speech compelled by the government (here the Amended Warning) will communicate messages that are purely factual and uncontroversial. Plaintiffs have alleged that, to the contrary, the Amended Warning conveys messages that are false, misleading, and at minimum controversial—specifically, that drinking beverages with added sugar is inherently hazardous and more likely to cause weight gain and related diseases than consuming other equally caloric foods and beverages without added sugar. When participants in Dr. Isaacson's survey were asked questions about what messages are sent by advertisements with and without the Amended Warning, their answers confirmed that the

---

[2] Courts routinely exclude only parts of an expert's opinion, either at the request of the movant or based on the court's analysis of the expert's opinion and Rule 702. *See, e.g.*, *ADT Security Servs. v. Security One Int'l, Inc.*, No. 11–CV–5149 YGR, 2013 WL 10542929, at *1 (N.D Cal. Sept. 15, 2013) (granting motion to exclude expert opinions related to four survey questions about caller ID misrepresentation because of risk of confusion of issues); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 747-49 (S.D.N.Y. 2011) (excluding survey conducted by Dr. Scott on specific issues due to relevance).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

Amended Warning conveys those misleading messages.  *See supra* at Background § B; Isaacson Rpt. ¶ 17.

The final section of Dr. Scott's survey did not test those same propositions.  Instead, it asked participants about their attitudes and beliefs.  That missed the mark.  When the issue is whether something renders an advertisement misleading, "the question in such cases is – what does the person to whom the advertisement is addressed find to be the *message*."  *P&G*, 574 F. Supp. 2d at 345 (emphasis added) (quoting *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992)).  Survey evidence thus fits that relevant inquiry when it tests whether "consumers are *taking away the message* that the plaintiff contends the advertising is conveying."  *P&G*, 574 F. Supp. 2d, at 345 (emphasis added).  "Rather than asking participants about what the posters or Warning communicated," Dr. Scott's Questions 11 and 12 purported to instead measure participants' "attitudes and beliefs."  Kivetz Rpt. ¶ 21(*i*).  But merely comparing the attitudes and beliefs of control subjects (who have viewed unadorned ads) and test subjects (who have viewed ads with the Amended Warning) cannot reliably assess the messages that consumers will take from the Amended Warning.  To provide a simple illustrative example, suppose that the City required advertisements to include a statement that "The Lunar Landing Was Faked."  If a consumer survey found that the inclusion of that statement did not significantly affect survey participants' "beliefs" about whether humankind has been to the moon, that might well show that the City's compelled statement was ineffective at changing the consumers' views—but it would not change that the message compelled by the City was false.  Thus, the survey results would fail to provide a relevant measure of whether the City's required statement transmitted purely factual and uncontroversial information.  So too here.  Because Dr. Scott's methodology did not address "the real issue[]," *P&G*, 574 F. Supp. 2d, at 345 (citation omitted), it flunks the requirements of *Daubert* and Federal Rule of Evidence 702.

Expert testimony is admissible only if it "will help the trier of fact . . . determine a fact in issue."  Fed. R. Evid. 702(a); *see Daubert*, 509 U.S. at 591-92.  To help the trier of fact, expert testimony must adequately "fit" the factual issue for which it is proffered.  *See Daubert*, 509 U.S. at 591; *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 492 (Fed. Cir.

2019); *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (testimony must "logically advance[] a material aspect of the proposing party's case" (citation omitted)).  Thus, a survey's results directed to the relevant issues.  *See, e.g.*, *Anti-Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*, 684 F.2d 1316, 1323-26 (9th Cir. 1982) (rejecting district court's exclusion of one survey, because it was relevant to issues and properly structured, while rejecting use of another survey because its results "are of no relevance").

A survey that fails to address the factual issue in question should be excluded.  For example, in *Gucci*, the court excluded an earlier survey done by Dr. Scott to the extent it was proffered as probative of issues related to consumer confusion, because the survey was designed to measure "point-of-sale" confusion and that was distinct from the plaintiff's theory of liability.  *Gucci*, 831 F. Supp. 2d at 747-48.  She made the same basic lack-of-fit mistake here.  Dr. Scott claims that Questions 11 and 12 indicate that the Amended Warning "is not likely to cause consumers to believe that sugar-sweetened beverages are unique in their capacity to affect one's weight or that any negative consequences of these beverages cannot be offset by other dietary and exercise factors."[3]  But the relevant First Amendment inquiry is whether the Amended Warning will send false, misleading, or controversial messages, not whether it will affect consumers' attitudes and beliefs.  Because this section of Dr. Scott's survey is "completely irrelevant for evaluating whether *the Warning* conveys the message that drinking beverages with added sugar is inherently dangerous or more likely to cause weight gain or other health consequences than other foods and beverages," Kivetz Rpt. ¶ 21(*i*), it should be excluded.

**B.  Questions 11 And 12 Did Not Reliably Test The Extent To Which The Amended Warning Affected Participants' Attitudes And Beliefs About Beverages With Added Sugar**

As discussed above, the extent to which the Amended Warning actually affects consumers' attitudes and beliefs about sugar-sweetened beverages is not the relevant inquiry.  But even if it were, Questions 11 and 12 did not reliably test even that.

---

[3] Dr. Scott concludes that the Amended Warning is unlikely to affect consumers' attitudes and beliefs about beverages with added sugar.  *See* Scott Rpt. ¶¶ 9, 11, 37; *see also id.* ¶ 43.  If that were correct, however, it would undermine the City's entire rationale for the Amended Ordinance.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     To begin with, Dr. Scott designed her survey in a manner that explicitly severed these

2 questions from the questions about the advertisements that preceded them—placing them in a

3 different section and instructing participants that "[t]he last section of this survey *focuses on your*

4 *attitudes and beliefs about sugar-sweetened beverages* such as some sodas, fruit juices, energy

5 drinks, flavored waters, etc." Scott Rpt. Ex. 4 at 8 (emphasis added). And crucially, unlike when

6 they were asked questions in the earlier stage of the survey, once participants in the test and control

7 groups got to Questions 11 and 12, they were *not* shown or given the option to review the

8 advertisements they saw earlier; indeed, they were not even directed to consider those ads or the

9 Amended Warning in any way. Kivetz Rpt. ¶¶ 90-91.[4]

10     To be sure, participants answering Questions 11 and 12 would have viewed the sample

11 advertisements, either with or without the Amended Warning, earlier in the survey. But that is

12 insufficient to establish that Questions 11 and 12 are a reliable measure of the Amended Warning's

13 effect, rather than participants' preexisting beliefs. Because a "stimulus may be forgotten, or

14 become less available," the more removed a question is from a stimulus, the less likely it is that

15 the stimulus will be "influential" on the answer. Richard E. Nisbett & Timothy D. Wilson, *Telling*

16 *more than we can know: Verbal reports on mental processes*, 84 Psych. Rev. 231, 251-52 (1977)

17 (Bress Decl. Ex. O); *see also* Shari Seidman Diamond, *Reference Guide on Survey Research in*

18 *Reference Manual on Scientific Evidence* 359, 363-64 n.13 (3d ed. 2011),

19 https://www.fjc.gov/sites/default/files/2012/SciMan3D09.pdf. Here, because Dr. Scott's

20 methodology "prompted participants to disassociate their responses from the advertisements

21 shown earlier to them and from the Warning" she failed to reliably "test [the] causal effect of

22 advertising posters bearing the Warning on consumers' beliefs regarding the health risks of sugar-

23 _____

24 [4] The comparison to other questions asked by Dr. Scott earlier in the survey is stark. For example, Questions 5 to 7 asked about the messages "communicated by this poster" (referring to the ad) and

25 even included images of the ads on the same screen, which allowed and encouraged participants to refer to each ad as they answered. Questions 11 and 12 neither provided images nor asked

26 participants to make their evaluations based on the "posters" they examined. Questions 11 and 12 did not mention the ads or the Amended Warning at all. At minimum, any ambiguity in the

27 instructions about whether participants should answer based on the ads they were shown or their preexisting personal beliefs further undermines the reliability of this portion of the survey.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

sweetened beverages." Kivetz Rpt. ¶ 88. Instead, "[b]y drawing participants' attention away from the posters (i.e., which either did or did not display the Warning)," Dr. Scott's survey principally assessed participants' preexisting beliefs, rather than the Amended Warning's impact. *Id.* ¶¶ 90-91. For that reason, Dr. Kivetz explained, "it is *not* surprising that Dr. Scott observed no statistically significant differences in the responses to these later questions between her test and control groups." *Id.* ¶ 91.

Dr. Scott exacerbated that problem by failing to ask any filter questions preceding Questions 11 and 12. Filter questions are used to control for the effect of survey "noise"—such as "existing consumers' preconceptions, bias, or reactions to anything other than the test stimulus." *Id.* ¶ 86 n.111 (emphasis and citation omitted). But Dr. Scott did not assess whether participants had prior "perceptions, opinions, or beliefs … about the topics of interest" or whether they perceived the stimulus to send any message at all about the health risks of beverages with added sugar. *Id.* ¶ 112. By failing to do so, Dr. Scott violated a core methodological requirement for a valid consumer perception survey. *See, e.g.*, *Am. Home Prods. Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739, 761-62 (D.N.J. 1994) ("It is clear that in a false advertising action survey results must be filtered via an adequate control mechanism to screen out those participants who took away no message from the advertisement as well as to account for those consumers who may have brought to the survey certain publicly held pre-conceptions regarding the product."); Diamond, *supra*, at 397 ("Surveys that merely record consumer impressions have a limited ability to answer questions about the origins of those impressions."). Dr. Scott's failure to include filter questions increased guessing and survey noise, further rendering unreliable her attempt to gauge whether the Amended Warning altered participants' perceptions, opinions, or beliefs. Kivetz Rpt. ¶¶ 113-14.

C.     **Questions 11 And 12 Did Not Reliably Test Respondents' Attitudes And Beliefs About Beverages With Added Sugar**

Questions 11 and 12 were so leading and, at minimum, so confusing, that they flunk basic requirements of survey design. As a result, they do not even provide reliable evidence as to the survey participants' underlying attitudes and beliefs about beverages with added sugar (divorced from the Amended Warning).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

To start, it is well-established that "improperly conducted surveys with slanted questions" are unreliable. *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004). The use of leading questions renders a survey unreliable and worthless. *See, e.g.*, *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 465 (E.D. Va. 2017) ("Suggestive questions render a survey unreliable by creating 'demand effects' or 'cues' from which a respondent can 'infer the purpose of the survey and identify the correct answers.'" (citation omitted)); *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey where a "leading question . . . suggested its own answer").

Here, as Dr. Kivetz explains, Questions 11 and 12 were obviously leading. Question 11 asked participants to use a scale of 1 to 5 to indicate agreement with the following statement: "The calories in sugar-sweetened beverages would make one gain weight in a different way than calories in sugar-sweetened foods, that is, a calorie consumed in a sugar-sweetened beverage has a different effect than a calorie consumed in sugar-sweetened foods." This "is phrased in a formal, 'scientific' manner that artificially forces participants to consider and compare a single unit . . . in one instance ('a calorie consumed in a sugar-sweetened beverage') to the same unit in another instance ('a calorie consumed in sugar-sweetened foods')." Kivetz Rpt. ¶ 110. Because the question was worded to ask whether *calories* in sugar-sweetened beverages make one gain weight in a different way than *calories* in sugar-sweetened foods, it directed participants to think about whether calories from one sugar-sweetened product cause weight gain in a different manner than calories in another sugar-sweetened product. As Dr. Kivetz explains, Question 11's design may therefore "implicitly convey[] to some participants that '1 calorie = 1 calorie'" even if the participants might otherwise have answered that they believe sugar-sweetened beverages are more likely to cause weight gain than sugar-sweetened foods. *Id.*

Question 12 suffered from the same problem. Its two separate prompts (each seen by half of the survey participants) asked participants to use a scale of 1 to 5 to indicate agreement with the prompts: (A) "You can offset the effects of sugar-sweetened beverages on weight gain by reducing the quantity you drink, doing more exercise to burn the calories, and/or reducing the calories you consume in other foods." and (B) "You cannot offset the effects of sugar-sweetened beverages on

weight gain by reducing the quantity you drink, doing more exercise to burn the calories, and/or reducing the calories you consume in other foods." Question 12(A) was constructed to lead participants to the City's preferred response—to agree that you can "offset" the effects of drinking sugar-sweetened beverages by "reducing the quantity you drink, doing more exercise to burn the calories, and/or reducing the calories you consume in other foods." Kivetz Rpt. ¶ 106 n.125. To begin with, by phrasing this as an "and/*or*" question, a participant was directed to agree with the statement even if the participant agreed with only one of the stated options—e.g., that you can reduce the health effects of sugar-sweetened beverages by reducing the quantity you drink. *Id.* (emphasis added). Dr. Scott then loaded up the question with multiple choices of behaviors, at least one of which participants generally would understand to help avoid weight gain—further "inappropriately focusing respondents on an expected or 'reasonable' answer." *Id.* ¶¶ 106, 108 & n.130. In so doing, Dr. Scott "likely inflated the proportion of participants . . . who expressed agreement with the easy-to-justify statement" in Question 12. *Id.* ¶ 108. By contrast, when participants who viewed the Amended Warning were asked more straightforwardly and neutrally whether the ad conveyed that you can drink beverages with sugar as part of a healthy diet, the Amended Warning overwhelmingly led participants to think that you *cannot*—*i.e.* that drinking beverages with added sugar renders one's diet unhealthy.[5] *See* Isaacson Rpt. ¶¶ 17, 87. And Question 12(B) was a mirror image of Question 12(A), with all of the same flaws.

Finally, Questions 11 and 12 were also sufficiently ambiguous and confusing as to render any results completely unreliable. Unclear questions can induce guessing behavior by a participant and give rise to different interpretations across participants that simply reflect their idiosyncratic beliefs, attitudes, or background knowledge pertaining to the subject or topic at issue. Kivetz Rpt. ¶¶ 93-94. "Participant confusion is particularly likely to arise when a question's phrasing or

---

[5] Indeed, Dr. Isaacson found that over 75% of participants exposed to advertisements with the Amended Warning understood the ads to communicate that you cannot drink the beverage in the ad as part of a healthy diet, as compared to only 29.8% of those in the control group. *See* Isaacson Rpt. ¶ 17(v)(a). But the FDA has expressly rejected calls to require products with added sugar to bear a warning linking them to obesity and diabetes because "some added sugars can be included as part of a healthy dietary pattern." 81 Fed. Reg. 33,742, 33,829 (May 27, 2016).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

structure is unnecessarily verbose, complex, or compound … ." *Id.* ¶ 95. This results in so-called survey error or "noise" that undermines the ability to analyze the survey results. *See id.*

Both Questions 11 and 12 suffered from these flaws. Question 11, for instance, was so self-evidently ambiguous that Dr. Scott felt the need to define what she meant by "calories [from sugar-sweetened beverages] would make one gain weight in a different way"—explaining that this refers to the idea that the calories "ha[ve] a different effect than" calories in sugar-sweetened foods. That did not resolve the confusion, however. As Dr. Kivetz notes, when a question is asked in this "double-barreled" way—a single question that covers two issues—the risk of confusing participants and increasing survey noise is heightened. *Id.*; *see also Handbook of Survey Research* 264 (Peter V. Marsden & James D, Wright eds., 2d ed. 2010) (Bress Decl. Ex. N) ("[C]ommon wisdom" from "hundreds of methodology textbooks" say "[a]sk about one thing at a time (avoid double-barreled questions)."

Question 12 was likewise ambiguous. Dr. Scott asked consumers whether you can "offset" the effects of sugar-sweetened beverages on weight gain by reducing the quantity you drink, doing more exercise to burn the calories, and/or reducing the calories you consume in other foods. As a matter of ordinary usage, however, the "offset" can mean *either* to reduce an effect *or* to eliminate it. Kivetz Rpt. ¶ 103. That is problematic because it could cause different participants who believe the same thing to answer Question 12 differently depending on which common usage of "offset" they adopt.

That Question 12 confused participants is also evidenced by the fact that it led to results that made no logical sense. Specifically, half of the participants were asked to respond to the statement in a positive form (i.e. "you can offset the effect on weight gain") and the other half to respond to the same statement in a negative form (i.e. "you cannot offset the effect on weight gain"). But the survey generated significantly different results: (1) When half of the participants exposed to the Amended Warning were asked whether you "can offset the effect" of drinking beverages with added sugar, approximately 70% agreed or strongly agreed and only 11% disagreed or strongly disagreed; and (2) when the other half of the participants exposed to the Amended Warning were asked the negative version of that question—i.e. whether you "cannot offset the

effect" of drinking beverages with added sugar—roughly 40% each either agreed or strongly agreed, or disagreed or strongly disagreed. *See* Scott Rpt. Exs. 7-5(A)-(B). Those divergent results confirm that participants were confused about what Question 12 asked, and that no conclusions can reliably be drawn from their responses.

**CONCLUSION**

At bottom, Questions 11 and 12 of Dr. Scott's survey failed to ask relevant questions and were so poorly designed as to be unreliable and invalid. For these reasons, Plaintiffs respectfully request that this Court grant the motion to exclude Dr. Scott's report and testimony derived from and regarding Questions 11 and 12 from her survey.

Dated: January 22, 2021

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Richard P. Bress*
    Richard P. Bress

    Steven M. Bauer (CA Bar No. 135067)
    LATHAM & WATKINS LLP
    505 Montgomery Street
    Suite 2000
    San Francisco, CA 94111-6538
    T +1.415.391.0600
    F +1.415.395.8095
    steven.bauer@lw.com

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

MOT. TO EXCLUDE IN PART THE EXPERT REPORT
& TESTIMONY OF DR. CAROL A. SCOTT
CASE NO: 15-cv-03415-EMC

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Richard P. Bress (Admitted *Pro Hac Vice*)
Michael E. Bern (Admitted *Pro Hac Vice*)
George C. Chipev (Admitted *Pro Hac Vice*)
Caroline A. Flynn  (CA Bar No. 296691)
Shannon Grammel (Admitted *Pro Hac Vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004-1304
T +1.202.637.2200
F +1.202.637.2201
rick.bress@lw.com
michael.bern@lw.com
george.chipev@lw.com
caroline.flynn@lw.com
shannon.grammel@lw.com

*Attorneys for Plaintiffs*
American Beverage Association and
California Retailers Association


By: /s/ *Theodore B. Olson*
    Theodore B. Olson

    Theodore B. Olson (CA Bar No. 38137)
    Andrew S. Tulumello (CA Bar No. 196484)
    Helgi C. Walker (Admitted *Pro Hac Vice*)
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, NW
    Washington, DC  20036-5306
    T +1.202.955.8668
    F +1.202.530.9575
    TOlson@gibsondunn.com
    atulumello@gibsondunn.com
    hwalker@gibsondunn.com

Charles J. Stevens (CA Bar No. 106981)
Joshua D. Dick (CA Bar No. 268853)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA  94105-0921
T +1.415.393.8233
F +1.415.374.8469
CStevens@gibsondunn.com
jdick@gibsondunn.com

*Attorneys for Plaintiff*
California State Outdoor Advertising
Association

## ATTESTATION CLAUSE

Pursuant to Civil Local Rule 5-1(i)(3),  I hereby certify that I obtained in the filing of this document the concurrence from all parties whose electronic signatures appear above.

Dated:  January 22, 2021


/s/ *Richard P. Bress*
Richard P. Bress