1    LATHAM & WATKINS LLP
      Steven M. Bauer (CA Bar No. 135067)
2       steven.bauer@lw.com
    505 Montgomery Street, Suite 2000
3    San Francisco, California 94111-6538
    Telephone: +1.415.391.0600
4    Facsimile: +1.415.395.8095

5    LATHAM & WATKINS LLP
      Richard P. Bress (Admitted *Pro Hac Vice*)
6       rick.bress@lw.com
      Michael E. Bern (Admitted *Pro Hac Vice*)
7       michael.bern@lw.com
      George C. Chipev (Admitted *Pro Hac Vice*)
8       george.chipev@lw.com
      Caroline A. Flynn (CA Bar No. 296691)
9       caroline.flynn@lw.com
      Shannon Grammel (Admitted *Pro Hac Vice*)
10      shannon.grammel@lw.com
    555 Eleventh Street, NW, Suite 1000
11   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
12   Facsimile: +1.202.637.2201

13   *Attorneys for Plaintiffs*
    American Beverage Association and California
14   Retailers Association

15   *Additional Counsel on Signature Page*

16          **UNITED STATES DISTRICT COURT**

17          **NORTHERN DISTRICT OF CALIFORNIA**

18             **SAN FRANCISCO DIVISION**

19

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION, CALIFORNIA RETAILERS ASSOCIATION, and CALIFORNIA STATE OUTDOOR ADVERTISING ASSOCIATION, | CASE No. 3:15-cv-03415-EMC<br><br>**PLAINTIFFS' MOTION TO EXCLUDE IN PART THE EXPERT REBUTTAL REPORT AND TESTIMONY OF DR. DAVID A. HAMMOND** |
|           Plaintiffs, | Date:      May 20, 2021<br>Time:     1:30 p.m. |
|           v. | Judge:    Hon. Edward M. Chen<br>Courtroom:  Courtroom 5, 17th floor |
| CITY AND COUNTY OF SAN FRANCISCO, | |
|           Defendant. | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

TABLE OF AUTHORITIES ................................................................................................ ii

NOTICE OF MOTION ...................................................................................................... 1

RELIEF SOUGHT ............................................................................................................ 1

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT .................................................................................................................... 9

    A.     DR. HAMMOND HAS NOT SHOWN HE IS QUALIFIED TO DESIGN
          A CONSUMER PERCEPTIONS SURVEY ...................................................... 9

    B.     DR. HAMMOND FAILS TO ESTABLISH THE BASIC RELIABILITY
          AND VALIDITY OF HIS SURVEY METHODOLOGY ................................... 11

         1.     Dr. Hammond's Choice To Tack His Questions Onto A Larger,
              Unseen Survey On Cannabis Use Violated Generally Accepted
              Methodology .................................................................................... 12

         2.     Dr. Hammond's Failure To Choose A Representative, Qualified,
              And Unbiased Sample Renders His Survey Results Unreliable ............... 14

    C.     DR. HAMMOND'S QUESTIONS WERE FUNDAMENTALLY
          UNSOUND AND DID NOT LEAD TO RELEVANT OR RELIABLE
          RESULTS ...................................................................................................... 15

         1.     The Part Of Dr. Hammond's Survey Addressing "How Consumers
              Would Interpret The Amended Warning" Should Be Excluded ............... 15

         2.     Dr. Hammond's Effort To Show That The Amended Warning Does
              Not Interfere With The Intended Messages of Plaintiffs'
              Advertisements Should Be Excluded ................................................... 19

         3.     Dr. Hammond's Opinions Based On Irrelevant Questions About A
              Fictional "Crushed Melon" Soda Ad Should Be Excluded ..................... 22

CONCLUSION ................................................................................................................. 23

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i  MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amorgianos v. National Railroad Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)...................................................................................21

*Calista Enterprises Ltd. v. Tenza Trading Ltd.*,
   43 F. Supp. 3d 1099 (D. Or. 2014) ..........................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)...............................................................................................2, 8

*Evory v. RJM Acquisitions Funding LLC*,
   505 F.3d 769 (7th Cir. 2007) ....................................................................................9

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997)..................................................................................20, 21, 23

*Gucci America, Inc. v. Guess ?, Inc.*,
   831 F. Supp. 2d 723 (S.D.N.Y. 2011) .....................................................................17

*Jaret International, Inc. v. Promotion in Motion, Inc.*,
   826 F. Supp. 69 (E.D.N.Y. 1993) ...........................................................................14

*Johnson & Johnson * Merck Consumer Pharmeuticals Co. v. Smithkline Beecham*
   *Corp.*,
   960 F.2d 294 (2d Cir. 1992)....................................................................................10

*Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc*
   *Rorer Pharmaceuticals, Inc.*,
   19 F.3d 125 (3d Cir. 1994) ......................................................................................18

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)...................................................................................................8

*Lucido v. Nestle Purina Petcare Co.*,
   217 F. Supp. 3d 1098 (N.D. Cal. 2016) ....................................................................9

*Lust ex rel. Lust v. Merrell Dow Pharmaceuticals, Inc.*,
   89 F.3d 594 (9th Cir. 1996) .................................................................................8, 13

*M2 Software, Inc. v. Madacy Enertaintment*,
   421 F.3d 1073 (9th Cir. 2005) ..............................................................................8, 9

*In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust*
   *Litiation*,
   No. 14-md-02541, 2018 WL 4241981 (N.D. Cal. Sept. 3, 2018)............................21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

|  | Page(s) |
|---|---|

*National Institute of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018)................................................................15

*O'Bannon v. National Collegiate Athletic Ass'n*,
   7 F. Supp. 3d 955 (N.D. Cal. 2014), *vacated in part on other grounds*, 802
   F.3d 1049 (9th Cir. 2015) ........................................................12

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) ....................................................9

*Palmisano v. Olin Corp.*,
   No. 03-cv-1607, 2005 WL 6777560 (N.D. Cal. June 24, 2005)...................20

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte.*,
   No. 10-cv-00544, 2011 WL 5417090 (N.D. Cal. Oct. 27, 2011) .................8, 9

*Procter & Gamble Co. v. Ultreo, Inc. (P&G)*,
   574 F. Supp. 2d 339 (S.D.N.Y. 2008)........................................10, 15

*Radiance Foundation, Inc. v. NAACP*,
   27 F. Supp. 3d 671 (E.D. Va. 2013) ............................................11

*Rogers v. Raymark Industries, Inc.*,
   922 F.2d 1426 (9th Cir. 1991) ..................................................9

*Shreve v. Sears, Roebuck & Co.*,
   166 F. Supp. 2d 378 (D. Md. 2001) ...........................................10

*Strumlauf v. Starbucks Corp.*,
   No. 16-cv-01306, 2018 WL 306715 (N.D. Cal. Jan. 5, 2018)....................17

*Universal City Studios, Inc. v. Nintendo Co.*,
   746 F.2d 112 (2d Cir. 1984)....................................................17

*Valador, Inc. v. HTC Corp.*,
   242 F. Supp. 3d 448 (E.D. Va. 2017) .......................................11, 18

*Vaporstream, Inc. v. Snap Inc.*,
   No. 17-cv-00220, 2020 WL 2543814 (C.D. Cal. Jan. 10, 2020)..................14

*In re Viagra & Cialis Products Liability Litigation*,
   424 F. Supp. 3d 781 (N.D. Cal. 2020) .........................................20

*Wallach v. Longevity Network, Ltd.*,
   No. 04-cv-2404, 2006 WL 5106206 (C.D. Cal. Apr. 26, 2006)..................8, 11

*Warner Brothers Entertainment v. Global Asylum, Inc.*,
   No. 12-cv-9547, 2013 WL 12114836 (C.D. Cal. Jan. 29, 2013).................8, 11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

|  | Page(s) |

*Zauderer v. Office of Disciplinary Counsel*,
   471 U.S. 626 (1985)......................................................................................19

## STATUTES

S.F. Health Code § 4202.......................................................................................4

S.F. Health Code § 4203.......................................................................................1

S.F. Health Code § 4203(a)...................................................................................4

S.F. Ordinance No. 26-20,
   https://sfgov.legistar.com/View.ashx?M=F&ID=8078165&GUID=AA264DC
   0-645D-4F27-BFE0-C4160BB20F81...................................................................4

## OTHER AUTHORITIES

Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference
   Manual on Scientific Evidence* 366 n.30 (3d ed. 2011), https://www.fjc.gov/
   sites/default/files/2012/SciMan3D09.pdf..................................................11, 13, 14

Fed. R. Civ. P. 26(a)(2)(D)(ii) ..............................................................................8

Fed. R. Evid. 702 ........................................................................................2, 8, 9

*Manual for Complex Litigation* § 11.493 (4th ed. 2004),
   https://www.uscourts.gov/sites/default/files/mcl4.pdf......................................16

6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 32:170.............17, 18

Vikas N. O'Reilly-Shah, *Factors Influencing Healthcare Provider Respondent
   Fatigue Answering A Globally Administered In-App Survey*, PeerJ (Sept. 12,
   2017), https://pdfs.semanticscholar.org/11b4/a3560ef98ab7cfe11a
   51335001903f3faddc.pdf?_ga=2.53685230.734776819.1611172455-
   1479785384.1611172455.........................................................................12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on May 20, 2021, at 1:30 p.m., in Courtroom 5 of the United

States District Court for the Northern District of California, located at 450 Golden Gate Avenue,

17th Floor, San Francisco, California, 94102-3489, Plaintiffs American Beverage Association,

California Retailers Association, and California State Outdoor Advertising Association will, and

hereby do, move the Court to exclude the portions of Dr. David A. Hammond's Expert Rebuttal

Report that rely on his "Consumer Perceptions Survey," including Paragraphs 13, 35-39, 45-46,

58, 60, and 68, Appendix A, and any associated testimony or evidence.

**RELIEF SOUGHT**

The Consumer Perceptions Survey designed and administered by Dr. Hammond suffered

from numerous fatal methodological flaws, which render it unreliable and irrelevant. This Court

should exclude the survey at Appendix A; all opinions derived from it, including Paragraphs 13,

35-39, 45-46, 58, 60, and 68; and any associated testimony or evidence pursuant to Federal Rule

of Evidence 702.

**INTRODUCTION**

In their opening reports, two of Plaintiffs' experts, Professor Peter Golder, Ph.D. and Dr.

Richard Kahn, explain that the warning required by Defendant the City and County of San

Francisco ("the City") on advertisements for beverages with added sugar, S.F. Health Code § 4203

(the "Amended Warning") will interfere with Plaintiffs' speech, and convey messages to

consumers that are misleading and inaccurate. In response, the City offered the rebuttal testimony

of David Hammond, Ph.D. As part of his rebuttal testimony, Dr. Hammond advances opinions on

the basis of an "experimental" consumer survey that he designed and oversaw. That survey

purported to "test[] the effect of San Francisco's Amended Warning[] on consumer perceptions"

and assess whether the Amended Warning will "overwhelm attention" to sugar-sweetened

beverage ads. Expert Rebuttal Report of David Hammond, Ph.D. ¶ 10 ("Hammond Reb. Rpt."),

Declaration of Richard P. Bress ("Bress Decl.") Ex. K.

Dr. Hammond's work violates the most rudimentary principles of valid survey design.

Without any explanation or justification, Dr. Hammond merely added his questions about sugar-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
1 REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

sweetened beverage advertisements to an entirely different and "larger" survey on *cannabis* use. He provides Plaintiffs and this Court almost no detail about the substance of the underlying cannabis survey. And the questions he asked about sugar-sweetened beverages were almost comically leading and biased. As a result, his survey results and the testimony he offers based on them fail to meet the base requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1]

*First*, Dr. Hammond never establishes that he has any expertise regarding consumer perception surveys such as the one he designed and relied on here. His "experimental survey" should be excluded for that reason alone.

*Second*, Dr. Hammond's survey methodology did not satisfy even the most basic requirements for validity and reliability. For starters, rather than design a stand-alone survey specifically tailored to test propositions relevant to the issues in this case, Dr. Hammond inexplicably "appended" his questions about sugar-sweetened beverage advertisements, dietary health, and the Amended Warning to "a larger survey assessing prevalence and patterns of *cannabis use*." Hammond Reb. Rpt. App. A at 31 (emphasis added). Dr. Hammond provides no methodological justification for this problematic choice, and he provides no information whatsoever about the questions asked in that cannabis survey—making it impossible to assess the extent to which his results were affected by the substance of the cannabis survey or by the participant fatigue that almost certainly followed from his approach.

In addition, Dr. Hammond flouted standard survey methods by failing to identify what steps he took, if any, to screen participants to ensure that they were qualified for the subject at hand, unbiased, and representative of those who would be exposed to the Amended Warning. Nothing in his report suggests that Dr. Hammond even took the customary step of excluding participants who were biased due to their job or prior survey experience. Dr. Hammond also fails to disclose the questionnaire setting forth the wording and order of his survey questions. For all these reasons, Dr. Hammond's survey flunks *Daubert*'s most elementary requirement—to apply

---

[1] Plaintiffs do not seek to exclude the remainder of Dr. Hammond's expert testimony.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    generally accepted methodology.

2        *Third*, adding to those overarching methodological issues, the survey questions Dr.

3    Hammond did ask were poorly designed, off-point, and obviously crafted to induce responses

4    supportive of the City's positions.  For one thing, part of Dr. Hammond's survey (summarized in

5    Tables 8 and 9)[2] purported to test Professor Golder's and Dr. Kahn's conclusions about "how

6    consumers would interpret the Amended Warning[]."  *Id.* ¶ 13; *see also id.* App. A at 38-40.  But

7    Dr. Hammond never asked participants that question.  He instead asked them about their

8    underlying *beliefs* about sugar-sweetened beverages and other products.  And to the extent these

9    questions were meant to assess whether the Amended Warning will affect participants' beliefs,

10   they provide no reliable measure of that either, because they were set apart from and made no

11   reference to the Amended Warning or the advertisements carrying them.   Moreover, Dr.

12   Hammond's questions about participants' beliefs were so clearly leading as to render the responses

13   irrelevant and unreliable:  Asking participants whether someone who drinks *five* cans as opposed

14   to one can of "sugary soda" a day is more likely to gain weight, and whether a person who does

15   not exercise at all is more likely to gain weight than someone who exercises a lot, tested only

16   attentiveness and common sense, rather than anything meaningful about the Amended Warning.

17       Other parts of Dr. Hammond's survey were equally invalid.  Dr. Hammond claims (via

18   Tables 3-5) that his survey proves the Amended Warning will not divert consumer attention away

19   from the message of the sugar-sweetened beverage ads.  *Id.* App. A at 35-37.  But he fails to

20   explain why his survey design—measuring *how long* participants viewed ads with and without the

21   Amended Warning—offers a reliable method of answering that question.  Notably, Dr. Hammond

22   did not even measure whether, while viewing the ads, participants were paying attention to the

23   advertiser's intended message or instead to the Amended Warning.  He also ignores that while

24   70% of participants exposed to the Amended Warning recalled seeing a health warning, barely

25   10% could remember most other attributes of the ad.

26       Dr. Hammond also claims (via Tables 6 and 7) that his survey shows the Amended Warning

27

28   [2] Because Dr. Hammond fails to provide the questionnaire, Plaintiffs can refer to portions of Dr. Hammond's survey only by reference to the tables he offers to summarize his results.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

3

did not affect whether participants believed that a fictional "crushed melon" soda ad targeted men or women; and kids, teenagers or adults. *See id.* ¶ 37; *see also id.* App. A at 37-38, 44. But guesses about which demographic groups a fictional ad *targets* reveal nothing about whether the Amended Warning will undermine perceptions of established brands or interfere with advertiser's intended *messages*. Both sides' principal survey experts—who tested real brands and real ads—established that it will.

From top to bottom, Dr. Hammond's survey is a slapdash product that fails the most basic requirements of accepted survey methodology and produced results that are neither reliable nor relevant. Each of the defects identified above would be fatal alone; cumulatively, they underscore that Dr. Hammond's survey fails *Daubert*'s requirements many times over. This Court's duty as gatekeeper is clear. The portions of Hammond's Expert Rebuttal Report that rely on his "Consumer Perceptions Survey," including Paragraphs 13, 35-39, 45-46, 58, 60, and 68, Appendix A, and any associated testimony should be excluded.

**BACKGROUND[3]**

In February 2020, the City's Board of Supervisors enacted S.F. Ordinance No. 26-20. *See* https://sfgov.legistar.com/View.ashx?M=F&ID=8078165&GUID=AA264DC0-645D-4F27-BFE0-C4160BB20F81. It requires anyone who manufactures, distributes, promotes, or sells sugar-sweetened beverages to include a large warning about the harmful health effects of consuming such beverages on all advertisements on covered media in San Francisco. S.F. Health Code §§ 4202, 4203(a). The Amended Warning must read:

> SAN FRANCISCO GOVERNMENT WARNING: Drinking beverages with added sugar(s) can cause weight gain, which increases the risk of obesity and type 2 diabetes.

*Id.* § 4203(a). It must occupy at least 10% of the advertisement. *Id.*

The City initially retained Dr. Hammond to offer testimony regarding its affirmative case. It subsequently retained him to respond to the Supplemental Reports of two of Plaintiffs' experts, Professor Peter N. Golder and Dr. Richard A. Kahn. Hammond Reb. Rpt. ¶¶ 8-9. In his

---

[3] Plaintiffs' concurrently filed Motion for Summary Judgment details the factual and procedural background of this litigation.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

Supplemental Report, Professor Golder, who is a Professor of Marketing at the Tuck School of Business at Dartmouth College, drew on well-established marketing frameworks, academic literature, and empirical studies to explain that the Amended Warning "will continue to broadly signal to consumers that drinking beverages with added sugar . . . is more harmful than consuming other foods and beverages whose advertisements do not contain the Amended Warning." Supplemental Expert Report of Professor Peter N. Golder ¶ 16 ("Golder Rpt."), Bress Decl. Ex. B-1. Professor Golder further concluded that the Amended Warning will "convey[] to consumers that drinking beverages with added sugar is inherently risky irrespective of one's other dietary or lifestyle choices." Golder Rpt. ¶ 69. Dr. Kahn agreed that the Amended Warning conveys that "beverages with added sugar are inherently hazardous" and that drinking beverages with added sugar "is more likely to cause weight gain than consuming other equally caloric foods and beverages for which the City does not require a warning." Supplemental Expert Report of Dr. Richard A. Kahn ¶¶ 23, 27 ("Kahn Rpt."), Bress Decl. Ex. A-1. Professor Golder also concluded that "[t]he severity of the Amended Warning and its prominence will likely cause consumers to perceive the Amended Warning as one of the primary messages of the advertisement, detracting from—if not overwhelming—the carefully-designed message intended for the consumer."[4] Golder Rpt. ¶ 85.

To rebut those conclusions, Dr. Hammond purported to conduct "an experimental study" to "test[] the effect of [the] Amended Warning[] on consumer perceptions . . . ." Hammond Reb. Rpt. ¶ 10. Dr. Hammond's "study" was conducted online over the course of three days. *Id.* App. A at 31. Dr. Hammond refers to this survey as the "Consumer Perceptions Experiment." *Id.* ¶ 10.

The two other survey experts who submitted consumer surveys as part of their reports each purported to design and field surveys exclusively to test claims relevant to this case. In contrast,

---

[4] As Professor Golder explained, the consumer survey conducted by the City's own principal survey expert, Dr. Carol A. Scott, confirmed Professor Golder's conclusions and rebutted the claims made by Dr. Hammond in his opening report. *See* Supplemental Expert Rebuttal Report of Professor Peter N. Golder ¶¶ 21-23, 29-30 ("Golder Reb. Rpt."), Bress Decl. Ex. B-2. These results of Dr. Scott's survey—as well as a consumer survey conducted by Plaintiffs' expert, Dr. Bruce Isaacson—confirmed Professor Golder's conclusions that "the Amended Warning will interfere with and often overwhelm an advertiser's intended brand-related messages." *Id.* ¶ 30.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
5   REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

Dr. Hammond appended his survey questions to a "larger survey assessing prevalence and patterns of cannabis use." *Id.* App. A at 31. Dr. Hammond did not attach that survey's questionnaire to his report; explain what it was testing (how or with what questions); reveal its results; or even reveal its length. Unlike the parties' principal survey experts, Dr. Hammond has not established that he took "standard" measures—or any measures at all—to screen participants to ensure that they were qualified, unbiased, and representative.[5] Dr. Hammond did not limit participants to those who reside in or around San Francisco, or at least live in California; nor did he limit participants to those who might purchase sugar-sweetened beverages. *Id.* He did not even establish that he excluded those who were in occupations or industries that might bias their responses. *Id.*

Following their completion of the cannabis portion of the survey—whatever that entailed—Dr. Hammond had participants complete "two experimental tasks." *Id.* The first required participants to review a series of nine advertisements: six for sugar-sweetened beverages and three for other products (Oreos, McDonalds, and chocolate milk). *Id.* For all participants, the last advertisement shown was either for Coca-Cola or Pepsi. *Id.* For roughly half of the participants (the Warning Condition Group), the advertisements for sugar-sweetened beverages included a health warning; the other half (the No Warning Condition Group) were shown the same advertisements without the health warning.[6]

Participants were not required to view an advertisement for any minimum period of time before proceeding. *Id.* Many spent very little time doing so. *Id.* App. A at 35 (Table 3). Following viewing, the survey asked participants to recall the brands for which they saw advertisements, as

---

[5] For instance, the City's other expert who conducted a survey, Dr. Carol Scott, explained that "in accordance with standard practice, respondents were disqualified from participation if they or anyone in their immediate family or household worked for a company that a company that manufactures, sells, promotes or distributes food or non-alcoholic beverages, for an advertising agency, public relations firm, or a market research company," and were also "disqualified if they reported taking any other survey related to non-alcoholic beverages in the last 30 days." Expert Report of Dr. Carol A. Scott ¶ 16 ("Scott Rpt."), Bress Decl. Ex. I. Dr. Hammond provides no indication that he followed that "standard practice." "To ensure the relevance of her sample," Dr. Scott also required that 75% of her participants had purchased a beverage with added sugar in the previous six months. *See id.* ¶¶ 15-16. Again, there is no indication that Dr. Hammond took such steps.

[6] Because his participants were not limited to those who live in or near San Francisco, Dr. Hammond tested a warning beginning with "**SURGEON GENERAL'S WARNING.**" *See* Hammond Reb. Rpt. App. A at 31.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

well as the attributes only of the final ad they were shown—a Coca-Cola or Pepsi ad. *Id*. at 32. Very few participants recalled any attributes from the survey advertisements, with only 8.3% even recalling seeing a "Coca Cola bottle" and only 4.0% recalling a "Pepsi can/bottle." *Id.* at 36-37 (Table 5). Fewer than half of participants remembered that they had *even seen* an advertisement for Coca-Cola or Pepsi. *Id.* at 35-36 (Table 4). Across all participants, the mean viewing time for the first advertisement was six seconds; by the ninth advertisement (which was either Coca-Cola or Pepsi), participants on average viewed the ad for only 3.1 to 3.6 seconds before moving on. *Id.* at 35 (Table 3).

The second "experimental task" required survey participants to answer a series of questions about their beliefs. Those questions included:

- "George drinks 1 can of sugary soda per day. Samuel drinks 5 cans of sugary soda per day. Which person is more likely to gain weight from drinking sodas?"
- "Anna and Carmen both drink sugary sodas every day. Anna does not exercise at all. Carmen exercises a lot. Which person is more likely to gain weight?"

*Id.* at 38-39 (Table 8). Unsurprisingly, the vast majority of participants chose Samuel and Anna— i.e. the answers Dr. Hammond considered correct. *Id.*

This part of the survey also required participants to report their beliefs with respect to statements about whether other foods and beverages that are not subject to the Amended Warning can lead to weight gain:

- "Foods high in sugar (e.g., cookies, doughnuts, flavored yogurts, ice cream) can lead to weight gain."
- "Foods high in calories (e.g., pizza, hamburgers, burritos) can lead to weight gain."
- "Milk drinks high in sugar (e.g., chocolate milk) can lead to weight gain."

*Id.* at 39-40 (Table 9). Participants were given the following options for responses: "Strongly agree"; "Agree"; "Neither agree nor disagree"; "Disagree"; "Strongly Disagree"; and "Don't Know." *Id.* Unsurprisingly, again, participants overwhelmingly agreed or strongly agreed with each of those statements. *Id.*

None of the questions in Dr. Hammond's survey asked whether the Amended Warning

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7   MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

conveys the messages that Plaintiffs allege. He asserts that his survey's results show that: (1) the Amended Warning does not "mislead consumers into believing that [sugar-sweetened beverages] cause weight gain to a greater extent than other foods and drinks high in sugar"; (2) "viewing [sugar-sweetened beverage] ads with the Amended Warning had no effect on beliefs about weight gain and the quantity of [sugar-sweetened beverages] consumed, or the importance of other risk factors to weight gain, such as exercise"; and (3) the Amended Warning will not affect a consumer's "focus on other messages intended by the marketer." *Id.* ¶¶ 36, 45-46.

## LEGAL STANDARD

Pursuant to Federal Rule of Evidence 702, the proponent of expert testimony bears the burden of establishing that such testimony: (a) provides expertise that would be helpful to the trier of fact; (b) "is based on sufficient facts or data;" and (c) results from reliable principles and methods that (d) have been reliably applied. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590–91; *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 597-98 (9th Cir. 1996) (burden of proof). "Rebuttal testimony," moreover, should be directed "'solely to contradict or rebut evidence on the same subject matter identified by another party.'" *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte.*, No. 10-cv-00544, 2011 WL 5417090, at *6 (N.D. Cal. Oct. 27, 2011) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)).

A court must first determine that an expert is qualified to testify regarding the subject matter. The trial court acts as a gatekeeper to the admission of expert testimony and must ensure that it is "not only relevant but reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The court must ensure that expert testimony, whether based on "professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152; *see also M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005) ("Admissibility of a survey is a threshold question that must be resolved by a judge."). Where a consumer perceptions survey is offered, an expert must be qualified to design and administer such surveys. *See Warner Bros. Entm't v. Global Asylum, Inc.*, No. 12-cv-9547, 2013 WL 12114836, at *6-7 (C.D. Cal. Jan. 29, 2013); *see also Wallach v. Longevity Network, Ltd.*, No. 04-cv-2404, 2006 WL 5106206, at *2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
8
CASE NO: 15-cv-03415-EMC

(C.D. Cal. Apr. 26, 2006).

Expert evidence that suffers from "serious methodological flaws" is unreliable and should be excluded. *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005). Surveys should be excluded when they are not "conducted according to accepted principles" and in a "statistically correct manner." *M2 Software*, 421 F.3d at 1087; *see also Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007) (To be admissible, survey evidence "must comply with the principles of professional survey research."); *Calista Enters. Ltd. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099, 1111 (D. Or. 2014) (explaining that a survey can be excluded where "there are substantial design defects in the survey or its execution is defective").

## ARGUMENT

Dr. Hammond never demonstrates that he is qualified by education or experience to conduct a consumer perceptions survey. And, regardless, his concededly "experimental survey" is an amateurish effort that violates rudimentary principles of sound survey design. His report fails to establish the basic reliability or validity of his survey methodology. He failed to screen participants to ensure they are representative and unbiased, and he slapped his questions onto the end of an entirely separate cannabis survey. Moreover, the survey questions themselves were untethered to the issues in this case, were not designed to test messages conveyed by the ads, and were patently biased and misleading. Each cumulative flaw compounds the unreliability of his survey. This is not a close call. Dr. Hammond's survey should be excluded.

### A.  Dr. Hammond Has Not Shown He Is Qualified To Design A Consumer Perceptions Survey

"Under Rule 702, a testifying expert must be 'qualified as an expert by knowledge, skill, experience, training, or education.'" *PixArt*, 2011 WL 5417090, at *4 (quoting Fed. R. Evid. 702). An expert may be qualified through practical training or academic experience. *See Rogers v. Raymark Indus., Inc.,* 922 F.2d 1426, 1429 (9th Cir. 1991); *Lucido v. Nestle Purina Petcare Co*., 217 F. Supp. 3d 1098, 1102-03 (N.D. Cal. 2016). Dr. Hammond and the City fail to make either showing.

Dr. Hammond's Rebuttal Report does not establish that he has the necessary prior

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
9  REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

experience designing consumer perception surveys or academic background in consumer perception survey design. That starkly contrasts with Plaintiffs' expert, Dr. Bruce Isaacson, who sets forth his extensive academic and professional expertise in marketing; identifies experience conducting hundreds of surveys, including many focused on deception in advertising; and establishes that he frequently writes and speaks on the same topics. *See* Expert Rebuttal Report of Dr. Bruce Isaacson Ex. 1 at 1-9 ("Isaacson Rpt."), Bress Decl. Ex. D. The City's own principal survey expert, Dr. Scott, sets forth that she has an academic and professional background in marketing and consumer perception survey design. *See* Scott Rpt. ¶¶ 1-5 (noting doctoral level education in the design, analysis, and interpretation of consumer perception surveys and setting forth experience in consumer perception survey design). Dr. Hammond, however, fails to establish that he has similar expertise or academic background.

Plaintiffs do not dispute that Dr. Hammond has academic and practical expertise that could qualify him to render expert opinions with respect to certain issues of public health.[7] And in that capacity, he may have designed surveys to measure the prevalence of certain behavior (like smoking rates) or individuals' knowledge of health effects (like the consequences of smoking). But "[t]he fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001). Whatever his survey experience, Dr. Hammond fails to point to any substantial experience designing or overseeing *consumer perception surveys*. When the issue is whether content renders an advertisement misleading, "the question in such cases is—what does the person to whom the advertisement is addressed find to be the *message*." *Procter & Gamble Co. v. Ultreo, Inc. (P&G)*, 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008) (emphasis added) (quoting *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp*., 960 F.2d 294, 297 (2d Cir.

---

[7] For that reason, Plaintiffs do not seek to exclude Dr. Hammond's opening report or those aspects of his rebuttal report in which he offers his opinion about the purpose of health warnings, purports to set forth best practices for health warning design, and asserts (prior to both parties' consumer surveys in this case) that no empirical evidence supports Plaintiffs' claims regarding the messages that will be conveyed by the City's Amended Warning. Plaintiffs' experts have strongly rebutted many of Dr. Hammond's opinions, and showed why they are entitled to little weight, *see, e.g.*, *generally,* Golder Reb. Rpt.; Isaacson Rpt., but Plaintiffs do not challenge Dr. Hammond's *qualifications* to offer those opinions.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

1992)); *see also* Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual on Scientific Evidence* 366 n.30 (3d ed. 2011), https://www.fjc.gov/ sites/default/files/2012/SciMan3D09.pdf ("Reference Guide") (same). Dr. Hammond points to no experience in designing surveys aimed at that purpose. That stands in stark contrast to Dr. Isaacson and Dr. Ran Kivetz, who have designed or overseen *hundreds* of such surveys.

Absent a showing that the expert has robust and particularized experience, courts frequently hold that expert surveys should be excluded. *See Wallach*, 2006 WL 5106206, at *2 (excluding survey because survey designer had no experience in designing consumer surveys in likelihood of confusion cases); *see also Warner Bros*, 2013 WL 12114836, at *6-7; *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 458 (E.D. Va. 2017); *Radiance Found., Inc. v. NAACP*, 27 F. Supp. 3d 671, 675 (E.D. Va. 2013) (excluding expert testimony because, although proposed expert's survey work had been published, she did not have experience in designing surveys for the specific legal area at issue).

The proponent of expert testimony bears the burden to establish the expert's specialized expertise, and the City has failed to do so. For that reason alone, Dr. Hammond's survey should be excluded.

**B.    Dr. Hammond Fails To Establish The Basic Reliability And Validity Of His Survey Methodology**

Dr. Hammond's survey should also be excluded because he fails to satisfy the most basic obligation to establish that his survey methods were valid and reliable. There is no question that the scope, order, and phrasing of survey questions can impact whether a survey is methodologically sound and its results reliable. Diamond, *supra*, at 395. But Dr. Hammond ignored basic survey methods when he dumped his questions onto the end of a larger survey on cannabis use—a choice that could obviously impact his results. He compounded that error by providing Plaintiffs and this Court no information about that cannabis survey's questions, structure, or length—making it impossible to assess the extent to which it biased participants' answers to this survey and rendered participants fatigued and inattentive. And he failed to establish even that his participants were qualified, unbiased, and representative. For all of these reasons,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

his survey methodology flunks fundamental requirements of reliability and trustworthiness.

**1.   Dr. Hammond's Choice To Tack His Questions Onto A Larger, Unseen Survey On Cannabis Use Violated Generally Accepted Methodology**

Unlike both parties' principal survey experts, who conducted surveys limited to questions they considered relevant to this case, Dr. Hammond "appended [his questions] to a larger survey assessing prevalence and patterns of cannabis use." Hammond Reb. Rpt. App. A at 31. Dr. Hammond makes no attempt to justify this choice for any methodological reason, and it profoundly undermined the reliability of his survey.

First, Dr. Hammond risked substantially biasing his results. Merely by appending his survey to a survey about cannabis, he may have implied a connection between illicit drug use and drinking beverages with added sugars. *See, e.g.*, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 975 (N.D. Cal. 2014), *vacated in part on other grounds*, 802 F.3d 1049 (9th Cir. 2015) (recognizing that initial questions can "prime[] respondents" to give certain answers). In addition, the questions asked in the cannabis survey (which Dr. Hammond failed to provide) may themselves have affected Hammond's results. For instance, if Dr. Hammond asked questions related to the health risks of cannabis use or the effect of government warnings on cannabis use, he may have primed participants to focus on health risks or warnings in ways that would have corrupted his sample and entire survey design.

Second, Dr. Hammond introduced issues of respondent fatigue that further biased his results. "Respondent fatigue is a common problem in the collection of survey data" and "refers to the situation in which respondents give less thoughtful answers to questions in the later parts of a survey." Vikas N. O'Reilly-Shah, *Factors Influencing Healthcare Provider Respondent Fatigue Answering A Globally Administered In-App Survey*, PeerJ (Sept. 12, 2017), https://pdfs.semanticscholar.org/11b4/a3560ef98ab7cfe11a51335001903f3faddc.pdf?_ga=2. 53685230.734776819.1611172455-1479785384.1611172455 (citations omitted). "Respondent fatigue lowers the quality of data collected for later questions in the survey and can introduce bias into studies." *Id.* In a survey such as Dr. Hammond's, which is designed, in part, to measure participants' attentiveness to advertisements, the risk that respondent fatigue biased results is

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

particularly high. All the more so because Dr. Hammond did not require respondents to view the nine advertisements they were shown for any minimum amount of time, making it easy (and attractive) for participants to speed through. Hammond Reb. Rpt. App. A at 31. Indeed, Dr. Hammond's reported data suggests that participants raced through the survey's advertisements and struggled to recall even the brands for which they saw advertisements, let alone any features of those ads. *See, e.g.*, *id*. at 35-37 (Tables 3-5); *see also infra* at Argument § C.2. In fact, 30% in the Warning Condition Group did not even notice that any advertisements included a health warning when asked a direct yes/no question. Hammond Reb. Rpt. App. A at 34-35 (Table 2). Common sense suggests that fatigue inevitably played some role in that—indeed those participants spent barely 2-3 seconds viewing most ads.

Dr. Hammond exacerbated these problems by making it impossible to assess the full extent to which these problems biased his results. It is well-established that "[t]he completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey." Diamond, *supra*, at 415. Accordingly, a survey report should provide "[t]he exact wording of the questions used, including a copy of each version of the actual questionnaire." *Id.* But Dr. Hammond fails to satisfy even *that* rudimentary obligation. Unlike both parties' principal survey experts, he does not attach a complete version of the questionnaire he used to ask the questions on which he relies; and he does not provide *any* information about the larger cannabis survey to which he appended those questions. As a result, Plaintiffs and this Court do not know what questions he asked, or whether participants spent three or thirty minutes responding to questions about cannabis before turning to the tasks associated with this survey. Those choices violate the very basics of generally accepted survey methodology because they make it impossible to gauge the full extent of the bias resulting from his choice to append his questions to a larger survey on cannabis use, and impossible to verify the reliability and trustworthiness of his results. As a result, the City has not met its burden to establish admissibility. *See Lust*, 89 F.3d at 597-98 (9th Cir. 1996).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
13
CASE NO: 15-cv-03415-EMC

## 2. Dr. Hammond's Failure To Choose A Representative, Qualified, And Unbiased Sample Renders His Survey Results Unreliable

Dr. Hammond's survey also failed to employ generally accepted survey methods in another important respect. A representative sample is a bedrock of a reliable survey. *See Vaporstream, Inc. v. Snap Inc.*, No. 17-cv-00220, 2020 WL 2543814, at *10 (C.D. Cal. Jan. 10, 2020) ("In conducting a reliable survey, a survey expert should 'select an appropriate sample.'"); Diamond, *supra*, at 386 ("In a carefully executed survey, each potential respondent is questioned or measured on the attributes that determine his or her eligibility to participate in the survey."). To that end, Plaintiffs' expert, Dr. Isaacson, qualified survey participants by ensuring that (1) most lived in or near San Francisco and the remainder lived in California; (2) participants had recently purchased or planned to purchase a beverage on which the Amended Warning would appear; and (3) participants were not biased by working for a beverage company, marketing agency, or other similar entity. Isaacson Rpt. ¶ 7; *see also id.* Ex. 2 at 1-5 (Beverage Study Qualifying Questions). Even the City's expert Dr. Scott conceded that it is "standard practice" when conducting a survey to identify a representative and qualified participant pool and exclude others. Scott Rpt. ¶ 16; *see also* Rebuttal Expert Report of Dr. Ran Kivetz ¶¶ 134-37 ("Kivetz Rpt."), Bress Decl. Ex. C.

In direct violation of "standard practice," Dr. Hammond took no such steps. He simply added his questions to a larger study on cannabis use, apparently without including any screening questions designed to ensure that his survey participants included a representative sample of the consumers the Amended Warning is designed to reach. Nor did Dr. Hammond limit his survey population to those who live in or near San Francisco, or even exclude individuals who may be biased on account of their employment. Dr. Hammond's failure to make any effort to qualify a representative sample further undermines the reliability of his results and provides yet another reason his survey should be excluded. *See, e.g., Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 74 (E.D.N.Y. 1993) (finding a consumer confusion survey unreliable because of, among other flaws, "its unrepresentative sample and its untrustworthy methodology").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC
14

**C.    Dr. Hammond's Questions Were Fundamentally Unsound And Did Not Lead To Relevant Or Reliable Results**

In addition to the fundamental methodological flaws that pervade Dr. Hammond's overall design, the specific questions on which he purports to premise his conclusions were flawed in several serious respects—any one of which is sufficient to require the exclusion of that part of his survey and his associated opinions.

**1.    The Part Of Dr. Hammond's Survey Addressing "How Consumers Would Interpret The Amended Warning" Should Be Excluded**

As Dr. Hammond stated, "[b]oth Professor Golder and Dr. Kahn offer opinions on how consumers would interpret the Amended Warning[]." Hammond Reb. Rpt. ¶ 13. Dr. Hammond claims that his survey rebuts those "offer[ed] opinions." *Id.* ¶¶ 13, 45-46. But it did not even test them. Rather, like the portions of Dr. Scott's survey addressed in Plaintiffs' companion motion, Dr. Hammond asked a series of questions that purported to measure participants' *underlying* "beliefs" about beverages with added sugar and other products "high in calories and sugar." *See, e.g.*, *id.* App. A at 38 ("George drinks 1 can of sugary soda per day. Samuel drinks 5 cans of sugary soda per day. Which person is more likely to gain weight from drinking sodas?"); *id.* App. A at 40 (asking participants to indicate level of agreement with statement: "Foods high in calories (e.g., pizza, hamburgers, burritos) can lead to weight gain"); *cf.* Kivetz Rpt. ¶ 21(i). Those questions were unresponsive to Professor Golder's and Dr. Kahn's opinions, and missed the point of Plaintiffs' First Amendment arguments. *See* Pls' Mot. to Exclude In Part Expert Rpt. of Dr. Scott 10-13.

The key question under *Zauderer* is whether a required government message conveys purely factual and uncontroversial information about a commercial product. *See Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018). To answer that question, Dr. Hammond should have tested whether "consumers are *taking away the message* that the plaintiff contends the advertising is conveying." *P&G*, 574 F. Supp. 2d, at 345 (emphasis added); *see also* E. Deborah Jay, *Ten Truths of False Advertising Surveys*, 103 Trademark Rep. 1116, 1140 (2013) (Bress Decl. Ex. M) (consumer perception surveys should be designed to determine what message

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
15 REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

a consumer will understand an advertisement to convey).  Dr. Hammond did not do that:  His questions do not test what message the Amended Warning sends.[8]

Dr. Hammond's questions were unreliable even for the more limited purpose of understanding how the Amended Warning will impact consumers' beliefs about beverages with added sugar or other foods and beverages "high in calories and sugar."  To begin, Dr. Hammond presented his questions in a manner that "prompted participants to *disassociate* their responses from the advertisements shown earlier to them and from the Warning."  *Cf.* Kivetz Rpt. ¶ 88 (describing an analogous flaw in Dr. Scott's survey).  Dr. Hammond asked the questions discussed in Tables 8 and 9 at the end of a survey in which the Amended Warning played only a small part, tacked on after more extensive section focused on cannabis use.  And when Dr. Hammond finally did ask these questions, he failed to present participants in his test group with a visual of the Amended Warning or advertisements bearing it.  He also did not in any other way prompt participants to consider the advertisements that they had viewed or the Amended Warning.[9]  As a result, Dr. Hammond's questions did not reliably assess the Amended Warning's effect on consumers' understanding of the advertised product, but instead charted only participants' beliefs about the product, informed by their preexisting knowledge, experience, and education.  *See* Kivetz Rpt. ¶¶ 84-92 (discussing a similar flaw in Dr. Scott's survey).

Finally, the questions summarized in Tables 8 and 9 must be excluded because they were patently leading and biased in violation of the most basic survey methods.  It is fundamental that survey questions must be "not leading."  *Manual for Complex Litigation* § 11.493 (4th ed. 2004),

---

[8] Measuring the effect of an advertisement on an individual's beliefs is not a reliable or sufficient means of measuring what message an advertisement conveys.  To provide a simple example, suppose that the City required advertisements to include a statement that "The Lunar Landing Was Faked."  If a City consumer survey found that the inclusion of that statement did not impact participants' beliefs about whether humankind has been to the moon, that might well show that the City's statement was ineffective at changing attitudes and beliefs, but it would not alter that the City's statement conveyed a false message.  Thus, the survey would not provide any relevant measure of whether the City's required statement transmitted purely factual and uncontroversial information under *Zauderer*.

[9] Dr. Hammond's survey was even less likely to measure the causal effect of the Amended Warning because his survey participants were highly inattentive; 30% of those exposed to multiple ads bearing a warning did not even remember seeing any health warning on any ad when asked a direct yes/no question—let alone what that warning said.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

https://www.uscourts.gov/sites/default/files/mcl4.pdf. Using "improperly conducted surveys with slanted questions or serious methodological deficiencies" renders a survey unreliable and excludable. *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 739 n.85 (S.D.N.Y. 2011) (quoting 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 32:170); *see also Strumlauf v. Starbucks Corp.*, No. 16-cv-01306, 2018 WL 306715, at *7 (N.D. Cal. Jan. 5, 2018) ("When a survey question begs its answer it is not a true indicator of the likelihood of consumer confusion."). By asking suggestive questions with obvious answers, Dr. Hammond "elicit[ed] responses which are suggested by the questions [themselves] and ultimately test[] reading comprehension and common sense," *Strumlauf*, 2018 WL 306715, at *7, and do not measure the Amended Warning's effect. They should be excluded. *See Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey where a "leading question . . . suggested its own answer").

Take, for example, the consumption question: "George drinks 1 can of sugary soda per day. Samuel drinks 5 cans of sugary soda per day. Which person is more likely to gain weight from drinking sodas?" Hammond Reb. Rpt. App. A at 38 (Table 8). The question not only suggested that the beverage is unhealthy, by describing it pejoratively as "sugary soda," but it also invited consumers to compare extremes: George consumes one can, while Samuel consumes *five*. *Id.* By inviting participants to decide whether someone who drinks five times the amount of "sugary soda" is more likely to gain weight, Dr. Hammond constructed a question to which participants would perceive only one obvious answer (and which did not address Plaintiffs' allegations in any event). *Id.*[10]

Dr. Hammond's question loaded the dice in two other ways. First, it presupposed (and conveyed to participants) that sugar-sweetened beverages cause weight gain. *See id.* (asking which of George or Samuel "is more likely to gain weight from drinking sodas"). Given that the question

---

[10] That a participant understands drinking five sodas a day is more likely to cause weight gain than drinking one soda a day says nothing about whether that participant understands the Amended Warning (1) to indicate that drinking beverages with added sugar, even in moderation, is likely to cause weight gain or (2) to suggest that sugar-sweetened beverages are more likely to cause weight gain than other foods and beverages with similar calories but no added sugar.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

17

expressly linked weight gain and drinking soda, it reinforced that participants should conclude that the individual who consumes significantly more soda is more likely to gain weight. Second, by isolating "drinking sodas" as a cause of weight gain, Dr. Hammond led participants to believe that they could answer the question without additional context—such as George's or Sam's overall diet or exercise, even though that information is necessary to determine whether and to what extent either one would gain weight.

Dr. Hammond's question on exercise and weight gain was just as leading: "Anna and Carmen both drink sugary sodas every day. Anna does not exercise at all. Carmen exercises a lot. Which person is more likely to gain weight?" *Id*. App. A at 39. Again, Dr. Hammond led participants to compare extreme opposites—one person exercises a lot and one never exercises at all. Unsurprisingly, participants overwhelmingly gave the expected answer.

Dr. Hammond's questions on "consumer beliefs about 'non-labeled' food and drinks" (*see* Table 9) were also leading and biased. *Id*. Dr. Hammond here asked participants to "indicate" their "level of agreement" with a list of statements: "Foods high in sugar (e.g., cookies, doughnuts, flavored yogurts, ice cream) can lead to weight gain"; "Foods high in calories (e.g., pizza, hamburgers, burritos) can lead to weight gain"; and "Milk drinks high in sugar (e.g., chocolate milk) can lead to weight gain." *Id*. App. A at 39-40 (Table 9).

Those were textbook examples of leading questions. First, Dr. Hammond used phrasing ("high in sugar" and "high in calories") that again suggested to participants that the selected foods and beverages were unhealthy and primed them to agree that those foods and beverages "can lead to weight gain." *Id*. That priming alone is a sufficient basis to exclude the question. *See Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994) ("A survey is not credible if it relies on leading questions which are inherently suggestive . . . ." (internal quotation marks omitted)); *Valador*, 242 F. Supp. 3d at 465 ("Suggestive questions render a survey unreliable by creating 'demand effects' or 'cues' from which a respondent can 'infer the purpose of the survey and identify the correct answers.'" (quoting 6 *McCarthy on Trademarks & Unfair Competition* § 32:172)).

Second, the foods and beverages that Dr. Hammond chose to highlight strongly suggested

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

18

the answer Dr. Hammond wanted. By offering up examples like cookies, doughnuts, ice cream, pizza, and burritos that most participants would associate with eating habits that can lead to weight gain (as opposed to foods that are less stigmatized, such as smoothies, sandwiches, and fruit), he strongly suggested that participants should agree with the statement that such foods can lead to weight gain. Unsurprisingly, almost no participants disagreed—the overwhelmingly one-sided nature of the questions makes clear what the expected right answer is. Because such questions were blatantly suggestive and leading, they do not provide reliable results. On that basis, the Court should exclude the questions and Dr. Hammond's opinions that rely on them.

### 2. Dr. Hammond's Effort To Show That The Amended Warning Does Not Interfere With The Intended Messages of Plaintiffs' Advertisements Should Be Excluded

Dr. Hammond claims that another part of his survey (reflected in Tables 2 through 5) "was conducted to directly test Professor Golder's hypothesis that the Amended Warning will overwhelm attention to SSB advertisements."[11] Hammond Reb. Rpt. ¶ 13. But the questions on which he relies failed to test that, and led to results that are irrelevant and unreliable. To the extent that they provide any insight at all, moreover, the responses actually undermine Dr. Hammond's conclusions. This part of Dr. Hammond's survey should therefore likewise be excluded.

Dr. Hammond asserts that the Amended Warning will not overwhelm sugar-sweetened beverage advertisements because survey participants who were exposed to a warning *and* noticed it spent "a greater amount of time looking at the SSB advertisements" than those who were not exposed to a warning at all. *Id.*; *see also id.* App. A at 34-35 (Table 2).

To begin with, Dr. Hammond impermissibly compares apples to oranges—effectively comparing those who paid more attention in the Warning Condition Group (those who noticed the

---

[11] Dr. Hammond's language is somewhat imprecise. Professor Golder concluded in his opening report that "[t]he Amended Warning will . . . disrupt and alter the message that consumers take away from advertisements containing the Amended Warning." Golder Rpt. ¶ 16. Professor Golder subsequently noted in his *rebuttal* report (submitted on the same date as Dr. Hammond's survey) that Dr. Scott's results affirmed that the Amended Warning "will disrupt and, in many cases, overwhelm the advertisers' intended messages." Golder Reb. Rpt. ¶¶ 21-35. In any event, the relevant legal test examines whether the Amended Warning represents an "unjustified or unduly burdensome" incursion on protected speech. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
19 REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

warning) to *everyone* in the No Warning Condition Group (including those who may have devoted little attention to the survey). His failure to compare equivalent populations impermissibly biases his results. *See Palmisano v. Olin Corp.*, No. 03-cv-1607, 2005 WL 6777560, at *5 (N.D. Cal. June 24, 2005) ("[A]ny step that renders [an expert's] analysis unreliable . . . renders the expert's testimony inadmissible.").

In any event, Dr. Hammond's methodology is again fundamentally flawed. He offers no justification for his claim that comparing how long participants look at ads with and without the warning reveals whether the Amended Warning is likely to interfere with a consumer's attention to an advertiser's message. Dr. Hammond measured only how long participants viewed an ad— not how much time participants were paying attention to the advertiser's intended message versus how much time they were paying attention to the warning. He ignores the obvious possibility that participants who spent more time viewing advertisements with the Amended Warning may have been focused on reading and thinking about the warning, *see, e.g.*, Golder Rpt. ¶ 86 (addressing research to that effect); in short, the mere fact that participants spent more time viewing an ad does not reveal which messages they were paying attention to or why. He points to no methodological basis for using these questions to measure whether the Amended Warning distracts from the advertiser's message, and his opinions based on this approach must be excluded. *See In re Viagra & Cialis Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) ("[U]njustified extrapolations from existing data can require exclusion of an expert's testimony.").

If anything, Dr. Hammond's survey results confirm the unreliability of his methods. Although he claims that the Amended Warning is unlikely to overwhelm the advertiser's message, his own data shows that *70%* of the Warning Condition Group recalled seeing a health warning, while only *10%* could even recall seeing a Coca-Cola or Pepsi logo even immediately after seeing an ad for those beverages, or remember most other attributes or images of that ad. Hammond Reb. Rpt. App. A at 36-37 (Table 5). Fewer than half of participants even remembered seeing an *ad* for Coca-Cola or Pepsi. *Id.* App. A at 35-36 (Table 4). Dr. Hammond's justification for leaping from these results to his conclusion that the Amended Warning does not overwhelm the advertiser's message remains a mystery and confirms that his opinions should be excluded. *See Gen. Elec. Co.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

1    *v. Joiner*, 522 U.S. 136, 146 (1997) (an expert cannot fill an analytical gap by *ipse dixit*).

2       Dr. Hammond argues that there was little difference in the ability of participants in the

3 Warning Group and No Warning Group to recall which brands were advertised or the specific

4 "pictures and images" that were included in the final advertisement (for Coca-Cola or Pepsi) that

5 they viewed. But participants' recall rates overall were abysmally low. Only 4% of participants

6 recalled seeing a "Pepsi can/bottle," while only 8.3% recalled seeing a "Coca Cola bottle" in an

7 ad that they had just viewed. Hammond Reb. Rpt. App. A at 36-37 (Table 5). As that underscores,

8 Dr. Hammond's results speak to his participants' inattentiveness—and likely their survey

9 fatigue—rather than anything about the Amended Warning's effect. Indeed, participants breezed

10 through the tested advertisement, spending an average of only 3.1 to 3.6 seconds viewing the Pepsi

11 or Coca-Cola ad. *Id.* App. A at 35 (Table 3).

12       Dr. Hammond also provides no basis for his claim that participants' ability to recall the

13 advertised brand or an ad's "pictures and images" reliably measures whether the Amended

14 Warning affected the participants' perception of the *message* that the ad conveyed. Dr. Hammond

15 makes no attempt to bridge the "analytical gap between [his results] and the opinion proffered."

16 *Joiner*, 522 U.S. at 146; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.

17 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply

18 inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of

19 that unreliable opinion testimony."); *see also In re Nat'l Collegiate Athletic Ass'n Athletic Grant-*

20 *in-Aid Cap Antitrust Litig.*, No. 14-md-02541, 2018 WL 4241981, at *6 (N.D. Cal. Sept. 3, 2018)

21 (excluding expert testimony because it was the product of *ipse dixit*).

22       The fundamental flaws in Dr. Hammond's survey design manifest in the sharp contrast

23 between his results and those of the other two consumer surveys presented in this case. The results

24 generated by the City's other survey expert, Dr. Scott, confirm the Amended Warning *does* reduce

25 participants' perceptions of brand messages (e.g., "[Brand] is refreshing" or "Dr. Pepper is one of

26 a kind"). Scott Rpt. ¶¶ 27, 35. Dr. Isaacson found the same. *See* Isaacson Rpt. ¶ 17(i). And both

27 surveys confirm that the Amended Warning is likely to alter and interfere with many consumers'

28 perceptions or first impressions of the advertisement's message. *See id.*; Kivetz Rpt. ¶ 19.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

For all those reasons, this portion of Dr. Hammond's survey is irrelevant and unreliable and should be excluded.

### 3. Dr. Hammond's Opinions Based On Irrelevant Questions About A Fictional "Crushed Melon" Soda Ad Should Be Excluded

Dr. Hammond finally asserts that several of his survey questions about a fictional "crushed melon" soda ad (Table 6 and 7) test whether the Amended Warning will "disrupt and alter the messages that consumers take away from advertisements." Hammond Reb. Rpt. ¶ 37 (claiming the data produced rebuts Dr. Golder's opinion). The questions, as designed, do no such thing, and this portion of Dr. Hammond's survey and the opinions derived from it likewise should be excluded as irrelevant.

For Questions 6 and 7, Dr. Hammond directed participants to a fictional ad (created by him) for a generic, nonexistent "crushed melon" soda. He asked participants: "Who does this ad target?" *Id*. App. A at 37. Participants could select: "Men," "Women," "Neither," "Both," "Don't Know." *Id*. Dr. Hammond then proceeded to ask: "What age group does this ad target?" *Id*. Noting that participants in both the Warning Condition Group and No Warning Condition Group gave similar responses, Dr. Hammond concludes that the Amended Warning will not disrupt brand perceptions.

That is junk science. Participants' guesses about whether a fictional ad for a fictional product targets men or women and kids or adults, shed no light on the whether the Amended Warning will undermine consumers' brand perceptions or advertiser's intended message. Dr. Hammond offers no basis for leaping from these questions to conclusions about brand perceptions because none exists.

In addition, Dr. Hammond's own opening report confirms that the Amended Warning *will* undermine consumers' brand perceptions in the real world. *See* Expert Report of David Hammond, Ph.D. ¶¶ 31, 46 ("Hammond Rpt."), Bress Decl. Ex. J (acknowledging Amended Warning will increase "perceived dangerousness" of warned-of brands, result in "significantly decreased perceptions" of their healthfulness, and reduce consumers' purchasing behavior). So too do the survey results of the City's principal survey expert. *See, e.g.*, Kivetz Rpt. ¶ 61 (noting

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

that Dr. Scott's results indicate that "participants who were exposed to the Warning were statistically significantly *less* likely to believe that the posters communicated that the advertised beverage is refreshing, tastes good, or is fun to drink, or that they should buy the beverage in question (among other positive brand messages, including both general and brand-unique messages")).

Dr. Hammond separately asked participants to report how much they thought they would "like or dislike the taste" of Dr. Hammond's fictional "crushed melon" soda. Hammond Reb. Rpt. App. A at 38 (Table 7). Because the Warning Condition Group and No Warning Group generated similar results, Dr. Hammond argues that the Amended Warning is unlikely to undermine brand perceptions of taste. Here again, his survey design was faulty. Having chosen a highly unusual flavor, he primed participants to respond based on their reaction to that flavor, rather than anything else. Regardless, his questions about a fictional product provide an unreliable measure of the Amended Warning's effect on real-world branded products. As noted above, Dr. Scott's survey of the Amended Warning's effect on real-world products establishes that the Amended Warning *does* interfere with and undermine positive brand messages, including with respect to the product's taste. *See* Kivetz Rpt. ¶ 61. Dr. Isaacson's survey shows the same. *See* Isaacson Rpt. ¶ 85.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. To the contrary, a court fulfills its responsibility as gatekeeper when it "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered" to justify the admission of expert testimony. *Id.* That is the case here. Like the other portions of Dr. Hammond's survey, this section is poorly designed and irrelevant to the opinions it purports to rebut.

**CONCLUSION**

Dr. Hammond's rebuttal report does not establish that he has the expertise to conduct a reliable consumer perceptions survey, and the survey he conducted here flunks the most basic requirements of survey design and methodology. The fundamental problems with this survey started with Dr. Hammond's failure to ensure a representative and unbiased sample, and were

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
23
CASE NO: 15-cv-03415-EMC

compounded by his unjustified decision to append the questions concerning this case to an entirely separate survey about cannabis use and his failure to construct questions that assess relevant issues in a non-leading way. The cumulative flaws in Dr. Hammond's survey require its exclusion. Plaintiffs therefore respectfully request that this Court exclude Dr. Hammond's survey and the testimony derived from it in his rebuttal report.

Dated: January 22, 2021          Respectfully submitted,

                                     LATHAM & WATKINS LLP

                                     By: */s/ Richard P. Bress*
                                        Richard P. Bress

                                        Steven M. Bauer (CA Bar No. 135067)
                                        LATHAM & WATKINS LLP
      505 Montgomery Street
      Suite 2000
      San Francisco, CA 94111-6538
      T +1.415.391.0600
      F +1.415.395.8095
      steven.bauer@lw.com

      Richard P. Bress (Admitted *Pro Hac Vice*)
      Michael E. Bern (Admitted *Pro Hac Vice*)
      George C. Chipev (Admitted *Pro Hac Vice*)
      Caroline A. Flynn (CA Bar No. 296691)
      Shannon Grammel (Admitted *Pro Hac Vice*)
      LATHAM & WATKINS LLP
      555 Eleventh Street, NW
      Suite 1000
      Washington, DC 20004-1304
      T +1.202.637.2200
      F +1.202.637.2201
      rick.bress@lw.com
      michael.bern@lw.com
      george.chipev@lw.com
      caroline.flynn@lw.com
      shannon.grammel@lw.com

      *Attorneys for Plaintiffs*
      American Beverage Association and
      California Retailers Association

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
24 REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC

By: /s/ *Theodore B. Olson*
Theodore B. Olson

Theodore B. Olson (CA Bar No. 38137)
Andrew S. Tulumello (CA Bar No. 196484)
Helgi C. Walker (Admitted *Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5306
T +1.202.955.8668
F +1.202.530.9575
TOlson@gibsondunn.com
atulumello@gibsondunn.com
hwalker@gibsondunn.com

Charles J. Stevens (CA Bar No. 106981)
Joshua D. Dick (CA Bar No. 268853)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA  94105-0921
T +1.415.393.8233
F +1.415.374.8469
CStevens@gibsondunn.com
jdick@gibsondunn.com

*Attorneys for Plaintiff*
California State Outdoor Advertising
Association

## **ATTESTATION CLAUSE**

Pursuant to Civil Local Rule 5-1(i)(3), I hereby certify that I obtained in the filing of this document the concurrence from all parties whose electronic signatures appear above.

Dated:  January 22, 2021

/s/ *Richard P. Bress*
Richard P. Bress

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO EXCLUDE IN PART EXPERT REBUTTAL
25 REPORT & TESTIMONY OF DR. DAVID A. HAMMOND
CASE NO: 15-cv-03415-EMC